# 16-cv-7476

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/5/17

## US District Court
## Southern District of NY

------------------------------------

## MOHAMMED QUADIR
### Plaintiff

### v.

## NEW YORK STATE DEPT. of LABOR (DOL)
### Defendant

1

RECEIVED SDNY PRO SE OFFICE
2017 APR -5 PM 4:54
S.D. OF N.Y.

------------------------------------

## Plaintiff's Response & Opposition to Defendant DOL's 2/8/17 Motion to Dismiss
## For: USDC SDNY **Judge J. Paul Oetken**

------------------------------------

## Mohammed Quadir, *Pro Se*
## 120 Alcott Place, Apt. 2A
## Bronx, NY 10475
## (646) 327-3667[1]

---

[1] Defendant DOL has consented to electronic notification in this case. A courtesy copy will be mailed (or otherwise consigned) to the Court at around time of filing. Please see my separate apology and explanation letter to the Court, which will be submitted before the end of this week, for the one-day-and-a-half tardiness in submitting this Response and Opposition to DOL's MTD due to all the issues I am currently facing.

# (1) INTRODUCTION

In Plaintiff's Response and Opposition to Defendant DOL's 2/8/17 Memorandum of Law in Support of Its Motion to Dismiss (Memorandum), I will address all of the major claims, points and arguments made by DOL actually requiring a response while largely ignoring/disregarding other obvious claims and points proffered by DOL (due frankly to extreme time constraints, illness, lack of employment and health insurance, numerous other stressors in addition to other reasons), which are largely immaterial and/or inapplicable to the facts in this 2nd lawsuit such as for example whether or not federal law bars me from even initiating this legal action against DOL. It does not as I believe my (this) 2nd suit against NYS Labor Dept. (DOL) is fully permitted under the federal Rehabilitation Act of 1973 since DOL (and more broadly the State of NY) is a receipt of federal largesse. As such, DOL's claim of 11th Amendment Sovereign Immunity falls short. (See ECF 2, Filed 9/23/16, p. 1 of 43.)

I will however address DOL's claims that this 2nd lawsuit is automatically barred by Collateral Estoppel: very specifically, DOL claims this present suit is automatically precluded due to the District Court's earlier 6/29/16 dismissal of my first complaint (SDNY Case # 13-cv-3327, ECF 158), which is presently on appeal before the 2nd Circuit (Case # 16-2617); secondly, DOL further argues that my October 7, '15, forced/involuntary medical suspension from work without pay should not even be reviewed by the Court because of a Hearing Officer's findings in a NYS Civil Service Law (CSL) Section 72 hearing. I will also[2] address and answer numerous other factual inaccuracies proffered by DOL in its very inaccurate, misleading, and (in some cases) false description of the facts pertaining to this present 2nd lawsuit and the earlier 1st lawsuit as well. This also includes briefly addressing DOL's "**POINT III Plaintiff Fails to State a Cause of Action**"—see ECF 13, Filed 2/8/17, pp. 21-27 of 27, where this is discussed by DOL in its present MTD.

Before concluding this introductory section, I am also respectfully requesting the District Court, at a bare minimum, please very carefully review the following documents: **(1)** all 139 pages of my (this) 2nd SDNY lawsuit (i.e., ECF 2, 2-1, 2-2, & 2-3—Filed 9/23/16); **(2) newly submitted Exhibit pp. 7-16** (my 10-page submission to the NYS Civil Service Commission very briefly summarizing why the Hearing Officer's 4/11/16 decision as repeatedly alluded to by DOL in its present Motion to Dismiss—MTD—was in grievous error); **(3)** my 2/22/16 Declaration (ECF 134-2) & my 3/23/16 Supplemental Declaration (ECF 154-1) pertaining to my first (now-dismissed) SDNY lawsuit (Case # 13-cv-3327); and **(4)** my Principal and Reply Briefs submitted to the 2nd Circuit (2ca Case # 16-2617, ECF 28, Filed 11/16/16 and ECF 55, Filed 3/17/17, respectively).

If the Court very carefully reviews the foregoing documents, as I am requesting, it will see that many of the claims and arguments which are now being put forward by DOL in its present MTD (ECF 13, Filed 2/8/17) to be inaccurate, misleading, and in some instances

outright false. This is even without me having to address and point out all of DOL's major inaccuracies and falsehoods, which I will surely do to a great extent.

## (2) DOL'S 1ST COLLATERAL ESTOPPEL ARGUMENT:

- **District Court's 6/29/16 Motion-for-Summary-judgment (MSJ) Ruling (ECF 158) in My 1ST Lawsuit (13-CV-3327) Does Not (& Should Not) Automatically Bar Consideration of All Retaliatory & Discriminatory Actions Against Me by DOL Very Specifically Since May 30, '14**

This 2nd legal action is not (and should not be) barred because of this Court's earlier dismissal of my first lawsuit on 6/29/16 (SDNY Case # 13-cv-3327, ECF 158) due to several reasons. The District Court in an order issued on 6/17/14 informed that "Plaintiff is free to file a new complaint alleging any wrongdoing after May 30, 2014"—ibid., ECF 37. The District Court should keep in mind that to date, I have been subjected to about 121 separate disciplinary write-ups and/or actions with only 9 of these occurring prior to the Court's cutoff date of May 30, '14.

3

The most recent disciplinary action against me was on Dec. 15, '16, when DOL terminated my employment with it (see ECF 10, Filed 1/10/17, pp. 4-5 of 8) not only for my medical disability, which DOL had full notice of, but for also engaging in a continuous unending series of legally protected activities after my first reasonable accommodation request to be exempt from teaching duties was denied on Feb. 14, '12, by the Labor Dept. (See SDNY Case # 13-cv-3327, ECF 5-5, pp. 44-46 of 84 for this denial letter.) And I was subjected to frequent workplace harassment and insults (that "I was not pulling my weight" due to my illness and so on) only 2 months after my initial approval to be exempt from teaching workshops in February 2011. I discussed this in numerous prior filings in my first lawsuit. As just one example of many, please see SDNY Case 13-cv-3327, ECF 35, Filed 6/3/14, pp. 14 & 25 of 51.

Additionally, the District Court's 6/29/16 dismissal of my first lawsuit is being appealed to the 2nd Circuit and I believe was in error. The reasons for why I believe it was in error can be found in the Principal & Reply Briefs filed by me with the Circuit. As such, I am respectfully requesting that the District Court please review both my 11/16/16 Principal Brief (Case # 16-2617, ECF 28) and my 3/17/17 Reply Brief (ECF 55). Essentially, what I am directly requesting to the District Court here is that this Court not automatically bar itself from considering all of the discriminatory and retaliatory actions taken by DOL against me since May 30, '14. My new assertions should be decided on their merits based on arguments

and evidence submitted in this new 2nd case.  The Court should not bind itself based on its earlier 6/29/16 opinion in my first lawsuit.

## (3) <u>DOL'S 2ND COLLATERAL ESTOPPEL ARGUMENT:</u>

- **Hearing Officer's 4/11/16 Arbitrary, Capricious, & Erroneous Opinion & Recommendation in My 10/7/15 Medical Suspension Without Pay Case Does Not (& Should Not) Automatically Bar a Separate and Independent Review of the Matter by the Courts**

My complaint is not (and should not be) automatically barred because of the Hearing Officer's April 11, '16, adverse determination in my case upholding DOL's forced and involuntary medical suspension of my employment with it without pay effective October 7, '15.  Why?  Because not only was the Hearing Officer's decision in grievous error not supported by the facts and evidence submitted (and in at least one instance very clearly contrary to the law—i.e., federal FMLA statute), but he was also very arbitrary and capricious (among other things) in how he actually conducted the hearings—in very arbitrarily changing the rules of the hearing itself in the middle of the hearing to favor evidently one party (DOL) over the other.  As such, the hearing I received in my view certainly cannot be described as fair, impartial and unbiased.

Additionally, as I discussed in an earlier submission to the Court (ECF 15, pp. 2-3 of 5), ". . . while DOL deemed it important enough to assign both a DOL attorney (Robert F. Axisa) and Regina Shields (**DOL's** Labor Relations Representative) to prosecute its 10/7/15 medical suspension case against me, the PEF union assigned a PEF Field Representative (without an accompanying PEF attorney) to represent my legal interests during the hearing.  An attorney was not assigned by PEF to represent me during the hearing.  (As proof, please see ECF 12-3, Filed 2/8/17, p. 1 of 17, under the Appearances heading.)"  The Court should further keep in mind that the NYS Civil Service Commission to which my 10/26/16 appeal of the hearing officer's 4/11/16 adverse determination, in my medical suspension case, was filed is after all a political instrumentality of the State of NY.  Members of the Commission are appointed entirely through a political process and are not neutral and impartial judges and/or arbiters of cases and controversies that come before it.

I am asking the Court to very carefully review my newly submitted 10-page 10/26/16 appeal to the Civil Service Commission.  Please see **newly submitted Exhibit pp. 7-16** as to why this hearing officer's decision is biased and in grievous error.  As I respectfully articulated to the Court before (ECF 15, Filed 2/21/17, p. 2 of 5), it is my belief the District Court should render its decision in this case based on the arguments and evidence submitted before it and

4

not automatically adopt the decision of a hearing officer who was paid $12,000 by DOL. He was paid this sum only after he issued his adverse determination, in my medical suspension without pay case, on April 11, '16. I paid him nothing and neither did the PEF union.

## (4) DOL's "POINT III Plaintiff Fails to State a Cause of Action"

- **DOL Claims My Failure-to-Accommodate Claim, for an Altered Morning Work Schedule at Reduced Pay, Should be Dismissed**

In a section entitled "Plaintiff Fails to State a Cause of Action" DOL claims that my complaint should be dismissed in its entirety. This includes my "Failure to Accommodate" claim, "Disability Discrimination" claim, and my "Retaliation" claim. (See DOL's 2/8/17 MTD—i.e., ECF 13, Filed 2/8/17, pp. 21-27 of 27.) Towards this end, DOL begins by deliberately misrepresenting (ibid., p. 22 of 27) my November 12, '14, meeting with Bronx DOL Manager Atel Sheffey during which the subject of my medical need for an altered morning work schedule or morning grace period (at reduced pay of course) came up.

During this Nov. 12, '14, meeting Mr. Sheffey very specifically asked me why I frequently  5 come to work late in the morning. I explained to him that my tardiness was due very significantly to my illness. In response, Mr. Sheffey informed me that despite whatever medical issues and illness I have I would still have to come to work at 9am. In essence, he was flat-out denying my request for a reasonable accommodation to come to work a little later in the morning (let's say at 9:30 or 9:45am) at reduced pay of course.

Mr. Sheffey did not ask me for a medical note, did not give me the option of submitting a medical note to him or the DOL agency for consideration, and did not even give me the option of filing a formal reasonable accommodation (RA) request with DOL's DEOD office in Albany, NY. Even if I had filed a formal RA request with DEOD in Albany that request would still have to be signed off on by Mr. Sheffey with his recommendation for either approval or disapproval. (And supervisory approval or disapproval carries very significant sway as to whether or not an employee's RA request is either or approved or disapproved by DOL DEOD.)

Additionally, DOL neglects to mention that a frontline office manager or supervisor like Sheffey has the direct authority to approve on-the-spot RA requests even without involving DOL DEOD's cumbersome and time-consuming formal RA process. Sheffey testified during his federal court deposition in 2015, which he was required to attend, that he had approved the RA requests (2 of them) of another Bronx DOL worker/LSR (Martin Brennan) even without involving DOL DEOD in Albany. As proof, please see his deposition testimony on SDNY 47-49—i.e., ECF 2-1, pp. 8-10 of 38.

Furthermore, former DOL DEOD Director, Omoye Cooper, and former Affirmative Action Administrator 3, Joseph Kabance testified during their respective federal court deposition in 2015, that a frontline manager or supervisor, like Sheffey, had the direct authority to approve RA requests made by employees even without involving DOL DEOD. As proof, please review my 3/23/16 Supplemental Declaration from my first federal action: Case # 13-cv-3327, ECF 154-1, pp. 5-6 of 10, paragraph 14.

However, while informally approving the RA requests of other Bronx DOL workers even without involving DOL DEOD, Sheffey always, always insisted that I always (always) go through DOL's formal, time-consuming, and cumbersome process for the approval of my RA requests. And in this particular case, involving my RA request again (again on Nov. 12, '14) for an alternate morning work schedule Sheffey did not even give me the option even to formally file for a RA request with DOL DEOD in Albany, NY. Instead, he just made a final, on-the-spot decision on behalf of the DOL agency to deny my RA request for an altered morning work schedule—at reduced pay of course due to illness

Mr. Sheffey after being reminded once again (once again) of my need for an accommodation to come to work a little later in the morning (at reduced pay of course), made an on-the-spot decision to deny my RA request for a morning grace period.[2] He followed up his Nov. 12 verbal decision with an email he sent me on the very next day on Nov. 13, '14, @ 12:20pm, in which he formally on behalf of the Labor Dept. reiterated his position that I still had to come to work at 9am despite my illness because I had been placed on "time restrictions"—in 6 other words "full restrictions," which has led to me automatically being denied the accrual of any leave days whatsoever since at least April 22, '14, the cumulative value of which is likely in excess of $20,000. **Please see SDNY 46 for this Nov. 13, '14, email from Sheffey**—i.e., ECF 2-1, Filed 9/23/16, p. 7 of 38—formally denying my request for a morning grace period or altered morning work schedule at reduced pay due to illness.[3]

(Please also see my 2/22/16 Declaration submitted as part of my first lawsuit where I discussed at greater length the broader financial—i.e., loss of pay—and other implications of having been placed on "full restrictions" since April 22, '14—SDNY Case # 13-cv-3327, ECF 134-2, pp. 10-13 of 13, paragraphs 39-49. I also discussed in numerous—and I do mean numerous—prior filings with the Court Mr. Sheffey's Nov. 12-13, '14, RA denials. As just another example of where I discuss Mr. Sheffey's Nov. 12 & 13, '14, denials of my altered morning work schedule at reduced pay request, please see SDNY 41-43, & 46—ECF 2-1, pp. 2-4 & 7 of 38 of this very complaint and please also see **newly submitted Exhibit p. 13**, which is part of my 10/26/16 10-page appeal to the NYS Civil Service Commission.)

---

[2] DOL's attorney certainly did not tell the truth when he claimed that I asked Sheffey specifically for permission to deliberately come to work late in the morning without consequence—ECF 13, p. 22 of 27.
[3] Incidentally, as I understand it, authorizing a morning grace period or an altered or reduced work schedule at reduced pay is an extremely common accommodation granted by employers all throughout the country. Nothing unique or unusual about a morning grace period at reduced pay!

The Bronx DOL supervisors have known illness was the reason for my tardiness since at least May 1, '13. As proof, please see page 10 of 13, paragraph 39 and also paragraph 5 on page 2 of 13 from my 2/22/16 Declaration (ECF 134-2) filed in my first lawsuit (13-cv-3327) having to do with the imposition of "full restrictions," which has led to me automatically being denied the accrual of any leave days whatsoever since 4/22/14, the cumulative value of which is in excess of $20,000 by now. Since May 1, '13, I have repeatedly reminded the Bronx DOL supervisors of my need for a medical accommodation that would allow me to report to work a little later in the morning at reduced pay—ibid., paragraph 41.

However, not only did the Bronx DOL supervisors not do anything to accommodate my illness in any way, their harassment and retaliation against me only intensified. On April 22, '14, I was formally placed on "full restrictions"—a highly punitive measure—as a result of which I have automatically been denied the accrual of any leave days whatsoever the cumulative value as of today is very likely well in excess of $20,000—ibid., paragraph 42.

In the interim, I repeatedly kept reminding the Bronx DOL supervisors during numerous disciplinary counseling and write-up sessions that I was late to work due to illness. But the Bronx DOL supervisors still did not take any action to accommodate me. As previously discussed, the Bronx DOL supervisors had the direct authority to accommodate me by altering my morning work schedule at reduced pay even without involving DOL DEOD in Albany.

Thereafter, Bronx DOL Office Manager, Atel Sheffey, met with me once again on Nov.      7
12, '14, to ask me yet again why I was coming to work late. After being reminded again illness was the reason for my tardiness, he advised me that irrespective of my illness I still had to report to work at 9am. Mr. Sheffey formalized his denial of my reasonable accommodation request, on behalf of the DOL agency, in an email he sent me the very next day at 12:20pm—see SDNY 46.

The next year DOL served me with a Notice of Discipline (NOD) dated June 12, '15 (ECF 12-1, Filed 2/8/17), for mainly my tardiness, which DOL deliberately chose not to accommodate despite having had notice of my need for such an accommodation since at least May 1, '13—as previously noted in this Plaintiff's Response and Opposition to DOL 2/8/17 MTD. Eight week suspension without pay was the punishment associated with the June 12, '15, NOD. Furthermore, the NOD cites all of my tardiness specifically after Nov. 12, '14 (date of my meeting with Atel Sheffey to discuss my tardiness and need for altered morning work schedule at reduced pay) as justification for the 8-week disciplinary suspension without pay—ibid., p. 4 of 17.

At least up to 40% of my absences were due to constant retaliatory harassment faced at work not only due to my disability (which DOL also deliberately refused to accommodate), but also for daring to partake in a legally protected activity—i.e., prosecution of my various anti-disability-discrimination complaints to the present day against DOL since at least May of 2013 when my first discrimination complaint was filed in the Southern District—see Case #

13-cv-3327, ECF 5, Filed 5/31/13.[4]  And just 3 to 4 days after filing my Amended Complaint with the District Court on May 31, '13 (after having first filed my first complaint at least a couple of weeks earlier in the middle of May 2013), I received my first disciplinary write-up on June 3, '13.  I discuss this in my 2/22/16 Declaration from my first lawsuit—ibid., ECF 134-2, p. 10 of 13, paragraph 39.  The Court should also review paragraphs 6-10 from the foregoing 2/22/16 Declaration, where I discuss the testimony of several of my Bronx DOL LSR co-workers who felt I was being subjected to "heightened scrutiny," that it was "unbelievable" how many write-ups I had received, that "tiny, tiny infractions that all of us incur that are only addressed to Mohammed" and so on.

- ## DOL Claims My Disability Discrimination Claim Should be Dismissed

DOL claims that I admitted in my prior complaints to the Human Rights Division (HRD) and the EEOC that the 2 prescription anti-depressants I take make me incapable of working, which is of course not only false, but total nonsense.  Towards this end, DOL cites "SDNY 55, 65, 67, 69, 121."  (See ECF 13, Filed 2/8/17, p. 23 of 27.)  However, a careful review of SDNY 55 and 121 as just two examples, very clearly reveals I never alleged my medications made me incapable of working at all.  SDNY 55 and 121 make it exceptionally clear I would 8 have difficulty reporting to work at exactly 9am, but required a later alternate morning schedule (at reduced pay of course).  The accommodation being requested, which DOL repeatedly denied, was for DOL to permit me to come to work a little later in the morning such as at 9:30am or 9:45am—at reduced pay of course.

Additionally, my work performance reports from May 2014 to May 2015 very clearly reveal that during this time I not only met DOL's numerical standard of 95% or above, but repeatedly exceeded them despite my illness when many of my LSR co-workers, without medical handicaps, were not.  The District Court should not just take my word for it, but should look at the actual submitted evidence from my first case (13-cv-3327), which is ECF 137-1, Filed 2/22/16.  Also, as part of ECF 137-1 are emails to me from the Bronx DOL supervisors complementing me for my professionalism in dealing with customers (ibid., p. 22 of 24); complementing me for exceeding all the REA measurements (ibid., p. 23 of 24); and getting my work done on time despite my medical handicap (ibid., p. 24 of 24).  I exceeded all of DOL's numerical standards despite my medical issues and more importantly

---

[4] The fact up to 40% of my absences were due to constant workplace retaliatory harassment is even documented in my medical charts—unredacted copies of which were consigned to the District Court as part of my first lawsuit sometime during 2016.  I actually discuss all this in my 2/22/16 Declaration from the first lawsuit—ECF 134-2, p. 12 of 13, paragraph 46.

irrespective of the constant retaliatory harassment I was being subjected to at work due to my illness and in retaliation for engaging in an unending series of legally protected activities.[5]

DOL relies very heavily on the hearing officer's 4/11/16 opinion and "findings" in my Oct. 7, '15 medical suspension case from DOL without pay "that plaintiff was incapable of performing his job, with or without an accommodation"—ECF 13, Filed 2/8/17, p. 23 of 27. As noted before, the hearing officer's decision was not only arbitrary and capricious, not supported by the evidence, but the hearing officer changed the rules of the hearing literally in the middle of the hearing to evidently favor one party (DOL) over the other in addition to using my approved FMLA request from 2012 as another piece of evidence against me—the latter likely in clear contravention of the federal FMLA law.

In addition to very heavily relying on the hearing officer's 4/11/16 opinion and "findings" in my Oct. 7, '15 medical suspension case, DOL also relies very heavily on the District Court's earlier 6/29/16 dismissal of my first lawsuit (SDNY Case # 13-cv-3327, ECF 158). For the most part, DOL does not really even attempt to address, in this 2nd new legal action, my detailed allegations of disability discrimination and retaliation. And on the rare occasions it does make such an attempt to refute my detailed allegations, it does so by deliberately misrepresenting and misstating my previously articulated positions or in some cases just simply flat-out lying about them. As just one example, as previously noted, DOL flat-out lied when it claimed in its Memorandum of Law in Support of Its Motion to Dismiss (Memorandum) that I ever admitted to the EEOC or the Human Rights Division that I am ". . .not otherwise qualified to perform his [my] job duties with DOL." (See ECF 13, Filed 2/8/17, p. 23 of 27.) This is of course categorically false as I made no such absurd admission.

In its Memorandum (ECF 13, p. 24 of 27), DOL claims that "[c]ourts have held that 'negative performance evaluations, standing alone, cannot constitute an adverse employment action.'" Thereafter, DOL appears to make the claim that my 2014-2015 2nd unsatisfactory annual evaluation for the 2nd year in a row did not lead to the loss of pay or benefits. False!

The 2nd unsatisfactory annual evaluation I received for the 2014-2015 period did in fact lead to the denial of an automatic pay raise, which I would have otherwise been eligible for. I have never been paid that automatic increase in salary. Not only that, but DOL never even rendered its decision on my Step One internal appeal of the 2014-2015 unsatisfactory evaluation, which further violated my rights. This is because if DOL had rendered a Step One determination on my appeal, it would have allowed me to file a Step Two appeal with a far more neutral statewide appeals board. I actually discuss this in my 10/26/16 10-page appeal to the NYS Civil Service Commission in my separate, medical suspension from DOL without pay, case—see **newly submitted Exhibit p. 15.**

---

[5] To date, I have been subjected to about 121 disciplinary actions and/or write-ups the most recent of which was my termination from employment by DOL effective Dec. 15, '16—see ECF 10, Filed 1/10/17, pp. 4-5 of 8 fort this termination notice.

DOL is similarly in obvious error when it appears to suggest my medical suspension from DOL without pay effective Oct. 7, '15, did not lead to the loss of pay and/or benefits. Of course it did as I have not been earning my regular DOL salary since Oct. 7, '15. And more recently DOL even terminated my employment with it effective Dec. 15, '16—see ECF 10, Filed 1/10/17, pp. 4-5 of 8 for this termination notice. That termination along with other retaliatory and/or adverse employment actions, such as termination of my health insurance in 2016, are not part of this 2ⁿᵈ lawsuit, but I suspect will be part of the 3ʳᵈ (yet to be filed) lawsuit against DOL.

DOL argues that my 8-week suspension without pay during June 2015 did not lead to a loss of pay or benefits (ECF 13, p. 24 of 27), because I had challenged that determination and as a result DOL never sought to enforce its own retaliatory and/or adverse employment action against me. **Instead of considering this particular adverse employment action as an isolated incident, the Court needs to look at the broader overall picture here, which is that I have been subjected to about 121 separate disciplinary write-ups and/or actions— the most recent of which was my termination from employment effective Dec. 15, '16—ever since I filed my first lawsuit against DOL in May 2013.**

My case may be somewhat unique in that I do not think most *pro se* plaintiffs (with very limited financial resources) who assert a charge of disability discrimination and retaliation are ever subjected to about 121 separate, continuing, and non-ending series of disciplinary write-ups and/or actions with some directly affecting pay or benefits with others (such as forcibly and very unnecessarily moving the employee from one floor to another) while not directly affecting pay are done simply to retaliate and harass the employee (i.e., cause the employee enormous stress, which can cause and/or prolong illness) not only for the medical handicap, but also for daring to partake in a legally protected activity—i.e., prosecution of the complaint. It is with this mind, I am respectfully suggesting the Court should consider my somewhat unique case and complaint.

Before concluding this section it needs to be noted, DOL is absolutely correct (absolutely it is) when it claimed on page 25 of 27 of its 2/8/17 Memorandum (ECF 13) that my tardiness was due to my disability, which, by the way, DOL deliberately refused to accommodate despite repeatedly being given notice of my need for an alternate morning work schedule at reduced pay—as previously mentioned in an earlier section of this Plaintiff's Response. DOL however is absolutely incorrect that my absences were due solely to my disability. My medical reports indicate that 40% of my absences were due to constant retaliatory harassment at work. Unredacted copies of these medical reports were consigned to both to DOL and the District Court as part of my first lawsuit sometime during 2015 or early 2016. I actually discuss all this in my 2/22/16 Declaration from the first lawsuit—ECF 134-2, p. 12 of 13, paragraph 46, SDNY Case # 13-cv-3327.

- ## DOL Claims "Plaintiff has Failed to Plead a Retaliation Claim"

In this section of its Memorandum, DOL once again tries to knowingly and deliberately misrepresent the facts. The Defendant claims that "DOL's seven disciplinary write-ups of plaintiff in June to August 2014 predate each of the protected activities identified above." (See ECF 13, Filed 2/8/17, p. 25 of 27.)   In this section of its Memorandum (ibid.), DOL makes it abundantly clear that the 4 protected activities it is referring to are my 6/8/15 DHR complaint (SDNY 1-3—i.e., ECF 2, Filed 9/23/16, pp. 5-7 of 43); my 9/14/15 EEOC complaint (SDNY 51-59); my 9/16/15 DHR complaint (SDNY 63); and finally my 11/6/15 EEOC complaint (although DOL incorrectly notes the filing date as being 11/15/15—see SDNY 119, i.e., ECF 2-2, Filed 9/23/16, p. 42 of 43, for the correct filing date of 11/6/15).

Here is what DOL deliberately neglects to mention:

1. From **June 2014 to the end of August 2014**, I was actively prosecuting my first lawsuit as a *pro se* litigant. The Docket Sheet from my first SDNY lawsuit (case # 13-cv-3327) reveals that on 6/3/14 I filed my Comprehensive Consolidated Supplemental Pleading with this very Court (ECF 35). On 8/29/14 (the last ECF entry for August 2014) reveals that I penned a letter for the Court (ECF 60). And in the interim there were in excess of 20 ECF filings, actions, or entries—i.e., ECF 36 to 59. All of the foregoing were legally protected activities for which I was repeatedly being retaliated against in the form of constant disciplinary counseling sessions and at least seven disciplinary write-ups.                                                                                11

2. From **9/18/14 to all the way to the end of July 2016**, my first lawsuit was being prosecuted by counsel. (See Docket Sheet from my first legal action.) Therefore, at a bare minimum, from June 2014 to the end of July 2016, I was engaging in a never-ending series of legally protected activities, which included not only active prosecution of my first federal lawsuit, but the 4 filings with the DHR & EEOC—2 with DHR and 2 with EEOC. DOL's Exhibit A (ECF 12-1, Filed 2/8/17, p. 7 of 17) further reveals that I received at least 11 (not 10) disciplinary write-ups very specifically between June 6, '14 to January 29, '15. DOL's attorney knows all this especially because at that time (as is also the case today) he was the lead counsel on behalf of this Defendant DOL. Yet he pretends as if he does not know any of this.

And as I noted in a prior section of this Plaintiff's Response and Opposition, the Court should not consider each of the separate 121 disciplinary write-ups and/or actions I received as isolated incidents. Instead it should **look at the broader overall picture here, which is that I have been subjected to about 121 separate disciplinary write-ups and/or actions— the most recent of which was my termination from employment effective Dec. 15, '16**—ever since I filed my first lawsuit against DOL in May 2013. Since May 2013, I have been partaking in an unending series of legally protected activities.

DOL implies the 9/21/15 "evaluation" conducted by DOL's paid-for psychologist Wapner (not a licensed medical physician, which is what my psychiatrist is) was fair, unbiased, and objective. It was not for some of the reasons I indicated in my 10-page 10/26/16 submission to the NYS Civil Service Commission—see **newly submitted Exhibit pp. 7-16**—where I briefly and succinctly address this. One of the reasons was his utter failure to actually review my work performance reports and workplace commendations for at least 13 consecutive months from May 2014 to May 2015.[6]

These performance reports as previously discussed very clearly reveal that during this time I not only met DOL's numerical benchmark of 95% or above, but repeatedly exceeded them despite my illness when many of my LSR co-workers, without medical handicaps, were not—SDNY Case # 13-cv-3327, ECF 137-1, Filed 2/22/16, i.e., Exhibit 28 from my first lawsuit. Also, as part of ECF 137-1 are emails to me from the Bronx DOL supervisors complementing me for my professionalism in dealing with customers (ibid., p. 22 of 24); complementing me for exceeding all the REA measurement (ibid., p. 23 of 24); and getting my work done on time despite my medical handicap (ibid., p. 24 of 24). I exceeded all of DOL's numerical standards despite my medical issues and more importantly irrespective of the constant retaliatory harassment I was being subjected to at work due to my illness and in retaliation for engaging in an unending series of legally protected activities.[7]

Lastly, DOL's claim that psychologist Wapner is an employee of the NYS Employee Health Service (EHS) not DOL does not in any way resolve whether or not he had a natural incentive to fulfill his employer's wishes for an adverse finding and recommendation in my case. Both EHS and DOL are NYS government entities with their employer being the one and only State of NY. Under the law I believe they are one and the same.

# (5) CONCLUSION

For all the foregoing reasons, the Defendant DOL's 2/8/17 Motion to Dismiss should be denied by the Court. The Court should allow my case to proceed to Discovery. The Court, I respectfully submit, should make its determination in this case based on the information and evidence submitted directly before it and not automatically adopt, without conducting a separate and independent review, the deeply flawed, erroneous, and arbitrary and capricious,

---

[6] Additionally, I have notes from my psychiatrist that I am fully capable of working. My psychiatrist is a licensed medical physician who is authorized to write prescriptions, which DOL's psychologist Wapner is not.

[7] To date, I have been subjected to about 121 disciplinary actions and/or write-ups the most recent of which was my termination from employment by DOL effective Dec. 15, '16—see ECF 10, Filed 1/10/17, pp. 4-5 of 8 fort this termination notice.

and biased determination and "findings" of the hearing officer assigned to hear my 10/7/15 medical suspension from DOL without pay case. Additionally, the Court, I respectfully submit should not rely exclusively on its earlier 6/29/16 ruling dismissing my 1st lawsuit in its entirety either as that case is presently on appeal and there were a number of very relevant factual errors made by the Court in that ruling. I thank the Court.

Sincerely

Mohammed Quadir

Mohammed Quadir
Plaintiff *Pro Se*
(646) 327-3667

13

# NEWLY SUBMITTED EXHIBITS TABLE OF CONTENTS[8]

(1) 10-PAGE 10/26/16 APPEAL FILED WITH THE NYS CIVIL SERVICE COMMISSION OF HEARING OFFICER, DENNIS J. CAMPAGNA'S, VERY WRONGFUL APRIL 11, 2016, DECISION UPHOLDING MY 10/7/15 INVOLUNTARY/FORCED MEDICAL SUSPENSION FROM DOL WITHOUT PAY.......................................................EXHIBIT PP. 7-16

14

---

[8] The last exhibit submitted—i.e., Exhibit p. 6—can be found in ECF 15, Filed 2/21/17, p. 5 of 5.

**New York State**
# PUBLIC EMPLOYEES FEDERATION AFL-CIO
205 Montague Street
Suite 400
Brooklyn, NY 11201

10-26-16

(718) 637-2019
(866) 897-9775
Fax (718) 637-2024

OFFICERS:

Wayne Spence
*President*

Kevin Hintz
*Secretary-Treasurer*

Adrelna Adams
Peter Banks
Nikki Brate
*Vice Presidents*

REGIONAL
COORDINATORS:

Rocco Brindisi
Region 1

Andrew Puleo
Region 2

John Prince
Region 3

Charles McRorie
Region 4

David Dubofsky
Region 5

Jeanette St. Mary
Region 6

Ed Snow
Region 7

Mike Blue
Region 8

Vivian Street
Region 9

Sheik Nabljohn
Region 10

Jemma Marie-Hanson
Region 11

Nora Geiser
Region 12

TRUSTEES:

Maureen Keltman
Sarah Lauser
Maddie Shannon-Roberts

**OVERNIGHT**

October 26, 2016

New York State Civil Service Commission
The Office of Commission Operations & Municipal Assistance
New York State Department of Civil Service
Empire State Plaza, Agency Building #1
Albany, New York 12239

RE:  **In the Matter of**
     **Mohammed Quadir and**
     **New York State Department of Labor (DOL)**
     Pursuant to Section 72 of the New York
     State Civil Service Law
           And
     Psychologist Evaluation of March 8, 2016

Dear Commissioner:

This letter is being submitted by the Public Employee Federation (PEF) on behalf of Mohammed Quadir to appeal the April 18, 2016 DOL "final determination" placing Mr. Mohammed Quadir on an involuntary Civil Service Law Sec. 72 Leave and the Employee Health Service, Psychologist, Evaluation of March 8, 2016. Also, included is Mr. Quadir's "Ability to Work" Statement.

The grounds for our appeal include but are not limited to the following:

ARGUMENT 1:  Mr. Mohammed Quadir (Appellant) was "Fit For Duty" on October 7, 2015 when Mr. Quadir was placed on involuntary leave. Mr. Quadir was performing the essential duties of his position at the time and was able to continue these duties.

During Mr. Quadir's total work history with the New York State Labor Department, Mr. Quadir has been preforming the essential duties of his position as shown by the Labor Department's performance evaluations and statistic records. Mr. Quadir's co-workers have also confirmed his ability to meet the essential duties of his position.

On March 8, 2016 the Employee Health Service re-evaluated Mr. Quadir based on Mr. Quadir's doctor's letter indicating that he was well enough and prepared to return to his position. The evaluation's determination indicated that "he is not functioning well enough to perform his duties in a consistent manner." This determination was based on the determination that Mr. Quadir was experiencing moderate levels of clinical depression. Presently, Mr. Quadir is ready to go to work and this determination only indicated moderate levels of clinical depression. Also, it was felt that Mr. Quadir's absences were a further reason for concluding that he was not able to return to work. Presently, Mr. Quadir has indicated to me, Mr. Markman, that his issues with absences will no longer be a problem.

ARGUMENT 2:  Mr. Quadir was placed on involuntary leave on October 7, 2015. This was a result of the Employee Health Service letter September 25, 2015 that found Mr. Quadir unfit for work. The involuntary leave was pursuant to CSL Sec. 72.1. DOL never invoked CSL Sec. 72.5. CSL Sec. 72.5 was never stipulated by the parties as an issue before the arbitrator. Regardless the standard for CLS Sec. 72.5 was not met.

The record will show that what was to be considered was the Labor Dept.'s decision to send Mr. Quadir to the Employee Health Service for evaluation based on Section 72.1 of the Civil Service Law. In arbitrator Campagna's decision, he cites Section 72.5 of the Law. On October 7, 2015, Mr. Quadir was placed on involuntary leave based on the recommendation and medical evaluation of September 21st of 2015. Mr. Quadir was sent for evaluation to the Employee Health Service based on a letter dated August 12, 2015 in which Ms. MaryAnn Wilson requested a medical evaluation. Mr. Quadir continued working until he was informed that he was being placed on involuntary medical leave. The NYS Labor Dept. never exercised their right under Section 72.5, which allows them to immediately suspend someone and send them for a medical evaluation. Mr. Quadir's performance was never of such a nature to interfere with the performance of his duties or his co-workers duties.

On October 7, '15, Mr. Quadir was placed on involuntary leave based on the evaluation pursuant to Section 72.1 of the Law.

Section 72.5 states "if the appointing authority determines that there is probable cause to believe that the continued presence of the employee on the job represents a potential danger to persons or property or would severely interfere with the operations, it may place such an employee on involuntary leave of absence immediately." The Labor Dept. never invoked Section 72.5. It never found that Mr. Quadir was interfering with the operations of the Labor Dept. Based on the facts it is clear that 72.5 was not an issue.

The Public Employees Federation believes that Mr. Quadir is fit to return to work and we respectfully request that you give Mr. Quadir the opportunity to show his ability to be a valued employee.


Thank you,

Sincerely yours,

Barry Markman
Field Representative

Enclosure: Final Determination Letter- April18, 2016
             Report and Determination-Hearing Officer Dennis J. Campagna

C:    Mohammad Quadir
      Scarlett Ahmed
      Darlene Shattuck
      Jessica Caggiano
      Blair Burroughs
      File

3

Wednesday, October 26, 2016


Mohammed Quadir
120 Alcott Place, Apt. 2A
Bronx, NY 10475
(646) 327-3667


NYS Civil Service Commission
Albany, NY 12239

Re: **Mohammed Quadir's "Ability to Work" Statement**


Dear Commission Members:

I am submitting this "Ability to Work" Statement as part of my appeal to the NYS Civil Service Commission (Commission) of my involuntary/forced  medical suspension by my current employer, NYS Labor Dept. (Dept. or DOL), on Oct. 7, '15, which the Labor Dept. decided to continue on March 28, '16, in another letter delivered to me.  This Statement is being submitted as an addition to (not in lieu of) the separate Brief being submitted on this very matter by my PEF Field Representative, Mr. Barry Markman.


# Work Performance Reports: 95% or Higher


The Labor Dept. never had any basis to suspend me from work on Oct. 7, '15 and to renew that involuntary/forced medical suspension again on March 28, '16.  As crystal clear proof of my ability to work and to perform the essential duties of the Labor Services Rep. (LSR) position, I submitted earlier as part of this very appeal 13 consecutive months of work production reports from May 2014 to May 2015, which show that during this period I not only met, but exceeded DOL's numerical performance standards of 95% or higher.  Month after month, this was consistently the case for me even though most of my LSR colleagues at the Bronx DOL office were failing to meet DOL's numerical benchmark of 95% or above.

In regards to the foregoing statistics, my immediate supervisor, Noemi Ramos, very reluctantly acknowledged no less than 6 times that my work was "good"—Transcript, pp. 137-140.  She further acknowledged that these statistics show the productivity of the LSRs in the office (Transcript, p. 141) and that the statistics are used to measure work performance of the LSR workers in the office—Transcript, p. 152.  (See also Transcript page 135 where I am congratulated for my good work.)

Absolutely none of the "psychological" tests done by the 2 "psychologists" (Cynthia A. Bobseine, Ph.D. and Dr. Wapner) retained and paid for by the NYS Employee Health Service (EHS) and DOL took into consideration whether or not I was actually capable of actually performing my LSR job duties, which the May 2014 to May 2015 work production reports (referred to above) clearly show that I was—when I not only met but exceeded DOL's 95% or higher numerical benchmarks when most of my LSR co-workers were not. The EHS and DOL psychologists did not test me on my knowledge of my LSR job title and the minimum amount of knowledge one would have to have in order to be a satisfactory employee. They also were not given to review by DOL my actual work performance reports, but were deliberately and very selectively given all of the misleading, inaccurate, and in many instances outright false disciplinary write-ups I received accusing me of misconduct, poor work performance, and so on. As such, the ill-suited "psychological" tests are of extremely limited value and are not effectual in establishing my supposed inability to perform my LSR work duties.

## Section 72.5 & Denial of Union Representation

In his April 11, '16, decision, the "neutral" hearing officer, Dennis J. Campagna, inaccurately claimed that the parties (i.e., NYS Labor Dept. v. Mohammed Quadir) had agreed/stipulated to have this matter be decided pursuant to Section 72.5 of the NYS Civil Service Law (CSL), which allowed DOL to immediately place me on involuntary leave without regular pay. This is wholly inaccurate as the Transcript (page 5) from the hearing very clearly reveals that the parties had stipulated to have this matter be considered and resolved pursuant to Section 72.1 of CSL—not Section 72.5.

This is of critical importance because **in very arbitrarily and capriciously changing the previously stipulated/agreed to rules of the hearing (agreed to by the parties), the hearing officer denied me the legal right and opportunity to present an adequate defense of all the false allegations of misconduct, abusive conduct, poor work performance, and so on, leveled against me by DOL's witnesses** (in particular and especially Noemi Ramos, my immediate supervisor). (It needs to be noted the hearing officer's $12,000 fee for conducting the 2-day hearing was paid entirely by the Labor Dept.—but only after he rendered his April 11, '16 decision—not before. Neither I nor PEF paid anything to this hearing officer.) **Had we (PEF's Mr. Markman and myself) known that the hearing officer would arbitrarily, capriciously, and ultimately render his April 11, '16 decision based on Section 72.5 of CSL as opposed to Section 72.1 as stipulated to by voluntary agreement of the parties (Transcript p. 5), a plethora of evidence would have been submitted by us that I was the target of incessant harassment and abuse (going on for several years) by the Bronx DOL supervisors not only for my medical disability (for which I requested an accommodation under the ADA, only to have that request be denied by DOL), but also for daring to prosecute my complaint against DOL in federal court, which I had every legal right to do.**

2

5

**Among the evidence that would have been submitted (but was not) by me** would have been very favorable rebuttal testimony from at least two of my Bronx DOL LSR co-workers. These two LSR co-workers testified under oath during their federal court depositions that I was being subjected to "heightened scrutiny" by the Bronx DOL supervisors and that I was being "singled out." One of the former LSR co-workers, Mr. Andrew Castillo, said that he thought it was "unbelievable" the no. of disciplinary write-ups that I had received when compared to others in the office. Mr. Castillo further stated that "tiny, tiny infractions all of us incur are only addressed to Mohammed." (Mr. Castillo was the Bronx office's PEF Shop Steward at that time.) To date, I have been subjected to about 120 separate disciplinary write-ups and/or actions. Many of the write-ups were consigned by email by my immediate supervisor, Noemi Ramos.

In her testimony, my immediate supervisor, Noemi Ramos, claimed that she found my deportment to be "menacing," "aggressive," and that she felt I was trying to intimidate her—Transcript, pp. 102, 117, & 120. This is an interesting but baseless claim. First, the psychologists retained and paid for by DOL and EHS all concurred that there was no evidence of suicidal or homicidal ideation—see Cynthia A. Bobseine, Ph.D, Feb. 2, '16 & March 8, '16 evaluations, pp. 1 & 2 respectively. She also found my impulse control to be adequate—ibid. Additionally, DOL's Asst. Director of Human Resources, MaryAnn Wilson, responded by saying "I don't know. . ." when asked whether or not she had any reason to believe that I was dangerous in any way—Transcript, p. 78. So I was essentially removed from work based on conjecture that possibly sometime in the future I could become violent.

Not only that but almost every single time Ms. Ramos requested to meet with me for a disciplinary counseling write-up or session, she made sure to always have another supervisor or manager accompany her to provide her with support and to back her up in terms of whatever she did or said during such sessions. However, as a rule she consistently denied my repeated requests to have a PEF union representative present, as an independent witness, during these countless disciplinary write-up and counseling sessions. It was usually the case of at least 2 or more supervisors ganging up, bullying, and trying to intimidate a subordinate worker with a medical disability.

## Tardiness, Absences, & FMLA

In general, the hearing officer spent a great deal of time discussing how DOL arrived at its decision to medically suspend me as if that in itself is a justification for the suspension—i.e., internal conversations/communications amongst and between Personnel, Employee Relations, DOL Counsel's Office, Bronx DOL supervisors, and so on. The hearing officer furthermore exerted no discernable independent effort to determine whether or not the misconduct and poor work performance allegations leveled against me by the Bronx DOL

3

supervisors were actually true. Instead, he just generally accepts them as true. Just because a supervisor (any supervisor) pens something censorious of a subordinate employee does not necessarily make the critique valid and true.

An example of the foregoing can be found on page 13 of the hearing officer's April 11, '16 decision where the hearing officer accepts at face value as being accurate the Time & Attendance Study conducted by my immediate supervisor, Noemi Ramos, from April 15, '13 to April 11, '14. The hearing officer claims that "there is no dispute, that from April 15, 2013 to April 11, 2014, the Respondent was absent 92 days, tardy 145 days and reported to work on time for 14 days"—Hearing Officer's April 11, '16 Decision, p. 13. Well, there actually is a dispute about the figures. How exactly does the hearing officer know the foregoing figures provided by DOL to be true. Has he seen my actual timesheets from April 15, 2013 to April 11, 2014 and added the actual number of tardiness and absences. To this day, I have not seen nor was I provided by DOL my timesheets from April 15, 2013 to April 11, 2014, which would have enabled me to make an independent assessment as to whether or not the figures provided by DOL pertaining to my lateness and absences are accurate and true. In the absence of an independent audit of the Time & Attendance Study, the "findings" of the hearing officer are without merit.

Furthermore, even if the figures from the aforementioned Time & Attendance Study were to be true, it is only (only) because the Bronx DOL supervisors refused to accommodate my medical disability despite having notice of my need for a morning grace period or an altered morning schedule that would have allowed me for example to report to work at 9:30am as opposed to 9am at reduced pay of course. The Bronx DOL supervisors had known about my need for a morning grace period (at reduced pay of course) since at least May 1, '13. They even acknowledged this in a disciplinary write-up they gave me on June 3, '13. However, they never accommodated my disability. And not only that the Bronx DOL office manager, Atul Sheffey, in an email he sent me on Nov. 13, '14, explicitly denied my request for a morning grace period—at reduced pay of course—in clear violation, I believe, of the Americans with Disabilities Act. Authorizing a morning grace period or an altered or reduced work schedule is an extremely common accommodation granted by employers all throughout the country. Nothing unique or unusual about a morning grace period at reduced pay!

This is not something that was expanded on at length during my medical suspension hearings. However, had we (PEF's Mr. Markman and myself) known that the hearing officer would arbitrarily, capriciously, and ultimately render his April 11, '16 decision based on Section 72.5 of CSL as opposed to Section 72.1 as stipulated to by voluntary agreement of the parties (Transcript p. 5), this evidence would have been introduced and discussed at length. **The hearing officer's decision to very arbitrarily and capriciously change the previously stipulated/agreed to rules of the hearing (voluntarily agreed to by the parties), denied me the legal right to present an adequate defense against all the false allegations of misconduct, abusive conduct, poor work performance, and so on, leveled against me by witnesses (in particular and especially Noemi Ramos, my immediate supervisor) representing the Labor Dept.**

4

7

In his April 11, '16, decision (p. 5) the hearing officer takes note of the fact that I arrived about 50 minutes late for my scheduled appointment with EHS physician Arthur Kurtz. In so doing, the hearing officer ignores the fact the commute to Brooklyn to the EHS office was about 3 to 4 times as my normal commute to the Bronx DOL office. Furthermore, I was not familiar to the Brooklyn area—at least not that section. Plus, the Bronx DOL supervisors and DOL in general knew of my need for a morning grace period. Yet, they mostly assigned me to the first morning appointments, which I believe were at 9 or 9:15am. In so doing, DOL deliberately set me up to fail. And so did the EHS psychologists as they generally scheduled me for the very first morning appointments despite being made aware by me of my need for a morning grace period or altered morning schedule (at reduced pay of course). This information, I believe, was not presented to the arbitrator, but certainly would have been **had we (PEF's Mr. Markman and myself) known that the hearing officer would arbitrarily, capriciously, and ultimately render his April 11, '16 decision based on Section 72.5 of CSL as opposed to Section 72.1 as stipulated to by voluntary agreement of the parties (Transcript, p. 5)**

In terms of absences, it needs to be noted at least 20-40% of my absences were directly attributable to constant workplace harassment, abuse, and retaliation. This can be found in my personal medical reports in my psychiatrist's office—which were consigned to DOL during discovery in the federal litigation. This evidence was presented to the federal court, which heard my separate legal action against DOL, but was not presented to the hearing officer. **Had we (PEF's Mr. Markman and myself) known that the hearing officer would arbitrarily, capriciously, and ultimately render his April 11, '16 decision based on Section 72.5 of CSL as opposed to Section 72.1 as stipulated to by voluntary agreement of the parties (Transcript p. 5), this evidence would have certainly been submitted. Once again, the hearing officer's decision to very arbitrarily and capriciously change the previously stipulated/agreed to rules of the hearing (voluntarily agreed to by the parties), denied me the legal right to present an adequate defense against all the false allegations of misconduct, abusive conduct, poor work performance, and so on, leveled against me by witnesses** (in particular and especially Noemi Ramos, my immediate supervisor) representing the Labor Dept.

The hearing officer claims that my FMLA request for "intermittent leave" (as needed) during 2012 was "not reasonable and if granted, would effectively eviscerate the Agency's attendance policy and make it virtually impossible to schedule customers to be seen by the Respondent"—Hearing Officer's April 11, '16 Decision, p. 14. This statement shows that the hearing officer frankly does not know what he is even talking about and does not even know how customers are assigned to LSRs to be interviewed in the Bronx DOL office. Unemployed customers are not assigned to a particular LSR; instead, they are assigned to whoever reported for work on that specific day. A customer is not required to be seen by a particular LSR. S/he can be assigned to any LSR who is available at that time and not interviewing another customer at that time. Furthermore, the hearing officer very clearly appears not to know that my FMLA request during 2012 for "intermittent leave" as needed was approved by DOL and did not cause any sort of a discernible problem for the Bronx

5

DOL office for the reasons I just mentioned.  The **hearing officer improperly used my 2012 approved FMLA request, which I was legally entitled to under the law, as yet another justification for DOL's medical suspension of me on Oct. 7, '15.**

Before concluding this section, it needs to be noted that the hearing officer did not tell the whole story when he claimed in his Decision (p. 8) that my work performance had been rated as "unsatisfactory" for two consecutive years.  One of the evaluations was overturned on appeal; with the other one an appeal was filed, but a decision was never rendered by DOL on the appeal, which further violated my rights.  If DOL had decided against me I would have been able to file an appeal to a more neutral statewide appeals board.  At least this is my understanding.

## Conclusion

For the foregoing reasons and some of the other reasons in my separate appeal-brief being submitted by PEF on my behalf, the NYS Civil Service Commission should invalidate my involuntary/forced medical suspension since Oct. 7, '15 and authorize me to immediately return to work at DOL with full restoration of all improperly withheld (lost) wages and benefits.  Thank you.

Mohammed Quadir

Mohammed Quadir
P.S.: Written in haste; please forgive errors.

6

Mr. Barry Markman                            3                          October 14, 2016

## APPEAL CONFERENCE ATTENDANCE FORM

Please complete and return this form to:

New York State Civil Service Commission
Office of Commission Operations & Municipal Assistance
Empire State Plaza, Agency Building 1
Albany, New York 12239

Email: commops@cs.ny.gov
Office Phone Number: (518) 473-6598
Fax Number:  (518) 473-5017

1. Appellant Name: _Mr. Mohammed Quadir_

2. Appellant Phone No.: _646 - 327 - 3667_
   [office / home / cell phone]

3. Appeal Case No.: __16-15__

4. Will you attend your conference scheduled for **November 30, 2016 at 12:00 p.m.?**

   ☐  Yes, I will attend my scheduled conference.
   ☒  No, I would like my appeal considered based only on the written record.
   ☐  No, I would like to withdraw my appeal.

5. Are you including additional information to support your appeal?

   ☒  Yes, please see the document(s) attached.
   ☐  No.

## IF YOU ARE PLANNING TO ATTEND THE CONFERENCE:

**As part of our security procedures, you must advise this office of any person(s) who will be attending the appeal with you.**

6. If you are attending your scheduled conference, who will be attending with you?

   ☐  I will attend alone.

Name of Person Attending With You          Relationship to You / Title

_____               _____

_____               _____

_____               _____

Exhibit P 10

10/10