# 16-CV-7476

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/15/17

## US District Court
## Southern District of NY

------------------------------------

## MOHAMMED QUADIR
Plaintiff

v.

## NEW YORK STATE DEPT. of LABOR (DOL)
Defendant

------------------------------------

**Plaintiff's Surreply to Defendant DOL's 4/19/17 Reply
Memorandum & Its 2/8/17 Motion to Dismiss
For: USDC SDNY Judge J. Paul Oetken**

------------------------------------

Mohammed Quadir, *Pro Se*
120 Alcott Place, Apt. 2A
Bronx, NY 10475
(646) 327-3667[1]

---

[1] Defendant DOL has consented to electronic notification in this case. A courtesy copy of this Surreply will be mailed (or otherwise consigned) to the Court at around time of filing. Please see my separate apology and explanation letter to the Court, which will be submitted by early next week for the four-calendar-day tardiness in filing this Surreply, which technically was due no later than 11:59pm, on Wednesday, May 10, '17.

# (1) INTRODUCTION

This Surreply is entirely necessitated by DOL's wholesale misrepresentation of the basic facts pertaining to this 2nd new lawsuit.  As such, I will **first** address DOL's claim, for example, on page 3 of its Reply Memorandum of Law in Support of State Defendant DOL's Motion to Dismiss This Complaint (Reply Memorandum or Reply Memo of Law) that I provided no factual support for my belief that the Hearing Officer's 4/11/16 decision, in my 10/7/15 medical suspension without regular pay case, was not only biased but without any merit—ECF 24, Filed 4/19/17.

This is false as I articulated in my (i.e., Plaintiff's) Response and Opposition to DOL's 2/8/17 Motion to Dismiss (ECF 20) no less than 8 distinct reasons why I believe the Hearing Officer's decision was not only in error, but also very biased.  Those reasons were articulated by either me directly or by PEF Field Rep., Barry Markman, in my 10-page, 10/26/16 appeal to the NYS Civil Service Commission.  As proof, please see pages 15-24 of 24 of my abovementioned Plaintiff's Response & Opposition (i.e., ECF 20, Filed 4/5/17).  Nevertheless, I will discuss those 8 distinct reasons in detail in this Surreply since DOL's lead attorney is falsely claiming that I provided no factual support for my belief that the Hearing Officer's 4/11/16 decision in my 10/7/15 medical suspension without regular pay case was not only biased but without any merit.

**Secondly**, I will address and rebut the numerous other misrepresentations of fact (i.e., lies) made by DOL in its 4/19/17 Reply Memorandum (ECF 24).  As just one example, on page 4 of 9 of its Reply Memorandum (ibid.), DOL claims that this 2nd lawsuit consists entirely of my time and attendance issues & complaints—in fact, the word used by DOL on page 4 (ibid.) was "all."  In other words, DOL is claiming on page 4 of its Reply Memo of Law that "all" (every single one) discriminatory and retaliatory actions taken by it against me, both before and after May 30, '14, had entirely and only to do with my time and attendance issues.  This is categorically false.

A very easy way to establish the falsity of this claim by DOL can be done by reviewing an exhibit submitted by DOL earlier in this 2nd lawsuit.  Here I am specifically referring to the June 12, '15, Notice of Discipline I received suspending me without pay for 8 weeks.  In particular, I am referring to ECF 12-1, filed by DOL on 2/8/17.  If the Court looks at p. 7 of 17 of the foregoing 6/12/15 Notice of Discipline it will see that between June 3, '13, to January 29, '15, I received no less than 14 disciplinary write-ups consigned in paper copy form—as opposed to via email.  However, only 4 (dated 6/3/13, 6/6/14, 8/1/14, 11/3/14) out of those 14 disciplinary write-ups dealt with time and attendance issues, which mean only 28% if my arithmetic is correct.[2]

Furthermore, the Court should keep in mind this 2nd lawsuit consists of 4 separate complaints with two (6/8/15 & 9/16/15) being filed with the Human Rights Division and with the other

---

[2] Four time & attendance disciplinary write-ups divided by 14 write-ups overall = 28.5%.

two (9/14/15 & 11/6/15) being filed with EEOC.  For independent verification, the Court should look carefully at the following documents from this 2nd lawsuit: ECF 2, Filed 9/23/16, p. 9 of 43; ECF 2-1, Filed 9/23/16, pp. 19-20 of 38; ibid., p. 28 of 38; and ECF 2-2, Filed 9/23/16, p. 43 of 43.  A careful review of the foregoing pages reveals the preponderance of the retaliatory and discriminatory actions taken against me by DOL have absolutely nothing to do with time & attendance concerns, but instead have everything to do with the Bronx DOL supervisors making false allegations against me that I am **not doing my work properly, that I am sending too many emails, that I am providing poor customer service,** and so on.  Plus, I did not receive the unsatisfactory annual evaluation for 2014-2015 denying me a pay raise for the 2nd straight year in a row due only to time and attendance concerns of the Bronx supervisors insofar as an overall evaluation of my work performance is concerned.  Additionally, DOL articulated many more reasons besides just time and attendance for my 10/7/15 medical suspension without regular pay—all of which I take issue with.

## (2) AT LEAST 8 REASONS WHY HEARING OFFICER, DENNIS CAMPAGNA'S, APRIL 11, '16 DECISION IN MY OCTOBER 7, '15 MEDICAL SUSPENSION WITHOUT REGULAR PAY CASE WAS BIASED, ARBITRARY & CAPRICIOUS, AND WHOLLY UNSUPPORTED BY THE EVIDENCE SUBMITTED:

In its 4/19/17 Reply Memorandum of Law in Support of State Defendant DOL's Motion to Dismiss this Complaint (Reply Memorandum or Reply Memo of Law), DOL claims that I provided no factual support in favor of my arguments that the 4/11/16 Hearing Officer's decision in my 10/7/15 medical suspension without pay case was anything but biased and not at all supported by the evidence (see ECF 24, p. 3 of 9).  This claim by DOL is so demonstrably/provably false that I am surprised that it was even proffered by DOL's counsel.

There are at least 8 reasons that I submitted to this Court earlier as a separate exhibit in this case explaining in a summarized manner why the Hearing Officer's decision was indeed biased, arbitrary and capricious, and not at all supported by the evidence submitted.  (Please my earlier submitted "Ability to Work" Statement—ECF 20, Filed 4/5/17, pp. 18-24 of 24.  And even though I addressed them in the foregoing document (ibid.), I will explicitly do so here again for the Court's convenience and frankly to refute the false allegation by DOL in its Reply Memorandum (ECF 24, p. 3 of 9) that I provided no factual support for my view that I did not receive a fair and just hearing.  (Just to make it absolutely clear I did not receive a fair, full, and just Section 72 medical suspension hearing—due significantly to the Hearing Officer's actions and decisions favoring DOL as explained below).  Here are at least

8 reasons why the Hearing Officer's 4/11/16 decision was biased, arbitrary and capricious, and certainly not supported by the evidence submitted in this case.[3]

- ## 1ˢᵗ Reason: Hearing Officer Changed Rules of the Hearing to Favor DOL—Decided Case on CSL 72.5 not 72.1 as Stipulated

The parties (Mohammed Quadir represented by PEF Field Rep., Barry Markman & DOL represented by DOL Attorney, Robert F. Axisa and DOL Labor Relations Rep., Regina Shields) had on December 9, '15, very specifically stipulated to have my 10/7/15 involuntary medical suspension, from DOL without regular pay, appeal adjudicated pursuant to Section 72.1 of the NYS Civil Service Law (NYSCSL or CSL).  As proof, please see **newly submitted Exhibit pp. 17-18**—especially 18, which is Transcript p. 5 from the December 9, '15 hearing.  However, in his 4/11/16 the Hearing Officer, Dennis J. Campagna, claimed that the parties had stipulated to have the appeal adjudicated pursuant to Section 72.5 of NYSCSL, which is simply not true—please see ECF 12-3, Filed 2/8/17, p. 1 of 17.

This is of enormous import because my defense as presented by PEF Field Rep., Barry Markman was focused chiefly on whether or not DOL had a reasonable basis pursuant to Section 72.1 of NYSCSL (meaning whether or not my illness impaired my mental and physical faculties to such a great extent that I was simply no longer even capable of executing my LSR work duties **not I was** ". . . a potential danger to persons or property or would severely interfere with operations. . . [,]" **which would have been chiefly permitted under Section 72.5 of CSL)** to send me to "medical" evaluations by 2 DOL paid-for healthcare professionals and thereafter to **propose a future date** for my involuntary medical suspension from work due to ordinary disability, which pursuant to Section 72.1 was to "be held in abeyance until a final determination is made by the appointing authority"—meaning only and only after DOL had reviewed the Hearing Officer's opinion and recommendation.

**In the meantime, I was to be allowed to continue working at DOL with full pay and benefits for the duration of my medical suspension hearings and review process.[4]  This would have allowed me to further show that even during my medical suspension hearings I was effectively performing my LSR duties by not only meeting but exceeding DOL's work performance expectations when many of my co-workers without handicaps were not.**

---

[3] And here I am not even alluding to the fact that the Hearing Officer was paid $12,000 by DOL, but only after he rendered his adverse determination in my medical suspension case on 4/11/16.  Furthermore, the PEF union did not assign an attorney to represent me, while DOL assigned both an attorney (Robert F. Axisa) and Regina Shields (DOL's Labor Relations Representative) to prosecute its 10/7/15 medical suspension case against me. I briefly alluded to this in some of my earlier submissions to this Court—as examples please see ECF 15, Filed 2/21/17, pp. 2-3 & 5 of 5 and ECF 20, Filed 4/5/17, pp. 4-5 of 24.

[4] Please see ECF 2-3, Filed 9/23/16, pp. 6-8 of 19 for a copy of Section 72 of NYSCSL.

However, this is not what did DOL to me as I was immediately suspended by DOL on Oct. 7, '15, even before the Hearing Officer's opinion and recommendations in my case on 4/11/16—see ECF 12-3, Filed 2/8/17 for that decision.  DOL did not raise Section 72.5 of CSL as an issue during the medical suspension hearings.  (Once again please see **newly submitted Exhibit pp. 17-18**—especially 18, which is Transcript p. 5 from the December 9, '15 hearing.)

Since Mr. Markman did not think the Hearing Officer would even entertain (let alone make his final determination) DOL's last-minute, surprising, and very belated allegations that I was now all of a sudden a menace to public safety (pursuant to Section 72.5) and that supervisor Noemi Ramos felt threatened by my mere presence, he did not present a plethora of evidence we had at our disposal showing (such as favorable deposition testimony from my LSR co-workers that I was, among other things, being "singled out" and subjected to "heightened scrutiny")[5] that not only was I not a threat to public safety, but I had been subjected to a campaign of unrelenting harassment and retaliation by the Bronx DOL supervisors not only for my medical disability, but for partaking in a series of legally protected activities—filings EEOC complaints and prosecuting my complaint in federal court as examples.  Instead Mr. Markman's defense in my case was focused almost exclusively on my May 2014 to May 2015 outstanding work performance reports, which showed that I had repeatedly exceeded DOL numerical expectations of 95% or greater when many of my LSR co-workers were not.[6]  These outstanding work performance reports were submitted to the Court earlier as part of my first lawsuit—see Case # 13-cv-3327, ECF 137-1, Filed 2/22/16, i.e., Exhibit 28.

The Hearing Officer ultimately rendered his 4/11/16 opinion in my 10/7/15 medical suspension case pursuant to CSL 72.5 not 72.1—only the latter was stipulated by the parties. CSL 72.1 permits a NYS government entity to suspend an employee in the course of his or her employment due to an ordinary disability ". . .other than a disability resulting from occupational injury or disease as defined in the workers' compensation law. . ." (see ECF 2-3, Filed 9/23/16, p. 6 of 19), **but only after—not before**—after reviewing the Hearing Officer's opinion and recommendations (ibid.).  In contrast, CSL 72.5 allows a NYS agency to **immediately—without delay**—suspend an employee from work, **even before reviewing the Hearing Officer's opinion and recommendations, if** ". . . the continued presence of the employee on the job represents a potential danger to persons or property or would severely interfere with operations. . ." (ibid., p. 7 of 19).

---

[5] See page 20 of 24 of ECF 20 where I briefly even allude to this—i.e., my 10/26/16 submission to Civil Service Commission, which is a political instrumentality of the State of NY not an independent and impartial panel of arbiters.

[6] I also discussed this earlier in my 10/26/16 "Ability to Work" Statement that I submitted to the Civil Service Commission and then later to this Court—please see ECF 20, Filed 4/5/17, pp. 18-20 of 24 as one example.

In my case DOL never invoked CSL 72.5 as an issue.  However, well into the medical suspension hearing DOL surprisingly and unexpectedly attempted to portray me as a threat to public safety and property pursuant to CSL 72.5 even though the parties had never stipulated CSL 72.5 as an issue only CSL 72.1—as proof, once again, please see **newly submitted Exhibit p. 18**, which is Transcript page 5 from my December 9, '15, medical suspension hearing.  **In so doing, DOL effectively denied me the right to adequately plan and prepare beforehand to present evidence showing that not only was I not in any way a threat to public safety or property, but instead was the target of incessant supervisory harassment, retaliation, and discrimination.**[7]  (I also briefly discussed this mentioned this my 10/26/16 "Ability to Work" Statement submitted to the Civil Service Commission—see as one example ECF 20, Filed 4/5/17, p. 19-20 of 24.)

The "neutral" Hearing Officer in my personal opinion was certainly complicit in allowing DOL at the last minute to even present "evidence" unjustly and wrongly portraying me as a menace to public safety and property even though CSL 72.5 was not invoked **beforehand** by DOL as an issue and was certainly never stipulated as an issue by the parties, which required adjudication.  The Hearing Officer further revealed his bias in favor of DOL when he claimed in his 4/11/16 opinion and recommendation that the parties had stipulated to CSL 72.5 as an issue, which is simply not true (as proof, please see ECF 12-3, Filed 2/8/17, p. 1 of 17 for this wholly inaccurate and untrue claim made by the Hearing Officer on page 1 of 17 of his 4/11/16 determination and see also **newly submitted Exhibit p. 18**, which reveals that the parties stipulated to have this case adjudicated pursuant to CSL 72.1 not CSL 72.5).

Even if CSL 72.5 had been an issue stipulated by the parties, the standard for CSL 72.5 was not met by DOL.  DOL's psychologists found my "impulse control" to be adequate and found no evidence of "suicidal" or "homicidal" ideation.[8]  And even though supervisor Noemi Ramos claimed during the medical suspension hearing to have found my deportment to be "menacing," "aggressive," and intimidating, it was her all along who over and over again denied my repeated requests for union representation for all disciplinary counseling sessions, meetings, write-ups and/or actions, while making sure she had a supervisor at all times to back her up and her false accusations and claims during such disciplinary sessions. So it was always 2 supervisors ganging up on a subordinate worker with a medical disability.[9]  (I actually briefly discussed all this earlier in my 10/26/16, 10-page appeal to the

---

[7] To date, I have been subjected to about 121 separate disciplinary write-ups and/or actions with the most recent being my termination from employment effective Dec. 15, '16—see ECF 10, Filed 1/10/17, pp. 4-5 of 8.

[8] Due to the confidential nature of the psychological evaluation reports authored by DOL's paid-for "psychologists," I am not submitting the actual reports to the Court at this very moment.  However, the DOL paid-for psychological reports can certainly be consigned to the Court if the Court later needs to review them to establish *pro se* Plaintiff's veracity.

[9] "Additionally, DOL's Asst. Director of Human Resources, MaryAnn Wilson, responded by saying 'I don't know. . .' when asked whether or not she had any reason to believe that I was dangerous in any way. . . . So I was essentially removed from work based on conjecture that possibly sometime in the future I could become violent" (ECF 20, Filed 4/5/17, p. 20 of 24).

NYS Civil Service Commission—please see ECF 20, Filed 4/5/17, p. 20 of 24 as just one example.)

- ## 2nd **Reason: DOL's Psychologists Were Never Given to Review & Consider My Excellent Work Performance Reports from May 2014 to May 2015**

The Hearing Officer failed to acknowledge and address in his decision the fact the my May '14 to May '15 excellent work performance reports were never consigned to the "psychologists" retained and paid-for by DOL to "evaluate" me. These reports conclusively establish my ability to fully perform the "essential functions" of the LSR job title—teaching to large groups of people is not an "essential function." For more information, please see my "Ability to Work" Statement—ECF 20, Filed 4/5/17, p. 19 of 24. (Case # 13-cv-3327, ECF 137-1, Filed 2/22/16, i.e., Exhibit 28 is where the foregoing excellent work performance reports can be found.)

- ## 3rd **Reason: Hearing Officer Failed to Appropriately Acknowledge & Address the Fact Even My Former Supervisor, Noemi Ramos, Admitted that My Work Product Was "Good."**

During her December 9, '15 deposition in my medical suspension case even Noemi Ramos grudgingly acknowledged that my work product was "good" (please see **newly submitted Exhibit pp. 20-23**). She further conceded that these statistics revealed the "productivity" of the LSRs in the Bronx office (**newly submitted Exhibit p. 24**); and that these statistics were used to measure the "performance" of the LSRs in the Bronx office (**newly submitted Exhibit p. 25**).[10] Even Bronx DOL Office Manager, Atel Sheffey, in an email he sent me on July 16, '14 congratulated me for my good work (**newly submitted Exhibit p. 19**). (For more information, see also ECF 20, Filed 4/5/17, p. 18 of 24, where this is also mentioned by me.)

- ## 4th **Reason: Hearing Officer Improperly Used as Justification My Approved Intermittent FMLA Request from Latter 2012 as Another Valid Reason for DOL to Have Medically Suspended Me on 10/7/15**

---

[10] See Case # 13-cv-3327, ECF 137-1, Filed 2/22/16, i.e., Exhibit 28, for my actual May 2014 to May 2015 work performance reports. .

As I discussed in my 10/26/16 appeal to the Civil Service Commission (ECF 20, pp. 22-23 of 24) the Hearing Officer on page 14 of his 4/11/16 decision proclaimed that my request in latter 2012 for "intermittent leave" under FMLA if approved by DOL ". . . would effectively eviscerate the Agency's attendance policy and make it virtually impossible to schedule customers to be seen by the Respondent"—see ECF 12-3, Filed 2/8/17, p. 14 of 17.  This truly absurd proclamation by this "neutral" Hearing Officer reveals that he frankly does even know what he is even talking about.

First, the Hearing Officer appeared not to even know that my request for "intermittent leave" was approved by DOL without any discernible problems.  Second, under the FMLA I was entitled to request and receive "intermittent leave."  So, the Hearing Officer used the fact I requested "intermittent leave" (a lawful and legally protected activity) in latter 2012 under the FMLA, which I was entitled to take and was even granted by DOL as another justification for upholding DOL's 10/7/15 involuntary medical suspension.  For more information, please see ECF 20, pp. 22-23 of 24.

- ## 5th Reason: Hearing Officer Failed to Appropriately Acknowledge & Address Issues Involving My Tardiness Were Directly Connected to My Handicap, Which DOL Had Notice of Since At Least May 1, '13, But Still Repeatedly Refused to Accommodate.

In his 4/11/16 decision the Hearing Officer failed to appropriately acknowledge and address the fact that DOL had notice since at least May 1, '13, that illness was largely the reason for my tardiness.  In fact, the Bronx DOL supervisors in a disciplinary write-up they gave me on June 3, '13, even acknowledged in writing that I had informed them on May 1, '13, that illness was largely the reason for my tardiness.  (As proof, please see paragraph 39 from my 2/22/16 Declaration from my first lawsuit where I not only discuss this, but also provide the citation for the foregoing, June 3, '14, write-up received—ECF 134-2, p. 10 of 13, Case # 13-cv-3327.)

However, DOL repeatedly denied my requests to report to work a little later in the morning at reduced pay.  Had DOL accommodated my repeated requests to report to work let's say at 9:30 or 9:45am (at reduced pay of course), it would have largely resolved the issues related to my tardiness.  For more information please, see as just one example, my 10/26/16 appeal to the Civil Service Commission (ECF 20, Filed 4/5/17, p. 21 of 24); and please also see SDNY 46 (ECF 2-1, Filed 9/23/16, p. 7 of 38), which is an email Bronx DOL office manager, Atel Sheffey, sent me on Nov. 13, '14, at 12:20pm to inform me that he was denying my request to report to work a little later in the morning (at reduced pay of course) due to illness,

because he had put me on "Full Restrictions," which is the reason I have since April 22, '14, been systematically denied the accrual of any leave days whatsoever the cumulative dollar value of which is likely well in excess of $20,000 by now.

Furthermore, DOL's counsel provided the Court with inaccurate information, when he claimed on page 6 of 9 of DOL's Reply Memorandum that my "placement on 'full restrictions' removed any authority Sheffey may have had to consider plaintiff's request for an altered work schedule"—ECF 24, Filed 4/19/17. Since my tardiness was directly related to my medical handicap, which DOL had notice of since at least May 1, '13 (as just previously discussed), but still deliberately refused to accommodate, DOL did not have a legitimate non-discriminatory reason for placing me on "Full Restrictions" effective April 22, '14, as a result of which I have been systematically denied the accrual of any leave days whatsoever the cumulative value of which by now is well in excess of $20,000—as previously mentioned.

Furthermore, Bronx DOL office manager, Atel Sheffey, provided the Court with inaccurate (i.e., false) information during his 2015 deposition when he claimed that my placement on "Full Restrictions" was not initiated by him, but by DOL's Personnel Office. This is untrue as Mr. Sheffey did in fact initiate my placement on "Full Restrictions." No less than DOL Personnel Administrator, Kathleen Case, admitted as much in her Affidavit to the Court in support of DOL's position and on its behalf. Please see Case # 13-cv-3327, ECF 134-2, Filed 2/22/16, p. 11 of 13, paragraph 43, where I discuss all in this far greater detail and provide the relevant citations.[11]

- ## 6th Reason: Hearing Officer Failed to Appropriately Acknowledge & Address At Least 40% of My Absences Were Due to Constant Workplace Harassment as Even Documented in My Medical Reports.

In his 4/11/16 decision the Hearing Officer failed to appropriately acknowledge and address the fact that 40% of my absences were as a result of constant workplace harassment and retaliation as documented in my medical reports—not only for my disability, which DOL repeatedly refused to accommodate, but also for partaking in a series of legally protected activities. I very briefly mention this in my 10/26/16, 10-page appeal to the NYS Civil Service Commission—see ECF 20, Filed 4/5/17, p. 22 of 24. I also discuss this greater detail

---

[11] Additionally, both DOL and its paid-for "medical professionals" also set me up to fail their "evaluations" by deliberately scheduling my "medical" and "psychological" evaluations the very first thing in the morning even though they had full notice of my medical handicap and my need for an altered (later) morning work schedule at reduced pay of course. They usually assigned me to be "evaluated" at around 9 or 9:15am. This particular facility was all the way down in Brooklyn in an unfamiliar area, which was about 3 to 4 times my normal morning commute to the Bronx DOL office. I actually discuss this in my 10/26/16 appeal to the Civil Service Commission—ECF 20, Filed 4/5/17, p. 22 of 24.

in my 2/22/16 Declaration to the Court from my first lawsuit. See Case # 13-cv-3327, ECF 134-2, p. 12 of 13, paragraphs 46 & 47. Incidentally, in paragraph 47 (ibid.) I discuss the fact that even Labor Dept.'s own transcription of purportedly one of my voicemails from 2014 (not 4/23/13 @ 8:03am as inaccurately written by DOL) reveals that I had stated "[p]art of the reason I had to take so many days off from work for which I have no leave without pay, leave benefits is because the departments [sic] constant threats and harassment against me"— also Exhibit 35 from my 1st lawsuit (i.e., DEFS 2825, ECF 137-6, pp. 1-2 of 2.

All of the foregoing would have been submitted in great detail as evidence only if we (PEF's Mr. Barry Markman and myself) known the Hearing Officer would very arbitrarily and capriciously and ultimately render his 4/11/16 opinion in my 10/7/15 medical suspension case based on Section 72.5 of CSL as opposed to the stipulated Section 72.1 of CSL—only the latter was agreed to by the parties as discussed at some length in a prior section of this Surreply. The Hearing Officer changed the rules of the hearing in the middle of the hearing to favor one party (DOL) over the other and in so doing denied me the opportunity and right to have a fair, just, and unbiased hearing.

- **7th Reason: Hearing Officer Exerted No Discernible Independent Effort to Determine Whether or not DOL's Allegations of Misconduct, Poor Work Performance, Excessive Absences and Tardiness Were Actually True & Supported by the "Evidence" Submitted by DOL.**

The Hearing Officer exerted no discernible independent effort to determine whether or not the "evidence" submitted by DOL portraying me in a very negative light actually proved and revealed what DOL claimed it proved and revealed. An example of the foregoing would be the Hearing Officer's automatonlike acceptance of the 4/15/13 to 4/11/14 "Time Study" conducted by my immediate supervisor, Noemi Ramos, which DOL claims purports to show that during the foregoing period I "was absent 92 days, tardy 145 days and reported to work on time for 14 days." (See ECF 12-3, Filed 2/8/17, p. 13 of 17.) There are several points that need to be made in regards to this.[12]

**First and foremost**, how exactly does this Hearing Officer know if was truly was absent 92 days and tardy 145 days during the foregoing 4/15/13 to 4/11/14 period. Unless this Hearing Officer was consigned the actual timesheets for the foregoing 4/15/13 to 4/11/14 period and added up all the tardiness and absences he would not and could not possibly know. As such, this baseless "finding" by the Hearing Officer is pure conjecture on his part. (To date, even I have not been consigned by DOL my actual signed timesheets for the foregoing period. See also ECF 20, Filed 4/517, p. 21 of 24, where I also briefly referred to this.)

---

[12] In general, please see also the following pages from my 10/26/16 submission to the Civil Service Commission also addressing this matter: ECF 20, Filed 4/5/17, pp. 20-24 of 24.

**Second**, even if the 4/15/13 to 4/11/14 Ramos-created "Time Study" were to somehow be accurate and true it is only because DOL and the Bronx DOL supervisors refused to accommodate my repeated requests to be allowed a 30-to-45-minute grace period in the morning at reduced pay.[13]  As I discussed in a prior section of this Surreply, the Court should bear in mind the Bronx DOL supervisors had notice of my medical need to report to work a little later in the morning due to illness—at reduced pay—since at least May 1, '13, which was only after 15 days the beginning of the 4/15/13 to 4/11/14 "Time Study."

**Third**, the Hearing Officer refused to address and acknowledge the fact at least 40% of my absences were as a result of constant retaliatory harassment and retaliation at work as even documented in my medical reports (redacted copies of which were consigned to this very Court—and also DOL--earlier as part of my now-dismissed first lawsuit) and as also evidenced by the Labor Dept.'s purported transcription of a voicemail from me to Noemi Ramos during 2014 not 4/23/13 at 8:03am as inaccurately indicated by DOL in DEFS 2825, which is a document consigned by DOL during my first lawsuit—Case # 13-cv-3327, ECF 137-6, Filed 2/22/16, p. 2 of 2.  As noted in a prior section of this Surreply, please also see my 2/22/16 Declaration from my first lawsuit, paragraphs 46-47, ECF 134-2, p. 12 of 13, where I discuss this in greater detail.  The Court should keep in mind two of co-workers (Scott Gallop & Andrew Castillo) testified during their depositions in 2015 that I was being subjected to "heightened scrutiny"—for more detailed information please once again see my 2/22/16 Declaration from my first lawsuit, paragraphs 7-10, ECF 134-2, pp. 2-3 of 13.

**Fourth**, the Hearing Officer did not instruct DOL to consign to me the actual time and attendance records and annual evaluations for all of my fellow LSR co-workers prior to me becoming a permanent tenured employee in April 2010.  Because if he had I likely would have been able to prove during the April 2008 to April 2010 evaluation periods my time and attendance was not significantly worse than many (if not most) of my LSR co-workers although I will admit I was occasionally/sometimes late—but usually by 15 minutes or less, but generally not late by 45 minutes, and so forth.  Furthermore, my time and attendance issues during the foregoing period were not significant enough for DOL discontinue my probationary service during my first two years with DOL (i.e., 2008-2010) or to take any other form of
disciplinary action against me directly leading to some sort of loss of pay or benefits, and so on.[14]

---

[13] The Court further should be reminded Bronx DOL office manager, Atel Sheffey, even after being reminded during a face-to-face meeting with me on Nov. 12, '14, that the primary reason for my tardiness was illness still sent me an email the very next day formally and officially denying my request for an altered morning work schedule.  Please see SDNY 46 for this email—i.e., ECF 2-1, Filed 9/23/16, p. 7 of 38.

[14] Once again, all of the foregoing would have been brought to the fore in excruciating detail if we (Mr. Markman and I) had an inkling that the Hearing Officer would ultimately render his decision in my 10/7/15 medical suspension based on Section 72.5 of CSL as opposed to Section 72.1—only the latter was stipulated by the parties with the Hearing Officer's full understanding and blessing.

- **8th Reason: Hearing Officer Certainly Did Not Tell the Whole Story When He "Found" that My Work Performance Had Been Rated Unsatisfactory for 2 consecutive Years.**

On page 8 of his 4/11/16 Decision, the Hearing Officer "found" that I had been rated unsatisfactory for 2 full consecutive years—ECF 12-3, Filed 2/8/17, p. 8 of 17. However, here is what the Hearing Officer failed to mention. **First,** my immediate supervisor, Noemi Ramos, failed in her duties to inform me at least twice in a timely manner what she and the DOL agency had expected from me in terms of meeting the agency's performance goals and standards. Since I was very belatedly informed well into the **April 2013 to April 2014 evaluation period** and 13 days after the end of April 2014 what she and the DOL agency had expected from me, I was not successful in meeting DOL's performance evaluation standards (which by the way were constantly being changed at the time) for the foregoing period.

As a result, the unfair and unjust evaluation from the foregoing period was reversed on appeal. However, even though the "unsatisfactory" 2013-2014 evaluation was changed to "satisfactory" on appeal, the utterly unfair, misleading, and thoroughly inaccurate information based on which the "unsatisfactory" rating was given was allowed to remain in my in my personnel file thereby automatically impairing my reputation and my future prospects for a promotion within and outside the DOL agency. I actually discussed this in numerous prior filings from my first lawsuit. As an example, please see Case # 13-cv-3327, ECF 35, Filed 6/3/14, pp. 31-35 of 51; I also very briefly discuss this in my 10-page 10/26/16 appeal with the Civil Service Commission—ECF 20, Filed 4/5/17, p. 23 of 24.[15]

Insofar as the 2nd consecutive "unsatisfactory" evaluation I received for the **April 2014 to April 2015 evaluation period,** which had the automatic effect of denying me a pay raise for the 2nd straight year in a row (I have never received what would have otherwise been that automatic pay raise to this very date), DOL never rendered a Step-one decision on my appeal. Because if DOL had rendered a Step-one decision on my appeal, I would have been able to file a Step-two appeal to a more neutral statewide appeals board—ibid. p. 23 of 24. Furthermore, **DOL tries to escape legal culpability for the denial of this 2nd automatic pay raise by claiming (on page 7 of 9 of its Reply Memorandum—ECF 24) that I was not entitled to receive this raise because by October 7, '15 I had been placed on**

---

[15] Incidentally, after I was very belatedly informed by my former supervisor, Noemi Ramos, about what the DOL agency's goals, standards, and expectations for me were for the April 2014 to April 2015 evaluation period, my work performance dramatically improved. As undeniable proof, please see Exhibit 28, (i.e., my emailed work performance records from May '14 to May '15) from my first lawsuit—ECF 137-1, Filed 2/22/16. Nevertheless, I was still given an "unsatisfactory" rating for the 2014-2015 evaluation period even though I was not only meeting but exceeding DOL's 95% or better numerical performance benchmarks—even when many of by LSR co-workers without medical issues were not.

**forced/involuntary medical leave by DOL, without regular pay, at the recommendation of a DOL paid-for "psychologist."**

**However, since I am asserting that the Oct. 7, '15 medical suspension to have been anything but non-discriminatory, DOL I believe is not entitled to an automatic dismissal of this particular aspect of this 2nd lawsuit**.  The Court I respectfully submit should allow this new 2nd lawsuit to develop further through the discovery process.  I have been terminated from my job effective Dec. 15, '16.  The worse thing an employer (any employer) can do to an employee has been done to me.  What is worse than termination!

# (3) DOL's NUMEROUS OTHER MISREPRESENTATIONS

On page 3 of its Reply Memorandum (ECF 24), DOL claims that if I disagreed with the Court's dismissal of my first lawsuit then ". . . the proper means to address it is through an appeal and not by bringing a successive action at [sic] the one here."  I don't necessarily disagree and that determination is being appealed.  However, this 2nd legal action involves discriminatory and retaliatory actions against me by DOL very specifically after May 30, '14, which is wholly consistent with this Court's ruling in ECF 37 (Filed 6/17/14, p. 2 of 2) from my first lawsuit—Case # 13-cv-3327.  This new suit deals with a different set of dates and facts.  And while there may be some similarities between the two lawsuits, not all the issues are the same—not even close.  There are very relevant and noteworthy differences with new pertinent information being provided in this 2nd lawsuit, which was not provided in my first suit.

The **Reply Memo of Law then proceeds to critique me (ECF 24, p. 3) for not having any confidence whatsoever in DOL's "pay-for-play" scheme where it (DOL) pays a "neutral" hearing officer a substantial sum of money to render a decision to its satisfaction and liking with payment only being made after an adverse determination has been made against the affected employee.**[16]  Additionally, I believe I have a separate and independent right under the Rehabilitation Act of 1973 to bring legal action in this forum (i.e., federal court) alleging disability discrimination and retaliation.

DOL then proceeds to claim on page 4 of its Reply Memo that it (DOL) was justified in suspending me without regular pay because it did so at the recommendation of a "psychologist" who felt I was incapable of performing my work duties.  However, Exhibit 28 from my first lawsuit reveals that I am fully capable of performing all essential work duties associated with the LSR position—Case 13-cv-3327, ECF 137-1, Filed 2/22/16.

---

[16] For at least 8 reasons why the "neutral" Hearing Officer's 4/11/16 decision in my 10/7/15 medical suspension case was not only biased but wholly in error, please see the previous section of this Surreply where this is discussed at some length.  See also ECF 20, Filed 4/5/17, pp. 15-24 of 24.

Additionally, I have medical notes from my psychiatrist (who is a licensed medical physician authorized to write prescriptions unlike DOL's paid-for "psychologist" who has no such authorization) informing I am capable of performing my LSR work duties.

On page 5 of its Reply Memorandum (ECF 24), DOL claims that after Bronx DOL office manager, Atel Sheffey, had denied my request on November 12-13, '14, for an accommodation to report to work a little later in the morning at reduced pay, I had the option supposedly to appeal to DEOD, which is the outfit within DOL that unlawfully denied my request to be exempt from teaching workshops (a marginal job function for LSRs) on Feb. 14, '12. I had no such viable option as Sheffey's decision consigned via email on 11/13/14 was authoritative and on behalf of the DOL agency—see SDNY 46, ECF 2-1, Filed 9/23/16, p. 7 of 38, for this Nov. 13, '14 email from Sheffey.

Additionally, Atel Sheffey had approved the reasonable accommodation requests of at least one other LSR, Martin Brennan, even without involving DOL DEOD.[17] He did so on at least 2 separate and distinct occasions and one of those requests approved by Sheffey involved Martin Brennan being absent Tuesdays (i.e., a time and attendance accommodation request very similar to mine) due to medical reasons. I discussed this at some length in an earlier submission—see ECF 20, Filed 4/5/17, pp. 5-8 of 24—and also on pp. 8-9 of this Surreply. However, Sheffey always insisted I utilize DEOD's cumbersome, time-consuming, and convoluted process for approving accommodation requests. What is the reason for this disparate and/or discriminatory treatment?

DOL's then moves on to critiquing me for my absences and tardiness—ECF 24, pp. 5-6 of 9. However, as documented in my medical reports and as noted on several prior occasions at least 40% of my absences were due to constant workplace harassment—i.e., hostile work environment; plus, I would not have been tardy to work if DOL had approved my repeated requests to report to work a little later in the morning at reduced pay—also as noted on several prior occasions including in this Surreply filing.

And because DOL's actions caused me to miss work 40% of the time I absolutely consider all of DOL's write-ups, 8-week suspensions, transfer to a different desk, and 2014-2015 unsatisfactory evaluation denying me a pay raise for the 2nd straight year in a row to have been materially adverse—see p. 8 of 9 of ECF 24, top paragraph, where DOL's refers to this. And on occasion, the Bronx DOL supervisors' constant retaliatory harassment also negatively impacted my ability to even complete assignments on time. I recall sending my former supervisor, Noemi Ramos, an email advising her that her constant threats and retaliatory harassment, meetings, write-ups, and disciplinary counseling sessions were negatively impacting my ability to concentrate and complete assignments on time—and I have concentration issues/difficulties to begin with due to my condition.

---

[17] Plus, supervisory recommendation or opposition carries enormous sway in whether or not an accommodation request is approved by DEOD—as also mentioned by me previously.

Lastly, the Court should keep in mind the very first disciplinary counseling session I was subjected to was on May 1, '13.  This was less than 3 months after Feb. 6, '13, when my former lawyer, Ian Wallace, sent a letter to the Labor Dept. on my behalf—please see Exhibit 40 from my first lawsuit, i.e., ECF 147-3, Filed 3/1/16, Case # 13-cv-3327.  This was a legally protected activity I was partaking in irrespective of what DOL claims on p. 8 of its Reply Memorandum—ECF 24—that it had received the ". . . executed summons in the prior action. . . on November 9, 2013. . ."

## (4) CONCLUSION

For all the foregoing reasons, the Defendant DOL's 2/8/17 Motion to Dismiss should be denied by the Court.  There is really no exigent need for the Court to dismiss my case at this very preliminary Motion-to-Dismiss stage.  The Court should allow my case to proceed to Discovery in order for the case to develop and for relevant information and evidence to be gleaned.  If at that time, if the Court still felt my case was entirely without merit, the Court would always be free to dismiss my case in its entirety at the Motion-for-Summary-Judgment stage.

Additionally, I respectfully submit, the Court should make its determination in this case based on the information and evidence submitted directly before it and not automatically adopt, without conducting a separate and independent review, the deeply flawed, erroneous, and arbitrary and capricious, and biased determination and "findings" of the hearing officer assigned to hear my 10/7/15 medical suspension from DOL without pay case.  Additionally, the Court, I respectfully submit should not rely exclusively on its earlier 6/29/16 ruling dismissing my 1st lawsuit in its entirety either as that case is presently on appeal and there were a number of very relevant factual errors made by the Court in that ruling.  I thank the Court.

Sincerely

*Mohammed Quadir*

Mohammed Quadir
Plaintiff *Pro Se*
(646) 327-3667
Submitted Sunday, May 14, 2017

# NEWLY SUBMITTED EXHIBITS TABLE OF CONTENTS[18]

(1) TRANSCRIPT P. 5 FROM MY DECEMBER 9, '15, SECTION 72, MEDICAL SUPSENION WITHOUT REGULAR PAY FROM DOL, HEARING CLEARLY SHOWING HEARING OFFICER, DENNIS J. CAMPAGNA, ARBITRARYILY CHANGED THE STIPULATED RULES OF THE HEARING IN THE MIDDLE OF THE HEARING TO FAVOR DOL AS THE PARTIES HAD ONLY CONSENTED TO HAVE HEARING DECIDED BASED ON SECTION 72.1 OF THE NYS CIVIL SERVICE LAW NOT SECTION 72.5...........................EXHIBIT PP. 17-18

(2) NOEMI RAMOS GRUDINGLY ACKNOWLED THAT BRONX DOL OFFICE MANAGER, ATEL SHEFFEY, CONGRATULATED ME FOR MY GOOD WORK.................................................EXHIBIT P. 19

(3) NOEMI RAMOS RELUCTANTLY ACKNOWLED NO LESS THAN SIX TIMES THAT MY WORK WAS "GOOD"...........…...EXHIBIT PP. 20-23

(4) NOEMI RAMOS ADMITTED THAT THE MAY '14 TO MAY '15 WORK PERFORMANCE REPORTS REVEALED THE PRODUCTIVITY OF THE LSR WORKERS IN THE BRONX DOL OFFICE.....................................................…...............EXHIBIT P. 24

(5) NOEMI RAMOS ADMITTED THE FOREGOING MAY '14 TO MAY '15 STATISTICS WERE VERY SPECIFICALLY USED TO MEASURE THE PERFORMANCE OF THE LSR WORKERS IN THE BRONX DOL OFFICE......................................................…...….……EXHIBIT P. 25

(6) SHORTHAND REPORTER'S CERTIFICATION AND COVERSHEET OF JANUARY 20, '16 HEARING TRANSCRIPT…......EXHIBIT PP. 26-27

---

[18] The last exhibit submitted—i.e., Exhibit pp. 7-16—can be found in ECF 20, Filed 4/5/17, pp. 14-24 of 24. Exhibit pp. 17-27 are the new exhibit pages being submitted with this Surreply filing today.

STATE OF NEW YORK

DEPARTMENT OF LABOR

In the Matter of Civil Service LAW 72
New York State Department of Labor

        -and-

MOHAMMED QUADIR and PUBLIC EMPLOYEES
FEDERATION.
-------------------------------------------x

                 December 9, 2015
                 10:27 a.m.

B E F O R E:

        DENNIS J. CAMPAGNA
        Hearing Officer

Exhibit p. 17

1          MR. AXISA: The first issue we agreed on is

2      Civil Service Law Section 72.1, whether the

3      defendant's decision to send Mr. Quadir to

4      medical evaluation as reasonable, and the second

5      issue is whether the Department had próbable

6      cause to remove Mr. Quadir from the workplace and

7      if not, what an appropriate would be.

8          MR. MARKMAN: My only question is whether

9      they had probable cause as a result of the --

10          THE HEARING OFFICER: And intertwined in the

11      decision for probable cause and they have the

12      burden.

13          MR. MARKMAN:  I just wanted to make it

14      clear.

15          THE HEARING OFFICER: I think counsel does,

16      too.  We are on the same page.

17          Anything else before we begin?  Do you have

18      an opening statement?

19          MR. AXISA: Yes, a brief one.

20          Mr.  Quadir is a Department of Labor

21      employee.  He was a issues representative working

22      in the Bronx One Stop office.  Over the course of

23      Mr. Quadir's employment history exhibits various

24      signs of mental impairment, that significantly

25      affected his job responsibilities and over the

Exhibit P 18

1      Q.   One aspect of his work product? Can you explain a

2   little clearer what that aspect is?

3              MR. AXISA: Can I just note an objection.

4         For this, Ms. Ramos isn't the author of it, so

5         she's not --

6              THE HEARING OFFICER: She can't testify to

7         the accuracy, but she can certainly testify to

8         what it means.

9              MR. AXISA: Exactly, okay.

10             THE HEARING OFFICER: Go ahead.

11     Q.   Can you explain what this means?  You are saying

12   this is one aspect of his work?

13     A.   Yes.

14     Q.   But it was 100 percent?

15     A.   On the activity.

16     Q.   Yes.  And can you read to us five lines down, it

17   starts not only is there a lot less yellow?

18     A.   There was a lot more green.

19     Q.   Read the whole sentence?

20     A.   Congratulations to Joanne, Stephanie, Sara,

21   Maria, Scott, Merrill, Nesta and Mohammed for --

22     Q.   Okay, thank you.  Could you turn to the second

23   page.  That's July 16, -- the third page, really, July

24   16, 2014.

25     A.   Okay.

Exhibit P. 19

1      A.  So for the month of July, he saw 11 customers and

2  received 100 percent on four of the activities.

3      Q.  For August 14?

4      A.  He saw three customers and received one hundred

5  percent on four of the activities.

6      Q.  On September 2014?

7      A.  That would be, he saw 23 customers, he had 100

8  percent on five of the measurements, 39.1 percent on one

9  of the measurements.

10     Q.  I really should ask you, and I should have asked

11  you on the other one, in general, how does that compare

12  with his coworkers?

13     A.  That's pretty good.

14     Q.  And I don't want to go back, but would you say

15  that in comparison when we went over the other ones, in

16  comparison to coworkers it's pretty good, too?

17     A.  The percentage?  Yes.

18     Q.  Yes.  Would you look at October 2014.

19     A.  He saw 27 customers, he received 100 percent on

20  five of the measurements and 37 percent on one.

21     Q.  On November 14?

22     A.  He saw 27 customers and he met the 95 percent on

23  -- I can't read one of them, but four of the

24  measurements.

25     Q.  How would that compare, do you think, with his

Exhibit P. 20

1    coworkers?

2     A.  Good.

3     Q.  December 14, December of 2014, I am sorry.

4     A.  Saw 24 customers and he completed 95 percent on

5    the six measurements.

6     Q.  How does that compare with his coworkers?

7     A.  Good.

8     Q.  January 2015?

9     A.  He saw 13 customers and received 100 percent on

10    six measurements.

11     Q.  How does that compare with the other workers?

12     A.  Good.

13     Q.  February 2015?

14          MR. AXISA: Can I just object.  I think the

15         point has been made.

16          MR. MARKMAN: I think I would love to not do

17         this, but as far as I am concerned, the whole

18         issue here is can Mr. Quadir do the work and I

19         want to enter into the record what the office

20         manager --

21         THE HEARING OFFICER: Go ahead.

22     Q.  We are on February 2015?

23         THE HEARING OFFICER: Yes.

24     A.  He saw 23 customers and received 100 percent on

25    all six measurements.

Exhibit P. 21

1    Q.  Again, the same question, how does that compare?

2    A.  Good.

3    Q.  March 2015?

4    A.  He saw 24 customers, and met the 95 percent on

5    the six measurements.

6    Q.  And that I assume --

7    A.  Is good

8    Q.  I think I have two March 15's there.  April 2015?

9    A.  He saw 22 customers and received 100 percent on

10   six measurements.

11   Q.  April twice again.  Is it there twice or is it a

12   different --

13   A.  It's different.

14   Q.  Can you explain -- let's go back to March, where

15   I think the two begin.  Can you explain to us the

16   difference?

17   A.  It's two different programs.  One is career,

18   which is reemployment assessment, and the other one is C

19   3 E, which is customer engagement.

20   Q.  Can we go back to March 15 on the C 3 E?

21   A.  Okay, for that he saw two customers and received

22   100 percent on five measurements.

23   Q.  And how does that compare to his coworkers?

24   A.  Good.

25   Q.  And I think we just did the first page.

Exhibit P 22

1      A.  Yes.

2      Q.  So could we look at the second page, April 2015,

3  on the CRE?

4      A.  He saw six customers and received 100 percent on

5  five measurements.

6      Q.  How would that compare with coworkers?

7      A.  Good.

8      Q.  May 15, 2015, the REA?

9      A.  For that he saw 28 customers and met the 95

10  percent for six measurements.

11          MR. AXISA: Can I just make an objection as

12          to the foundation of these documents.  We are

13          throwing a lot of stats out there and we have no

14          context of want they are speaking to and what the

15          stats are and what they mean.  It seems we have a

16          lot of numbers and no numbers behind the numbers.

17          THE HEARING OFFICER: I'm sure when we come

18          to redirect, I am going to get that.  Okay, go

19          ahead.

20      Q.  The C 3 E for May 2015?

21      A.  Okay, he sought two customers and received 100

22  percent on five measurements.

23          MR. AXISA: That is it.

24      A.  What is the C 3 E exactly?  What does it measure?

25  What does it measure.  Let me go back.  This was

Exhibit P. 23

1    prepared by Mr. Sheffy, right?

2        A.  No.

3        Q.  No, it wasn't?  It was distributed by Mr. Sheffy?

4        A.  Yes.

5        Q.  And Mr. Sheffy is the office manager?

6        A.  Yes.

7        Q.  And he distributes these documents to show the

8    productivity of the SLRs in the offie?

9        A.  For this particular program, yes.

10       Q.  For these two programs?

11       A.  Yes.

12       Q.  What percentage of the work do these two programs

13   entail?

14       A.  Percentage as to how much time is spent on it?

15       Q.  Percentage, no.  In the times of what the

16   quantity -- not only the time, but what the quantity of

17   the work means?  It could mean nothing.  It could mean

18   that he does this and it takes ten minutes and it's

19   irrelevant.  What is the relevancy of this form in terms

20   of explaining the work performance?

21       A.  This form for both programs, the customer

22   engagement and the rear, the employment assessment

23   program, these are appointments that we receive from the

24   unemployment office that when they come in, they are

25   seen by the legal service representative and both these

Exhibit P. 24

1    Q.  Okay.

2    A.  The only time the job search and number may be

3    different is for job referrals, because this is done for

4    job search ready customers.

5    Q.  So following -- so saying things were labor law,

6    can you explain that?

7    A.  The labor service representative is sent an email

8    from Mr. Sheffy on what the current stats of the labor

9    market information is.  That information, the labor

10   service is providing that to the customer.

11   Q.  These are provided to Atul and he mails this?

12   A.  Yes.

13   Q.  Do you know what the statistics are used for?

14   A.  Performance.

15   Q.  After these that are represented by the

16   statistics here, are there any follow-up they may have

17   in reference to these appointments?

18   A.  Yes.  Yes, they have that set up, a second

19   appointment.

20   Q.  Is there any data involved in this?

21   A.  Yes.

22   Q.  Can you explain that?

23   A.  The data entry is based on the registration form

24   they complete which gives the work history, employment

25   history, any certificates, licenses or degrees that they

Exhibit P 25

1            C E R T I F I C A T I O N

2

3

4

5      I, LeROY EARL, a Certified Shorthand Reporter and a

6    Notary Public, do hereby certify that the foregoing is a

7    true and accurate transcription of my stenographic

8    notes.

9         I further certify that I am not employed by nor

10   related to any party to this action.

11

12

13

14

15

16

17          LeROY EARL, CSR

18

19

20

21

22

23

24

25

Exhibit P 26

Page 167

STATE OF NEW YORK
DEPARTMENT OF LABOR

      In The Matter

            Of

CIVIL SERVICE SECTION 72, NEW
YORK STATE DEPARTMENT OF LABOR
AND MOHAMMED QUADIR
--------------------------x


                    New York State Department of Labor
                    75 Varick Street
                    New York, New York 10013

                    January 20, 2016
                    1:20 p.m.




B E F O R E:

            DENNIS CAMPAGNA, ESQ.
            Hearing Officer

I copy of
This
pp. 167 - 195

Exhibit P. 27