*Pro Se* Plaintiff, Mohammed Quadir's, Opposition to Defendant *DOL's* Motion for Summary Judgment
*Quadir v. NYS Dept. of Labor*, SDNY (16-CV-7476 & 17-CV-5177)

# 16-CV-7476 & 17-CV-5177

## US District Court
## Southern District of NY



------------------------------------

## MOHAMMED QUADIR
Plaintiff

v.

## NEW YORK STATE DEPT. OF LABOR (DOL)
Defendant

------------------------------------

# Plaintiff's Opposition to Defendant DOL's 8/23/19 Motion for Summary Judgment
## For: USDC SDNY Judge J. Paul Oetken

------------------------------------

Mohammed Quadir, *Pro Se*
120 Alcott Place, Apt. 2A
Bronx, NY 10475
(646) 327-3667[1]

---

[1] An apology and explanation will be consigned to the Court on or about January 20, '20, for the three-plus week lateness in submitting Plaintiff's Opposition Papers including the <u>Transcripts & Exhibits Table of Contents Pages</u>, the 4 (Bobseine, Burrell, Castillo, & Wapner) <u>condensed deposition transcripts</u> being produced in their entirety, and **Newly Submitted Exhibit pp. 89-243.** *Pro se* plaintiff's Opposition Papers were due on Dec. 20, '19.  Being submitted on Tuesday, January 14, 2020.

1

# Introduction[2]

In these Opposition Papers to Defendant DOL's 8/23/19 Motion for Summary Judgment, I will present information to the Court, which convincingly demonstrate my ability to work despite my diagnosis of Major Depressive Disorder.  I will show the 9/21/15 & 3/8/16 "psychological evaluations" DOL paid for and relied on to justify my suspension on Oct. 7, '15, and my continued suspension thereafter in April 2016, to have been grossly biased and flawed.

Furthermore, I affirm DOL had no lawful and justifiable basis whatsoever for taking any of the punitive and disciplinary actions it took against me including, **but not limited to**, my Dec. 15, '16 involuntary medical termination; termination of my medical insurance effective 7/28/16 (*Quadir III*, ECF 2, filed 7/07/17, p. 15 of 32) and thereafter denial of my waiver request from having to pay the full premium of $800 per month (ibid., p. 16 & **Newly Submitted Exhibit pp. 223-236**); my forced involuntary medical suspension from work without regular pay effective Oct. 7, '15 and continued suspension thereafter on April 18, 2016 (see *Quadir III*, ECF 2, filed 07/07/17, p. 22 of 32; see also DOL Exhibits EE & DD); my April 2015 unsatisfactory annual evaluation citing, among other things, my inability to teach workshops (at a time when workshops were not even being taught & thereby proving my accommodation request to be exempt from having to teach workshops was never approved after Feb. 14, 2012—see *Quadir I*, ECF 5-3 Filed 05/31/13 Page 2 of 7) and perform all resource room duties (another marginal duty of LSR job title similar to workshops) because of which I have not received a pay raise to this date even;[3] imposition of "full restrictions" denying leave accruals since April 2014; and the 130 or so disciplinary write-ups, emails and counseling sessions to which I have been subjected to date, and so on.

Towards this end, the following documents present very relevant information pertaining to my 2nd & 3rd lawsuits against DOL and refute DOL's numerous and vociferous denials

---

[2] From this point on my first SDNY lawsuit against DOL (13-CV-3327) will be referred to as "*Quadir I*" for simplicity's sake.  And these present 2nd & 3rd lawsuits against DOL will be referred to as "*Quadir II*" and "*Quadir III*" respectively.  Responses to DOL's 56.1 Statement will be submitted by me on or about January 20, 2020.

[3] The fact DOL very specifically cited my inability to teach workshops as one reason for the 2015 unsatisfactory annual evaluation denying a pay raise to this date even, just further proves my contention DOL did not accommodate my reasonable accommodation request to be exempt from teaching workshops after Feb. 14, 2012—see *Quadir I*, ECF 5-3 Filed 05/31/13 Page 2 of 7.  The same goes for requesting modified duties while working in the resource room, which was an accommodation readily approved for at least two other workers in the Bronx office at around the same time.  Here I am specifically referring to former LSR Martin Brennan and former clerical staff member Sandra Harrison. (See DOL's Exhibit J for this unsatisfactory 2015 evaluation denying a pay raise—i.e., *Quadir III*, ECF 42-10, filed 08/23/19, page 8 of 11, paragraphs 11 & 12.)

*Pro Se* Plaintiff, Mohammed Quadir's, Opposition to Defendant *DOL's* Motion for Summary Judgment
*Quadir v. NYS Dept. of Labor*, SDNY (16-CV-7476 & 17-CV-5177)

of disability discrimination and retaliation against me. As such, I am respectfully asking the Court to please review the following documents before making a final decision on DOL's Motion for Summary Judgment. I am also asking the Court to hold oral arguments in these latter *Quadir v. DOL* cases if the Court still has unanswered questions after all of the authorized filings (pre-approved or otherwise permitted by the general rules of the Court) have been submitted by the parties.

I am specifically asking the Court to please thoroughly read my 2nd & 3rd *Quadir v. NYS Dept. of Labor* lawsuits. In regards to the 2nd *Quadir* suit, I am very specifically asking the Court to review ECFs 2, 2-1, 2-2, & 2-3, filed 09/23/16. In regards to the 3rd *Quadir* lawsuit, I am asking the Court to review ECF 2, which was the initial complaint I filed with the *pro se* office on 07/07/17. I am asking the Court to please carefully review my earlier-submitted Opposition to Defendant DOL's Motion to Dismiss and my Surreply to the same (*Quadir II*, ECFs 20 & 28, filed 04/05/17 & 05/15/17, respectively). Both documents present important information very relevant and applicable to DOL's present Motion for Summary Judgment.

Finally, I am asking the Court to please review my Declaration and Supplemental Declaration from *Quadir I.* These would be ECF 134-2 filed 02/22/16 (13 pages) & ECF 154-1 filed 03/23/16 (10 pages). They not only present information relevant to these present 2nd & 3rd Quadir lawsuits, and refute DOL's numerous denials, but were filed well after my involuntary/forced medical suspension from work on Oct. 7, '15. The Court needs to please remember I have not been back to work at DOL as an employee since my forced medical suspension after Oct. 7, '15.[4]

## Quadir's Psychological Records, 2 Return-to-Work Letters, & GoodTemps Confidential Medical Report Since 2015 Affirm His Ability to Work & Workplace Harassment

Dr. Naveed Iqbal is my present psychiatrist and he has been treating me for my condition, Major Depressive Disorder, since August 2011. As such, records of my medical visits with him from 2/23/15 to 2/9/19 are being submitted as exhibits in these latter *Quadir* suits—please see **Newly Submitted Exhibit pp. 94-206**.[5] (My psychological records

---

[4] I am also asking the Court to review my Responses to DOL's 56.1 Statement, because some of the issues not directly being addressed here are very likely to be addressed there. My Responses to DOL's 56.1 Statement will be submitted on or about January 20, '20, along with my apology and explanation for the considerable lateness in submitting my Opposition Papers and Responses to DOL's 56.1 Statement.

[5] Only the date of birth is being redacted in Quadir's medical reports.

prior to Feb 2015 were submitted in first *Quadir v. NYSDOL* SDNY lawsuit—13-CV-3327—as Exhibit 34—ECF 143-2, filed 2/23/16. As such they should already be available to the Court. However, if they are no longer available and the Court needs to review them, Plaintiff is requesting the Court inform him of this and he will provide the Court with another copy of said records of medical visits prior to Feb. 2015.)

If the Court carefully reviews these progress notes from Dr. Iqbal from 2/23/15 to 2/9/19, it will see that in visit after visit Dr. Iqbal notes (usually on the very first of the three pages of every visit) that I am neither suicidal nor homicidal (meaning I do not pose a threat to myself or others), which by the way even DOL's paid-for psychologist, Cynthia Bobseine acknowledged in her March 8, '16, report finding me unfit to work—see **DOL's Exhibit DD**, p. 2 of 3, DEFS 5238.[6] Dr. Iqbal almost always notes in visit after visit that my speech is coherent. On the 3rd page of the progress notes he indicates which anti-depressant medications he is prescribing me to take. I have been taking Zoloft and Pamelor for a very long time including to the present time to manage the symptoms associated with my condition.

And although Dr. Iqbal's handwriting is somewhat hard to read he frequently notes my complaints to him about the constant workplace harassment, threats, and write-ups at DOL causing me additional anxiety and stress—so was having to prosecute the lawsuit against DOL while working at DOL. For example, during the 5/21/14 visit, he noted that 40% of my absences at work were due to the constant supervisory harassment—see *Quadir I*, Plaintiff's Declaration, ECF 134-2, filed 2/22/16, p. 12 of 13, paragraph 46. (Even DOL's psychologist John Wapner wrote on p. 2 of his Sept. 21, '15, "evaluation"—DOL's Exhibit BB—DEFS 5141—that I had been disciplined and written up so many times and that I found the environment so stressful that I often found it difficult to come to work. I agree. The work environment was so stressful it contributed up to 40% of my absences as noted in the aforesaid Iqbal medical reports.)

During the 6/13/16 visit (**Exhibit p. 142**), Dr. Iqbal noted I was fired from my job and that I was stressed. Although, DOL never acted on this May 20, '16 termination (**DOL's Exhibit P**, *Quadir III*, ECF 44-4, filed 08/23/19), it did act on the subsequent Dec. 15, '16, termination—see **DOL's Exhibit LL**, filed on 8/23/19. During the 11/17/16 visit, Dr. Iqbal noted DOL had dropped me from its health insurance plan and coverage—**Exhibit p. 154**. During the 11/29/17 visit, Dr. Iqbal noted I was under financial pressure as a result of having been fired from my job—**Exhibit pp. 175 & 179**. When asked if he would have asked to see these reports from my psychiatrist Dr. Naveed Iqbal, Dr. Wapner answered "I don't know"—Wapner transcript, p. 97.[7]

---

[6] Similarly, Dr. Bobseine's husband DOL psychologist, John Wapner noted on page 3 of his Sept. 21, '15, "evaluation" of me that "[h]e appears to have good impulse control overall. . ."—see DOL's Exhibit BB.

[7] When citing from the 4 condensed transcripts, the pages being cited are the actual transcript pages not the condensed transcript page numbers, which combine 4 separate actual transcript pages into just one.

Additionally, Dr. Iqbal authored two medical notes finding me fit to work.  One of the notes was dated January 1, 2016 (which DOL submitted as **Exhibit Q** in these cases), while the other was dated January 1, 2017, which DOL conveniently did not include as part of its Lisa Burrell (Associate Director of Human Resources for DOL) **Exhibits KK & LL**, along with several additional critically important documents pertaining directly to Plaintiff's Dec. 15, '16 termination—DOL's **Exhibit LL**.  As such, Plaintiff is providing the Court with this January 1, 2017 Dr. Iqbal's Return-to-Work Letter for Quadir along with some of the other aforesaid documents, which DOL evidently omitted—see Plaintiff's **Newly Submitted Exhibit p. 222**, in particular for the Iqbal Jan. 1, 2017, Return-to-Work medical note for Quadir.

Dr. Iqbal did not just stop at writing the aforementioned 2 Return-to-Work Letters.  He also authored a two-page September 7, '17, "GoodTemps Confidential Medical Report Psychiatric Disability" on my behalf in which he specifically noted "[p]atient is willing and able to participate in a structured work-related program and has realistic decision making skills and understands his limitations and capabilities"—see **Newly Submitted Exhibit pp. 238-239** (submitted earlier to DOL during Discovery as PDF 24).[8]  Directly as a result of this, I was placed on assignment by the GoodTemps employment agency to work for the Westchester County Council for part of 2018—during months of February, March, April & August.  See **Newly Submitted Exhibit p. 240**, which was submitted to DOL earlier as PDF 26 for this employment verification letter from GoodTemps dated August 31, 2018.[9]

## Quadir's Neurological Records From 2015-2016 Affirm His Ability to Work & Workplace Harassment

Similar to psychiatrist Dr. Naveed Iqbal, I have been seen by neurologist Dr. Sandeep Gulati since 2011.  Of particular relevance are the 3 visits from 2015-2016 occurring on 3/2/15, 6/1/15, and 5/2/16.  (My neurological records prior to Feb 2015 were submitted in first *Quadir v. NYSDOL* SDNY lawsuit—13-CV-3327—as Exhibit 33—ECF 143-1, filed 2/23/16.  As such they should already be available to the Court.  However, if they are no longer available and the Court needs to review them, Plaintiff is requesting the Court

---

[8] Dr. Iqbal noted in this 9/7/17 GoodTemps Confidential Medical Report my only stressor at that very moment anyway was being economically unstable and not having a job—due to DOL's termination of course.

[9] **Newly Submitted Exhibit pp. 238-240** are out of sequential order as the immediately preceding exhibit page cited was Exhibit p. 222.

inform him of this and he will provide the Court with another copy of said records of medical visits prior to Feb. 2015.)[10]

In all visits occurring on 3/2/15, 6/1/15, and 5/2/16, Dr. Gulati essentially noted that my mood was appropriate; that my immediate recall and short-term memory were intact. And in addition to my long-term memory also being intact, repetition and naming were also intact (Please see **Newly Submitted Exhibit pp. 207-213** for these Dr. Gulati neurological records for the aforesaid period.) Of particular importance were the visits to Dr. Gulati occurring on 6/1/15 (just 3 months before DOL's psychologist Dr. Wapner Sept. 21, '15, "evaluation" finding me unfit to work) and 5/2/16 (just 2 months after DOL's psychologist Cynthia Bobseine March 8, 2016 "evaluation" also finding me unfit to work.)[11]

Incidentally, the Court should be informed that both Dr. **Wapner & Dr. Bobseine have been married to each other for over 40 years** (please see pp. 11, 19 & 87 of Dr. Bobseine's deposition transcript and pp. 10-11 & 110 of Dr. Wapner's deposition transcript). However, neither included this very relevant fact (pointing to a direct conflict of interest) in their respective psychological evaluation reports finding me unfit to work. (There is also, at a minimum, another incident with Dr. Bobseine in particular in which she concealed her marriage to Dr. Wapner in a newspaper op-ed she authored on Oct. 17, 2017 via which she promoted his reelection to the Chatham Town Board. I address this in some length later in the section dealing with why Dr. Bobseine's evaluation is flawed.)

Finally, Dr. Gulati in all visits occurring on 3/2/15, 6/1/15, and 5/2/16 noted in my medical records that I found having to prosecute the case while at work to be stressful. In particular and in regards to the foregoing 3 visits, he wrote "[l]awsuit at work-stressful." Dr. Gulati further noted during my 5/2/16 visit (**Exhibit p. 211**) that I was "'always under stress'" after the ". . . state doctors decided that. . . [I was] unable to work. . ." When asked if he would have asked to see these reports from my neurologist Sandeep Gulati, Dr. Wapner answered "I don't know"—Wapner transcript, p. 97.

---

[10] As a reminder again, my first lawsuit will be referred to as *Quadir I* for simplicity's sake. And these present 2nd & 3rd lawsuits against DOL will be referred to as *Quadir II* and *Quadir III* respectively.

[11] These conflicts between the 2015-2016 Dr. Gulati medical reports intimating my ability to work versus psychological reports authored by DOL psychologists John Wapner & Cynthia Bobseine (a married couple for over 40 years) from the same general time period were brought to their attention during their depositions—please see Dr. **Wapner's deposition transcript pp. 105-109** & Dr. **Bobseine's deposition transcript pp. 82-86**.

# DOL Psychologist John Wapner's 9/21/15 Evaluation Is Flawed[12]

In this section, I will discuss how DOL psychologist John Wapner's evaluation of me is grossly flawed as evidence not only by his deposition testimony (the entirety of which is being submitted to the Court as a condensed transcript)[13], but by his 9/21/15 "evaluation" report itself. First it needs to be noted that as a psychologist, Dr. Wapner, never attended medical school and is not licensed to prescribe medications (see Wapner deposition transcript, p. 15).[14] This is unlike my neurologist, Dr. Gulati and my psychiatrist, Dr. Iqbal who are.

During his deposition, Dr. Wapner testified in his own words "I don't ask employees to provide anything"—Wapner transcript, p. 24. So, while he reviewed, as admitted by him (DOL's Exhibit BB, 9/21/15 Wapner evaluation, p. 1 of 3, DEFS 5140), many of the negative disciplinary emails and write-ups authored by my former supervisor, Noemi Ramos, he never asked me for documentation, which would have favorably communicated my actual job performance at DOL.

Dr. Wapner noted on p. 2 (DEFS 5141) of his "evaluation" that I had achieved a scaled score of 4 on the **Verbal Paired Associates 1** and **Verbal Paired Associates 2** exams. However, during his deposition he testified he was aware of criticisms pertaining to the validity of these very tests—Wapner transcript, pp. 55-56.

Regarding the **Working Memory Index of the W.A I.S. IV**, Dr. Wapner noted my average score of 102 indicated ". . . functional concentration and attention. . ." (Wapner evaluation, p. 2, DEFS 5141). He testified during his deposition based on his 9/21/15

---

[12] On paragraph 30 (p. 7) of his Declaration Employee Health Service (EHS) Director, RICHARD A. CIULLA noted that DOL psychologist John Wapner had opined that I had ". . . limited judgment in terms of . . . behavior in the workplace." My question is since Dr. Wapner has never seen me at work at Bronx DOL how exactly would he know whether or not my behavior in the workplace was appropriate. At most Dr. Wapner spent 3 hours with me during the Sept. 21, '15 "evaluation" (see pp. 73-74 & 103 of Wapner's April 16, 2019 deposition transcript) while I have been seeing Dr. Iqbal (my psychiatrist) and Dr. Gulati (my neurologist) since 2011. I have seen Dr. Gulati more than 20 times—Wapner transcript, p. 109. Dr. Wapner was paid at a rate of $250 an hour up to a maximum of 3 hours—Wapner deposition transcript, pp. 36-37.

[13] When citing from the 4 condensed transcripts, the pages being cited are the actual transcript pages not the condensed transcript page numbers, which combine 4 separate actual transcript pages into just one.

[14] 70% of work Dr. Wapner does comes from government agencies—Wapner transcript, pp. 19-20—and he has been employed by the Employee Health Service (EHS) since 1981—ibid., p. 21—giving him a strong natural incentive to tailor the results of his evaluations generally to the liking of the EHS.

interview of me that I was of normal intelligence (Wapner transcript, pp. 57 & 60)[15] and that his main concerns about my memory was "based mostly on presenting material"—meaning the disciplinary emails and write-ups presented to him by DOL (ibid., p. 57).

Insofar as some of the other tests conducted (p. 3 of Wapner's 9/21/15 "evaluation"), Dr. Wapner admitted there are criticisms as to the validity of both the **Beck Anxiety Inventory** (BAI) and the **Beck Depression Inventory II** (BDI-II) tests conducted (Wapner transcript, pp. 62, 63, 67, & 68—please feel free to review all pages in between for context).[16]  Dr. Wapner further admitted there are also criticisms as to the validity of also the **M.M.P.I.2** test he conducted (Wapner transcript pp. 72-73 and Wapner's 9/21/15 "evaluation," p. 3, DEFS 5142, i.e., DOL's Exhibit BB for the latter).

On page 3 of his 9/21/15 "evaluation" Dr. Wapner noted that I found the Bronx DOL workplace to be "extremely stressful" and this kept me from attending work more regularly.  However, he did not elaborate as to what caused this extreme workplace stress, which was the constant disciplinary write-ups, emails, counseling sessions, negative annual evaluations denying pay raises (which was the case in 2015).[17]

And Dr. Wapner's determination that I lacked "any coping skills"—p. 3 of 9/21/15 "evaluation"—was based entirely on the 9/21/15 interview not as result of one of the psychological tests he administered (Wapner transcript, p. 81).  Dr. Wapner admitted patients can be taught "coping skills," while claiming at the same time it would not have been appropriate for me—although he could not answer why when questioned (pp. 81-82 of Wapner transcript).[18]  See also Wapner transcript, p. 117 where he acknowledges again that I was unhappy at the workplace; however, he again does not explain why.

Perhaps the most important piece of information that was gleaned from Dr. Wapner's deposition was his admission that he never asked to (Wapner transcript, p. 93) nor was ever shown (ibid., p. 86, as admitted by Wapner's attorney, Ms. Hurley) by DOL my

---

[15] See also pp. 60, 61 of Wapner's transcripts for a discussion of conducting structured one-on-one interviews, which is the kind of work I did at DOL.

[16] To the extent I experienced anxiety at the workplace, it was mainly due to the constant disciplinary write-ups, emails, counseling sessions and overall harassment in general on a daily recurring basis.

[17] During his deposition, Dr. Wapner testified that he had no reason to dispute or doubt that workplace harassment and stress at DOL was exacerbating my disability and kept me from attending work more regularly—Wapner transcript,. p. 74.  He noted I "…seem to maintain normal concentration and attention. . ." (p. 3 of his 9/21/15 "evaluation" and p. 75 of Wapner transcript) and that I had "adequate judgment" (p. 3 of 9/21/15 Wapner evaluation and p. 78 of Wapner transcript).

[18] To date, I have been subjected to about 130 of these write-ups and other forms of disciplinary actions negatively impacting (or in the case of the Dec. 15, '16 "medical" termination denying) salary and/or benefits.

excellent work performance records from May 2014 to May 2015.  These critical work performance reports were filed on 2/22/16 as **Exhibit 28** in my first SDNY *Quadir* lawsuit (13-CV-3327, ECF 137-1).  These excellent work performance reports reveal that month after month (for 13 consecutive months) I was not only meeting, but exceeding DOL's numerical performance metrics/benchmarks when many of LSR co-workers at the Bronx DOL office were not.  And these were mostly LSR co-workers without any handicaps or disabilities—unlike me.[19]

As Bronx DOL office manager, Atul Sheffey, avowed to all staff in an email sent on Friday, April 25, 2014 at 12:18pm "[t]he state goal is all staff to have at least 95% in all five measurements."  (See *Quadir III*, ECF 20, filed 6/15/18, p. 39 of 48, for this email from Sheffey, which I personally hand inscribed as "Exhibit p. 75" on the actual email itself.)  Mr. Sheffey further noted, as I am directly quoting, the following from the aforesaid email:

> **We cannot stress enough how important these five measurements are.  The Department is measuring all staff on these 5 performance measures.**

The state (meaning the state of NY) throughout **ALL** DOL offices across the state was measuring how well LSRs performed on the foregoing 5 performance metrics not if and/or how well they taught workshops not if and/or how well they worked in the resource room, and so on.[20]  Even my former immediate supervisor, Noemi Ramos, reluctantly testified, during my earlier Civil Service Law Section 72 appeal (before hearing officer Dennis J. Campagna) that my work was "good."  She further admitted the May 2014 to May 2015 work performance reports revealed the LSR workers' productivity and were very specifically used to measure the productivity of the LSR workers in the Bronx DOL office and of course throughout the state of NY as we now know—see *Quadir II*, **ECF 28**, filed 5/15/17, p. 16 of 27 for the table of contents page of *pro se* Plaintiff's earlier-submitted surreply in opposition to DOL's Motion to Dismiss.[21]

---

[19] When asked specifically about which LSR job duties I was unable to perform, Dr. Wapner repeatedly answered "I can't recall"—Wapner transcript, p. 102.  In fact, responding to questions with "I don't know," "I can't recall," or "I don't recall" seem to have been a recurring theme during Dr. Wapner's deposition.  (Please see the entirety of Dr. Wapner's deposition transcript in particular however please review pp. 97-115.)

[20] The latter assignments (teaching workshops and working in resource room) were at best marginal job duties of the LSR position.  In particular as to why teaching was not an essential function of the LSR job title was discussed by me in numerous prior submissions to the Court in my first *Quadir* lawsuit.  As just one example, please see *Quadir I*, ECF 154-1, filed 3/23/16, pp. 9-10 of 10, for my Supplemental Declaration.

[21] Regarding these May 2014 to May 2015 work performance reports emailed by Sheffey to all Bronx DOL staff, see also my earlier submitted Declaration on 02/22/16 in *Quadir I*, ECF 134-2, p. 7 of 13,

## DOL Psychologist Cynthia Bobseine's 3/8/16 Evaluation Is Flawed[22]

Similar to her husband, DOL psychologist John Wapner, in this section I will discuss how Dr. Cynthia Bobseine's March 8, 2016 "psychological evaluation" of me is grossly flawed as evidenced not only by her deposition testimony (the entirety of which is being submitted to the Court as a condensed transcript), but by her March 8, '16, "evaluation" report itself. First it needs to be noted that as a psychologist, Dr. Bobseine (also very similar to her husband) never attended medical school and is not licensed to prescribe medications (Bobseine deposition transcript, pp. 16-17). This is unlike my neurologist, Dr. Gulati and my psychiatrist, Dr. Iqbal who are and who have known me since 2011.[23]

Dr. Bobseine testified during her April 16, '19, deposition that even though she disagreed with my psychiatrist, Dr. Naveed Iqbal's, assessment that I was fit to work, she never spoke to him, never exchanged correspondence with him and did not ask to see Dr. Iqbal's medical notes and reports as they pertained to me—Bobseine transcript, p. 30. And she also very similar to her husband cumulatively spent a total of about 3 hours with me—ibid. However, out of those 3 hours spent with me, Dr. Bobseine found me unfit to work based on only 2 hours of "tests" she conducted on March 8, '16—ibid., pp. 45-46. Additionally, in regards to my psychologist, Dr. Naveed Iqbal, Dr. Bobseine during her deposition—ibid., p. 48—was asked the following question: "How would you weigh the opinion of a practitioner who has cared for a patient for four and a half years [Dr. Iqbal since 2011] against a practitioner who saw a patient for three hours?"

Dr. Bobseine's 3/8/16 "psychological evaluation" report essentially begins with her noting that she had reviewed Dr. John Wapner's, earlier Sept. 21, '15 "evaluation" finding me unfit to work prior to her also finding me unfit to work as a result of her March 8, 16 "evaluation." See p. 1 of 3 (DEFS005237) of DOL's Exhibit DD under the heading **"REVIEW OF PREVIOUS EVALUATION"** for Dr. Bobseine's March 8, '16, "evaluation" where she noted that she reviewed her husband, John Wapner's work

---

paragraphs 24-25. And also my Supplemental Declaration from *Quadir I*, 154-1, Filed 03/23/16, page 8 of 10, paragraph 28.

[22] When citing from the 4 condensed transcripts, the pages being cited are the actual transcript pages not the condensed transcript page numbers, which combine 4 separate actual transcript pages into just one.

[23] Dr. Bobseine discussed the compensation rate of $260 per hour by the state when working in NYC—Bobseine transcript, p. 20. And also similar to her husband, Dr. Bobseine acknowledged that prior to conducting a psychological evaluation of an employee she usually receives referral materials from the referring agency, which in my case were the disciplinary write-ups against me provided by DOL without any of the accompanying rebuttals from me of course—ibid., pp. 25-26.

without identifying him as her husband for 40 or so years.[24]  (See Bobseine deposition transcript, p. 87, where she acknowledges the marriage).[25]

Dr. Bobseine further admitted during her April 16, '19 deposition that she ". . . requested Dr. Wapner's report from 2015 from EHS." (Bobseine transcript, p. 39 & see also p. 79 of the same.)  She also admitted she was paid for "evaluating" me—ibid.  However, when specifically asked whether or not Dr. Bobseine even considered disclosing in her March 8, '16, "psychological evaluation" her marriage to DOL psychologist John Wapner (whose report from Sept. 21, '15—DOL's Exhibit BB—she had just reviewed), she answered no.  When specifically asked why not, she answered "I don't believe it's pertinent."  (See Bobseine transcript, p. 49.)

On the first page of her 3/8/16 "psychological evaluation" report under the "**SUMMARY**" section, Dr. Bobseine noted that I had reported to her a long history of conflict with my administration regarding my fitness to perform my work duties.  This is inaccurate.  The conflict was not over my fitness to perform my work duties, but instead over DOL's repeated refusals to my accommodation requests to come to work a little later in the morning at reduced pay, to be exempt for teaching workshops (a marginal duty of the LSR position), and for slightly modified work assignment while working in the resource room (yet another marginal duty and all of which DOL denied), and so on.

Under the "**MENTAL STATUS**" section of her report (still on page 1), she noted that I had arrived at the appointment about 20 minutes late.  However, she omitted that DOL had deliberately scheduled me to see her the very first thing in the morning all the way in Brooklyn while I lived all the way in the north Bronx very near the border of Westchester County—a significant commuting distance by NYC subways with its constant stops & delays.

---

[24] There was, at a minimum, yet another incident in which Dr. Bobseine in particular concealed her marriage to her husband Dr. Wapner in an op-ed she wrote for a newspaper promoting his reelection to a local public office.  I discuss this at some length at the end of this very section just prior to the conclusion section.

[25] And Employee Health Service (EHS) Director, RICHARD A. CIULLA, acknowledged in his Declaration (*Quadir III,* ECF 45, filed 8/23/19, p. 7 of 10, paragraph 26) "EHS also arranged for Plaintiff to be examined by John Wapner, Ph.D., on September 21, 2015."  However, there is no mention of psychologist John Wapner being married to Cynthia Bobseine and both being selected by Ciulla's EHS to "evaluate" me.  EHS subsequently selected Cynthia Bobseine to "evaluate" me on March 8, 2016—ibid., paragraphs 37 & 40 on pp. 8-9 of 10.  Ciulla claims on page 10 of his Declaration, paragraph 44 that "DOL did not direct or advise EHS, and EHS did not direct or advise Dr. Bobseine, what conclusion to reach, i.e., whether to find Plaintiff fit or unfit to perform the duties of a Labor Services Representative."  He made a similar claim pertaining to Dr. Wapner on p. 8, paragraph 33 of his Declaration.

Dr. Bobseine further omitted DOL knew that my tardiness was directly linked to my malady, but repeatedly refused to accommodate me by allowing me to come to work a little later in the morning at reduced pay of course.[26]  As just one example of this denial, please see DOL's Exhibit L for the **Thursday, November 13, 2014 12:20 PM** email from Bronx DOL office manager Atul Sheffey, where he acknowledged that I was late for work because of my illness, but because I had been placed on "time restrictions" (i.e., "full restrictions") directly by him by the way (not even by DOL headquarters in Albany, NY) I still had to be at work on time at exactly 9am.[27]

(Incidentally, for proof that I was placed on "full restrictions" directly by Sheffey himself, which by the way is a highly punitive measure because of which I have not essentially accrued any leave days whatsoever since April 2014, totaling into the tens of thousands of dollars by now, please see Plaintiff's Declaration in *Quadir I*, 134-2 filed 02/22/16, page 11 of 13, **paragraph 43,** where DOL Personnel Administrator, Kathy Case, admits "full restrictions" was initiated by Sheffey himself not by DOL's personnel office in Albany, NY.[28]  See also the following paragraphs from the foregoing Declaration where I further discuss "full restrictions": **paragraphs 5, 17, 39-49**.  And even if "full restrictions" had not been initiated and put into place by Sheffey himself, but instead by DOL's personnel office in Albany, it frankly still would not matter as my lawsuit is not against Atul Sheffey as an individual, but against the NYS Dept. of Labor.[29])

---

[26] It stands to reason, if I had difficulty getting to the Bronx DOL office from my residence in the Bronx by exactly 9am due to my ongoing malady, I would have a substantially more difficult time getting to Brooklyn from the Bronx by 9am.  DOL certainly knew all this and deliberately set me up to fail.

[27] Similarly on page 2 of 3 of her 3/8/16 evaluation report, Dr. Bobseine noted that I was "highly suspicious" of management's intentions towards me, but she did not explain why—DOL's Exhibit DD, DEFS 5238.  She also noted, similar to her husband DOL psychologist John Wapner, that my ". . . impulse control was adequate"—ibid.  She further noted "[t]here was no evidence for suicidal or homicidal ideation. . ."—ibid.

[28] And since Sheffey had put me on "full restrictions" he also had the power to take me off the highly punitive measure even without involving DOL's personnel office.  And even if he somehow miraculously did not have the latter power, DOL certainly did, which it chose not to exercise in this case.  And most notably and once again my lawsuit is against the NYS Dept. of Labor as an employment organization/entity of the state of NY, not against Bronx DOL office manager Atul Sheffey as an individual.

[29] I already discussed at some length as part of my 2nd complaint (filed on 09/23/16), office manager Sheffey's refusal to allow me to come to work a little later in the morning at reduced pay of course due to my illness.  As proof, please see ECF 2-1, pp. 2-4, 7-10, 19-20, 28 of 38 and ECF 2-2, pp. 14-17, 19-23 of 43.  And see also **Newly Submitted Exhibit p. 243** for an email from Oct. 30, '14, from Ann Decker-Montarello in which she advises a frontline supervisor like Noemi Ramos that Ramos had the direct authority to extend "full restrictions" on her own for another 6 months.

On page 2 of her March 8, '16, "evaluation" (still under the "MENTAL STATUS" heading of her report) Dr. Bobseine noted my ". . . attitude was polite and appropriate throughout. . . . [and that my] perceptions were grossly intact, with no evidence for hallucinations." And when very specifically asked whether or not her finding my ". . . thought processes were organized, and thought content was grossly intact. . ." weighed in favor of a conclusion that I was fit to work, Dr. Bobseine answered yes—ibid., and Bobseine transcript, pp. 51-52. The same goes for Dr. Bobseine's finding (meaning she also answered yes) that I had adequate impulse control and ". . . presented with at least average intelligence, fair insight and adequate judgement" (ibid., and Bobseine transcript, pp. 52-53).

The LSR job title is broken down into at least **eight** different types of work assignments and/or work units with each group doing frankly different kind of work within the same exact DOL agency. These include, but are not limited to **599**[30], Telephone Claims Center Unemployment Insurance (**TCC-UI**), and Unemployment Insurance Appeals Board (**UIAB**) units. I worked in none of these foregoing types of LSR units. They also include "**Employment Services**" providing services directly to unemployed customers, which is the type of unit I was assigned to. I was not even assigned to the type of LSR units that exclusively provided services directly to **employers**. The remaining three types of LSR work units include **LSR-LVER** (Local Veterans' Employment Rep.), **LSR—DVOP** (Disabled Veterans Outreach Program), and finally **LSR-Rural** (serving chiefly agricultural workers). During Dr. Bobseine's deposition (transcript, p. 55), it was inaccurately noted or implied there are only about 4 different types of LSR assignments and/or units.[31]

And in regards to Bates number ending in 5196 (or DEFS 5196—**Newly Submitted Exhibit p. 237**) and the numbers preceding before and after it (pertaining to the LSR Duties Statement) when asked which of the numerous LSR-types of units I was assigned to work in as discussed in the preceding paragraph, Dr. Bobseine answered "I don't recall." (See Bobseine transcript p. 55.) Dr. Bobseine could not even say I was assigned only to "Employment Services"—ibid. When asked whether or not the 10-page LSR Job Duties Statement was provided to her by DOL prior to her March 2016 "evaluation" Dr. Bobseine answered "I can't say, really"—ibid., p. 54. When asked if I was not fit to

---

[30] For some inexplicable reason, LSRs in the 599 units are not even specifically indicated in the LSR Duties Statement as discussed by me in *Quadir I*, ECF 5-8 Filed 05/31/13 Page 6 of 12.

[31] I discussed all of the foregoing in some of my prior submissions to the Court including in the first lawsuit. As just one example, please see *Quadir I*, ECF 5-8 Filed 05/31/13, pp. 2, 5-8 of 12. And for the actual 10-page LSR Duties Statement, please see ECF 5-5 Filed 05/31/13 Page 61-70 of 84, also from *Quadir I*. DOL resubmitted the foregoing LSR Duties Statement as DOL's Exhibit A on 8/23/19 as part of its Summary Judgment Motion documents and exhibits in these present *Quadir II & III* lawsuits against DOL—Case 1:17-cv-05177-JPO Document 42-1 Filed 08/23/19.

perform any of the LSR job duties, Dr. Bobseine answered "I wouldn't say that"—ibid., and especially pp. 56-57 & see also 58.  And when asked did she even consider the possibility that I might have been fit enough to return to work and perform some of my job duties, Dr. Bobseine answered no—ibid., p. 59.

Under the "**PSYCHOLOGICAL TESTING**" section of her report (pp. 2-3), she found that I had performed in the *very low range* on the Brief Cognitive Status Exam, which is supposed to measure for various types of cognitive functioning (Bobseine transcript, p. 61).  She said I needed to have scored an *average* or *low average* in order work as an LSR—Bobseine transcript, p. 64.

Insofar as the Working Memory Index (WMI) exam (Bobseine's evaluation report, p. 3— DEFS 5239, DOL's Exhibit DD), which is a compilation of three other subtests including the digit span subtest, letter-number sequencing subtest and the arithmetic subtest.  The WMI is supposed to measure for intelligence by ". . . looking for short-term memory, concentration, attention, ability to listen to information and process it and manipulate it, as in doing math in his head. . ."  (See Bobseine transcript, p. 66.)  In regards to my performance on the WMI, Dr. Bobseine wrote the following in her evaluation report (p. 3): "Depending upon which two subtests are summed for a score on the composite WMI, his score ranges from ***borderline to low average.***"  When asked specifically whether ". . . someone of below average memory ability [is] unfit to work as an LSR. . ." Dr. Bobseine answered no—Bobseine transcript, p. 69; see also pp. 66-72 of said transcript for a discussion of the WMI exam.

To sum up the results from the Wechsler Memory  Scale, 4th edition Flexible Approach (LMVI) exam, Dr. Bobseine testified I needed to have scored "average" on the 4 subtests evaluating for immediate memory and delayed memory, visual memory and auditory memory in order to have been considered fit for duty as a LSR—Bobseine transcript, pp. 72-76.  Her evaluation found my score was not "average" on the subtests administered.  When asked how drawing a clock on a psychological exam is in any way related to the job duties that would have been performed by me as a LSR, Dr. Bobseine conceded it did not—ibid., p. 76.  In fact, her exact words were "[d]rawing a clock does not"—ibid.

The final test Dr. Bobseine conducted was the Beck Depression Inventory, 2nd edition, which is essentially a self report on depressive symptomatology and its severity one might be experiencing at the time the test is taken (Bobseine's evaluation report, p. 3— i.e., DEFS 5239, DOL's Exhibit DD— & Bobseine transcript, p. 76).  Based on this test Dr. Bobseine found I suffered from moderate level of clinical depression—Bobseine transcript, p. 78.  And this "finding" contributed to her conclusion I was unfit to work as a LSR—ibid.

And very similar to her husband, Dr. John Wapner, Dr. Bobseine was never shown by DOL my excellent work performance reports from May 2014 to May 2015.  In my case,

Dr. Bobseine answered "I don't recall" when very specifically asked whether or not she had reviewed these 13 months of work performance metrics, based on which LSRs in the entire state of NY were being evaluated—Bobseine transcript pp. 79-80.  These performance metrics revealed that month after month (for 13 consecutive months) I was not only meeting, but exceeding DOL's performance benchmarks of 95% when many of my LSR co-workers without medical handicaps were not.[32]

Dr. Bobseine was specifically asked if she had been shown my excellent work performance reports would that have changed her conclusion finding me unfit to work. She responded by saying no, because as she stated it ". . . my data says that he would have trouble doing his job"—Bobseine transcript, p. 80.[33]  And when asked whether she had requested to see any other reports or notes from Dr. Iqbal other than the January 1, 2016, Return-to-Work letter Dr. Iqbal authored finding me fit to work (which DOL submitted as **Exhibit Q** in these cases), Dr. Bobseine answered no—ibid., p. 81.

When asked whether Dr. Bobseine had reviewed my neurological reports (intimating my ability to indeed work) from Dr. Gulati's office of visits from 3/2/15, 6/1/15, and 5/2/16, she answered "I have not seen these before today"—ibid., p. 83.  She further admitted that Dr. Gulati's report from the 3/2/15 visit finding my immediate recall to be intact, short-term and long-term memory to be intact directly conflicted with her findings to the contrary—ibid., pp. 83-84.  Dr. Bobseine admitted the same in response to being shown the medical report from my 6/1/15 visit with Dr. Gulati in which he also found my immediate recall and short-and-long-term memory to be intact.  In fact, her exact words were "[t]his conflicts with my examination"—ibid., p. 85 for the exact citation and see also p. 84 for context.  She similarly responded by saying "[t]hese findings are different than mine" (ibid., p. 86) when shown Dr. Gulati's progress notes from the 5/2/16 visit (just 2 months after her March 8, '16 "evaluation"— DOL's Exhibit DD) in which he found my memory (long-and-short-term) and immediate recall to be intact.

---

[32] As noted and discussed in far greater detail in the earlier section of these Opposition Papers discussing the numerous shortcomings of her husband Dr. John Wapner's Sept. 21, '15, evaluation of me, these critical work performance reports were filed on 2/22/16 as **Exhibit 28** in my first SDNY *Quadir* lawsuit (13-CV-3327, ECF 137-1).  As such, please see the previous section of these Opposition Papers pertaining to Dr. Wapner where I discuss in far greater detail the relevancy and applicability of these work performance reports.

[33] The Court should please carefully consider who should be believed here: Dr. Bobseine and her husband, John Wapner who were paid by DOL to meet and "evaluate" me for about 2-3 hours each in total or my aforementioned 95% or better work performance reports; my Dr. Gulati neurological records intimating my ability to work; my Dr. Iqbal psychological records; and the Iqbal return-to-work letters from 2016 & 2017 explicitly finding me fit to work in addition to of course the " GoodTemps Confidential Medical Report Psychiatric Disability" Dr. Iqbal completed on 9/7/17 on my behalf explicitly finding me once again fit to work as a result of, which I was placed on assignment by the GoodTemps employment agency to work for the Westchester County Council for part of 2018—for months of February, March, April & August.  Once again see **Newly Submitted Exhibit pp. 238-240**, which is the citation for the latter.

Finally, before concluding this section discussing why Dr. Bobseine's March 8, '16, evaluation is grossly flawed, I need to advise the Court of yet another incident in which Dr. Bobseine concealed her marriage to her husband, Dr. John Wapner that we learned of during her deposition.  On October 17, 2017, Dr. Bobseine authored a newspaper op-ed for the **HudsonValley360** promoting Dr. Wapner's reelection to the Chatham Town Board without identifying herself to the voters as his wife for 40 years—**Newly Submitted Exhibit pp. 241-242.**  This is a direct conflict of interest and the voters were entitled to know this information.  Dr. Bobseine answered no, when specifically asked "[d]id you disclose in this letter that John Wapner is your husband?"—Bobseine transcript, p. 91.

## **Conclusion**

For all the foregoing reasons articulated herein and in my upcoming Responses to DOL's 56.1 Statement, the Defendant DOL's Motion for Summary Judgment should be denied by the Court and these combined *Quadir v. NYS Dept. of Labor* cases should be allowed to proceed to a jury trial.  DOL has consented to electronic notification in these cases.

Plaintiff thanks the Court.

Mohammed Quadir

# SUBMITTED TRANSCRIPTS TABLE OF CONTENTS[34]

(I) DOL PSYCHOLOGIST, CYNTHIA BOBSEINE'S, APRIL 16, 2019, CONDENSED <u>DEPOSITION TRANSCRIPT</u> IN ITS ENTIREITY............................................CONDENSED PP. 1-25


(II) DOL ASSOCIATE DIRECTOR OF HUMAN RESOURCES I, LISA BURRELL'S, JUNE 7, 2019, CONDENSED <u>DEPOSITION TRANSCRIPT</u> IN ITS ENTIREITY...............................…....CONDENSED PP. 1-24


(III) FORMER BRONX DOL LSR & PEF UNION SHOP STEWARD, ANDREW CASTILLO'S, MAY 20, 2019 CONDENSED <u>DEPOSITION TRANSCRIPT</u> IN ITS ENTIREITY…………..……….CONDENSED PP. 1-51


(IV) DOL PSYCHOLOGIST, JOHN H. WAPNER'S, APRIL 16, 2019, CONDENSED <u>DEPOSITION TRANSCRIPT</u> IN ITS ENTIREITY……………………………….…....……CONDENSED PP. 1-33


# NEWLY SUBMITTED EXHIBITS TABLE OF CONTENTS

(1) BOBSEINE & WAPNER ERRATA SHEETS..........EXHIBIT PP. 89-93[35]

---

[34] Once again, when citing from the 4 condensed transcripts, the pages being cited are the actual transcript pages not the condensed transcript page numbers, which combine 4 separate actual transcript pages into just one.

[35] **Exhibit page 88** was the last exhibit submitted in these latter *Quadir v. NYSDOL* cases (as an example please see ECF 52, Filed 9/20/19, p. 6 of 6, from *Quadir III*—i.e., Quadir's 3ʳᵈ lawsuit—SDNY Case # 17-CV-5177). **Exhibit p. 243** (with pp. 89-243 being the range) is the last exhibit page being submitted as part of these Opposition Papers by Plaintiff on Monday, January 13, 2020. Additionally, the Court

*Pro Se* Plaintiff, Mohammed Quadir's, Opposition to Defendant *DOL's* Motion for Summary Judgment
*Quadir v. NYS Dept. of Labor*, SDNY (16-CV-7476 & 17-CV-5177)

(2) QUADIR'S PSYCHOLOGICAL RECORDS FROM PSYCHIATRIST, DR. NAVEED IQBAL, FROM 2/23/15 TO 2/9/19 AFFIRM HIS ABILITY TO WORK & WORKPLACE HARASSMENT...........EXHIBIT PP. 94-206

(3) QUADIR'S NEUROLOGICAL RECORDS FROM NEUROLOGIST, DR. SANDEEP GULATI, FROM 3/2/15, 6/1/15, & 5/2/16 VISITS AFFIRM HIS ABILITY TO WORK & VERY STRESSFUL DOL WORK ENVIRONMENT..............…..................…....EXHIBIT PP. 207-213[36]

(4) LISA BURRELL'S LATE 2016 PRE-TERMINATION LETTERS TO QUADIR & HIS REQUESTS FOR AN EXTENSION UNTIL JANUARY 6, 2017 TO PROVIDE RETURN-TO-WORK MEDICAL NOTE DUE TO DOL'S HEALTH INSURANCE TERMINATION & THEREAFTER ITS REFUSAL TO WAIVE THE FULL $800 MONTHLY PREMIUMS FOR CONTINUATION OF QUADIR'S HEALTH INSURANCE........…...............................…..……...EXHIBIT P. 214-222

(5) QUADIR ON 8/1/16 REQUESTED A "PS-452 WAVIER OF PREMIUM" APPLICATION FORM BE EMAILED TO HIM BY DOL AFTER DOL INCORRECTLY ADVISED HIM IN AN EMAIL ON APRIL 12, 2016, THAT THE COST OF CONTINUING HIS HEALTH INSURANCE WOULD BE $400 PER MONTH NOT $800 PER MONTH, WHICH TURNED OUT TO BE THE CASE..................................................…..….........EXHIBIT PP. 223-236

---

should be informed the Bobseine & Wapner depositions were held on 4/16/19; however, they signed their errata sheets in late October 2019 and I was sent them via email on Tue, Nov 12, 2019 at 6:37 PM.

[36] Regarding Quadir's aforesaid medical records (psychological records from Dr. Iqbal & neurological from Dr. Gulati), the only data that has been redacted is his date of birth for very obvious reasons. Newly Submitted EXHIBIT PP. 94-206 are the Iqbal records; and Newly Submitted EXHIBIT PP. 207-213 are the Gulati records.

*Pro Se* Plaintiff, Mohammed Quadir's, Opposition to Defendant *DOL's* Motion for Summary Judgment
*Quadir v. NYS Dept. of Labor*, SDNY (16-CV-7476 & 17-CV-5177)

(6) DEFS 5196, LSR ILLUSTRATIVE DUTIES ONE PAGE ONLY, AS
CITED ON PAGE 54 OF DOL PSYCHOLOGIST CYNTHIA BOBSEINE'S
APRIL 16, 2019, DEPOSITION…...………………….EXHIBIT P. 237[37]


(7) SEPT. 7, '17, GOODTEMPS CONFIDENTIAL MEDICAL REPORT
PSYCHIATRIC DISABILTY AUTHORED BY DR. IQBAL FINDING ME
FIT TO WORK AS A DIRECT RESULT OF WHICH I SUCCESSFULLY
WORKED FOR PART OF 2018………………….....EXHIBIT PP. 238-240


(8) DR. BOBSEINE'S OCTOBER 17, 2017 NEWSPAPER OP-ED FOR
HUDSONVALLEY360 IN WHICH SHE PROMOTED DR. WAPNER'S
REELECTION TO THE CHATHAM TOWN BOARD WITHOUT
IDENTIFYING HERSELF TO THE VOTERS AS BEING HIS WIFE FOR
40 YEARS……………………………………....……..EXHIBIT PP. 241-242


(9) BRONX DOL SUPERVISORS HAD THE DIRECT AUTHORITY
WITHOUT INVOLVING DOL HEADQUARTERS TO IMPOSE, EXTEND,
AND TERMINATE "FULL RESTRICTIONS" AS ANN DECKER-
MONTARELLO'S OCTOBER 30, 2014 EMAIL TO SUPERVISOR
NOEMI RAMOS SHOWS…………………………………..EXHIBIT P. 243

---

[37] For the entire 10-page LSR Duties Statement, please see *Quadir I*, ECF 5-5 Filed 05/31/13 Page 61-70
of 84.  DOL resubmitted the foregoing LSR Duties Statement as **DOL's Exhibit A** on 8/23/19 as part of
its Summary Judgment Motion documents and exhibits in these present *Quadir II & III* lawsuits against
DOL—precise latter case ECF citation being **Case 1:17-cv-05177-JPO Document 42-1, Filed 08/23/19**.

Page 1

```
 1    UNITED STATES DISTRICT COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    ----------------------------------------------------X

 4    MOHAMMED QUADIR (PRO SE),

 5                              Plaintiff,

 6

 7    - Against -              CIVIL ACTION NO.:

 8                             17 CV 5177:16 CV 7476(JPO)

 9

10    NEW YORK STATE LABOR DEPARTMENT,

11                              Defendant.

12    ----------------------------------------------------X

13         DEPOSITION of:  CYNTHIA BOBSEINE, Ph.D.

14                   (Non-Party Witness)

15

16                 Tuesday, April 16, 2019

17                 2:40 p.m. - 5:05 p.m.

18

19

20    HELD:     Boies Schiller Flexner, LLP

21              30 South Pearl Street, 11th Floor

22              Albany, New York  12207

23

24    Reported by:  Deborah M. McByrne

25
```

Page 2

```
 1  APPEARANCES:
 2  APPEARING FOR PLAINTIFF:
 3  (Representation by Robins Kaplan LLP limited to
        specific witnesses only)
 4
        ROBINS KAPLAN LLP
 5         399 Park Avenue
           Suite 3600
 6         New York, New York  10022
           (212) 980-7441
 7  BY:  DAVID B. ROCHELSON, ESQ.
           drochelson@robinskaplan.com
 8
 9
    APPEARING FOR DEFENDANT:
10
        STATE OF NEW YORK
11      OFFICE OF THE ATTORNEY GENERAL
           28 Liberty Street
12         New York, New York  10005
           (212) 416-8651
13  BY:  MICHAEL A. BERG, ESQ.
           michael.berg@ag.ny.gov
14
15
    APPEARING FOR CYNTHIA BOBSEINE, Ph.D.:
16
        O'CONNOR, O'CONNOR BRESEE & FIRST, PC
17         20 Corporate Woods Boulevard
           Albany, New York  12211
18         (518) 465-0400
    BY:  ANNE M. HURLEY, ESQ.
19         hurley@oobf.com
20
21  Also Present:
22      Mohammed Quadir - Plaintiff
        Robert F. Axisa, Esq. - Department of Labor
23
24
25
```

Page 3

```
 1      F E D E R A L   S T I P U L A T I O N S
 2      IT IS HEREBY STIPULATED AND AGREED by
    and between the attorneys for the respective
 3  parties thereto that this deposition may be
    taken by the Plaintiff at this time pursuant to
 4  subpoena;
 5      IT IS FURTHER STIPULATED, that all
    objections except as to the form of the
 6  questions and responsiveness of the answers
    be reserved until the time of the trial;
 7
        IT IS FURTHER STIPULATED, that pursuant
 8  to Federal Rules of Civil Procedure 30(e)(1)
    the witness requests to review the
 9  transcript and make any corrections to same
    before any Notary Public;
10  OR;
11      IT IS FURTHER STIPULATED, that if the
    original deposition has not been duly signed
12  by the witness and returned to the attorney
    taking the deposition by the time of trial
13  or any hearing in this cause, a certified
    transcript of the deposition may be used as
14  though it were the original;
15      IT IS FURTHER STIPULATED, that the
    attorneys for the parties are individually
16  responsible for their certified transcript
    charge, including any expedite or other
17  related production charges;
18      AND IT IS FURTHER STIPULATED, that the
    Notary Public, DEBORAH M. McBYRNE, may administer
19  the oath to the witness.
20
21
22
23
24
25
```

Page 4

```
 1          CYNTHIA BOBSEINE, Ph.D.,
 2  was called as a witness, and having been first
 3  duly sworn, was examined and testified as
 4  follows:
 5  EXAMINATION BY
 6  MR. ROCHELSON:
 7  Q.  Good morning.  Could you please --
 8          MS. HURLEY:  Afternoon.
 9  Q.  Good afternoon.
10          MS. HURLEY:  This is our first
11      argument already, Dave.
12          MR. ROCHELSON:  Getting off on the
13      right foot.
14  BY MR. ROCHELSON:
15  Q.  Good afternoon.  Could you please state and spell
16      your name, for the record.
17  A.  Yes.  It is Cynthia Bobseine, and spelling both,
18      C-Y-N-T-H-I-A, B-O-B-S-E-I-N-E.
19  Q.  May I refer to you as Dr. Bobseine?
20  A.  Certainly.
21  Q.  Have you ever been deposed before?
22  A.  I have testified at hearings, but I don't think I've
23      been deposed.  I honestly don't know.
24  Q.  When have you testified at hearings?
25  A.  I've testified at hearings for New York State, when
```

Page 5

```
 1      an employee has contested a finding, or has filed an
 2      appeal.
 3  Q.  And would that be a state administrative hearing?
 4  A.  Yes.
 5  Q.  Before a --
 6  A.  -- arbitrator.
 7  Q.  Before an arbitrator?
 8  A.  Yes.
 9  Q.  Have you ever testified at trial?
10  A.  Yes, I have.
11  Q.  What were the circumstances?
12  A.  Custody hearings.
13  Q.  In your capacity as a psychologist?
14  A.  Psychologist, yes.
15  Q.  I think your Counsel might have instructed you on
16      some of these ground rules, but I just want to run
17      through them really quickly.  This is standard
18      deposition stuff.  I'll ask questions, the court
19      reporter will type up my questions and your answers.
20      For that reason, you have to give verbal responses.
21      You can't shake your head "No," or nod your head
22      "Yes."  You can't say "Uh-huh" or "Mm-hmm."  You
23      should try to give verbal responses.
24          Do you understand that you're
25      testifying under oath today subject to penalty of
```

2 (Pages 2 - 5)

Page 6

1    perjury?
2 A.  Yes.
3 Q.  If at any time today you don't understand one of my
4     questions, please tell me.  If you answer my
5     question without asking for clarification, I will
6     take that to mean that you understood it.  Do you
7     understand that?
8 A.  Yes.
9 Q.  Your testimony today is to be based on your personal
10    knowledge.  If you do not know the answer to one of
11    my questions, please tell me that you do not know.
12    If you answer a question, I will take that to mean
13    you're answering based upon your personal knowledge.
14    Do you understand that?
15 A.  Yes.
16 Q.  There may be times today when you think you know
17    where I am going with something.  Please wait and
18    let me finish my entire question, just so we have a
19    clear transcript.
20         Is the attorney seated next to you
21    representing you in this action?
22 A.  Yes.
23 Q.  Your attorney may object to the form of one of my
24    questions.  Please give your attorney an opportunity
25    to make that objection before you answer.  Once the

Page 7

1     objection has been made, you should continue to
2     answer the question, unless your attorney explicitly
3     instructs you not to answer.  Do you understand
4     that?
5 A.  No.
6         MR. ROCHELSON:  I can answer or you
7     can.
8 BY MR. ROCHELSON:
9 Q.  If there's an objection to the form of my question,
10    it is preserving an issue for trial and is not an
11    indication that you should not answer.  The
12    exceptions are, I would say, only privilege.  Your
13    Counsel might think there are other reasons you
14    should not answer a question, but if your Counsel
15    explicitly instructs you not to answer the question,
16    that's the only time you don't answer; otherwise,
17    she'll say objection, but you should keep going.
18    She is stating the objection for the record?
19         MR. BERG:  Let me jump in so I don't
20    have to interrupt the flow later.
21         MR. ROCHELSON:  Sure.
22         MR. BERG:  Dr. Bobseine, we met
23    briefly outside.  I'm Michael Berg; I am an
24    Assistant Attorney General for New York State,
25    and I am representing the Defendant in this

Page 8

1     case, the New York State Department of Labor.
2     On behalf of my client, I also have the right
3     and will occasionally object to questions, so I
4     don't want that to throw you off.  I am just
5     stating something for the record, and unless
6     Counsel wants to follow up with me, it just
7     means you take a breath and answer the question
8     if you are able to.
9         THE WITNESS:  Okay.  Thank you.
10 BY MR. ROCHELSON:
11 Q.  If you need to take a break at any time, just let me
12    know.  The only exception is if there's a question
13    pending, we just ask that you answer the question
14    and then you can take a break.  And please keep in
15    mind that you will remain under oath, even while you
16    are on a break.
17         Are you taking any medications that
18    could impact your ability today to give accurate and
19    truthful answers?
20 A.  No.
21 Q.  Is there any other reason you would not be able to
22    give accurate and truthful testimony today?
23 A.  No.
24 Q.  Does everything I've said so far make sense?
25 A.  Yes.

Page 9

1 Q.  We are going to look at some documents today that
2     have a little number in the bottom corner.  That's
3     called a Bates number.  I am going to refer to
4     those, we'll see some of those in a minute, just so
5     we're literally all on the same page.  It begins
6     "DEFS" and then there's a number after that.  You'll
7     see, it will make sense in a minute.  A couple of
8     abbreviations that might be helpful to go through;
9     if I refer to the Department of Labor as DOL; is
10    that all right?
11 A.  Yes.
12 Q.  And if I refer to the New York State Employee Health
13    Service as EHS; is that all right?
14 A.  Yes.
15 Q.  Can you state for the record your home address and
16    work address.
17 A.  My home address is 231 Thomas Road, Old Chatham, New
18    York  12136.  I have a home office there as well.
19         MR. ROCHELSON:  Let's mark this as
20    Plaintiff's 6.
21         (Plaintiff Exhibit 6 is marked for
22    identification.)
23 BY MR. ROCHELSON:
24 Q.  Dr. Bobseine, have you seen this document before?
25 A.  Yes.

3 (Pages 6 - 9)

Page 10

1  Q.  What is it?
2  A.  I believe I have -- it's a summons -- well, a
3     subpoena to return -- to come here for a deposition.
4  Q.  Do you understand you're appearing here under a
5     Subpoena issued by Mr. Quadir?
6  A.  No.  Well, I guess so, yes.  I'm confused by the Pro
7     Se, but --
8  Q.  That's all right.  We discussed that you're
9     represented by counsel here today, Ms. Hurley.  Has
10    the state provided counsel to you?
11 A.  No.
12 Q.  Are you paying Ms. Hurley's fee?
13 A.  No.
14 Q.  Is a malpractice insurer paying Ms. Hurley's fee?
15 A.  Yes.
16 Q.  I'd like to just ask a couple of questions about
17    your preparation for today's deposition.  Did you
18    speak to or meet with anyone about this deposition?
19 A.  I met with Ms. Hurley.
20 Q.  How many times?
21 A.  Once.
22 Q.  For about how long?
23 A.  An hour.
24 Q.  Did you speak to anyone else?
25 A.  No.

Page 11

1  Q.  Are you aware that Mr. Quadir also subpoenaed
2     Dr. John Wapner in this case?
3  A.  Yes.
4  Q.  Do you know Dr. Wapner?
5  A.  I do.
6  Q.  Who is he?
7  A.  He is a psychologist who works for EHS, who's also
8     my husband.
9  Q.  Are you aware that I deposed Dr. Wapner this
10    morning?
11 A.  Yes.
12 Q.  Did you and Dr. Wapner prepare together for your
13    depositions?
14 A.  No.
15 Q.  Did you meet together with Ms. Hurley?
16 A.  No.
17 Q.  Did you discuss with him any questions you thought I
18    might ask?
19 A.  No.
20 Q.  Did you discuss with him your evaluations of
21    Mr. Quadir?
22 A.  No.
23 Q.  After Dr. Wapner's deposition this morning, did you
24    speak to Dr. Wapner?
25 A.  Just to say "Hello."

Page 12

1  Q.  You did not discuss the substance of the deposition?
2  A.  No.
3  Q.  I should say, you did not discuss the substance of
4     his deposition?
5  A.  Correct, I did not.
6  Q.  And you did not discuss the substance of your
7     deposition?
8  A.  Correct.
9  Q.  Okay.  When you met with Ms. Hurley, did you review
10    any documents?
11 A.  Yes.
12 Q.  What documents did you review?
13 A.  My evaluations.
14 Q.  Of Mr. Quadir?
15 A.  Of Mr. Quadir, yes.
16 Q.  Is there more than one?
17 A.  There's two.
18 Q.  Which two evaluations are those?
19 A.  There's one in early February and one in early
20    March.  I think it's February 2nd and March 8th, if
21    I'm not mistaken.
22 Q.  And there are separate reports for each of those
23    evaluations?
24 A.  Yes.
25 Q.  Are you aware that Mr. Quadir has filed several

Page 13

1     lawsuits against the Department of Labor?
2  A.  Yes.
3  Q.  Are you aware that he has taken certain depositions
4     in those matters?
5  A.  No.
6  Q.  Have you spoken to anyone who Mr. Quadir has deposed
7     in those matters?
8  A.  No.
9  Q.  Did you review any documents, other than your
10    evaluation report?
11 A.  Some of the testing data, the actual data that went
12    into the reports.
13 Q.  When you say, "testing data," would that be the
14    reporting forms that you filled out pursuant to
15    certain psychological tests?
16 A.  Yes.
17 Q.  Are you aware that there is a file at the Employee
18    Health Service of your evaluation of Mr. Quadir?
19 A.  Yes.
20 Q.  Did you review the entirety of that file?
21 A.  I reviewed what they sent me when I asked for
22    material related to my evaluation.
23 Q.  At the time of your evaluation, you requested
24    materials?
25 A.  No.  When I received this.

4 (Pages 10 - 13)

Page 14

1  Q.  When you received the Subpoena, you asked EHS for
2      materials related to your evaluation?
3  A.  Yes.
4  Q.  And they sent you their file?
5  A.  Yes.
6          MR. BERG:  Objection to form.
7      BY MR. ROCHELSON:
8  Q.  Have you reviewed the complaints in Mr. Quadir's
9      cases?
10 A.  No, I don't believe so.
11 Q.  Are you familiar with his allegations?
12 A.  Very generally.
13 Q.  What do you understand them to be?
14 A.  Well, I know that he had -- he had accommodations
15     for a period of time for depression, a diagnosis of
16     depression.  When those expired, he reapplied and
17     they were not granted, and he was found unfit to
18     work and contested that.
19 Q.  At what point in time are we talking about?
20 A.  Prior to when I met with him.  This was part of the
21     history that he gave me.
22 Q.  It was prior findings of his unfitness before you
23     met with him?
24 A.  Yeah.
25 Q.  Okay.  We'll come back to that.  I just want to talk

Page 15

1      a little bit about your background, if that's all
2      right?
3  A.  Yes.
4  Q.  Can you please describe all of your education since
5      high school, formal degree-granting education.
6  A.  Okay.  I have an Associate's Degree in Liberal Arts
7      from a place that's now called Hilbert College in
8      western New York.  I have a Bachelor's Degree in
9      psychology and sociology from the University of
10     Buffalo.  I have a Master's Degree in rehabilitation
11     counseling from the University at Albany.  I have a
12     certificate of advanced study in school psychology
13     from the University of Albany, and I have a
14     respecialization in school psychology, direct
15     practice, which is a doctoral level degree in school
16     psychology, and a Ph.D. in psychology, all from the
17     University at Albany.
18 Q.  What is school psychology?
19 A.  School psychology is basically a field of psychology
20     that's largely related to evaluating children and
21     school age children under the age of, you know,
22     graduation from high school age.  It has to do with
23     a lot of assessment, evaluation, identification of
24     disabilities, consulting around children's needs who
25     have various disabilities under the IDEA

Page 16

1      legislation.
2  Q.  Would you say that you have a specialty?
3  A.  I don't understand.  Exactly in what?  What are you
4      asking?
5  Q.  I guess the first question is if you would say you
6      had a specialty at all, right?  Some people might
7      simply describe themselves as generalists.  So my
8      question is:  When you were describing yourself,
9      would you describe yourself as having a specialty?
10 A.  Okay.  I think my specialty is assessment and
11     developmental psychology.
12 Q.  Do you have a specialty in school psychology?
13 A.  No.
14 Q.  When you say "assessment," does that include things
15     like learning disabilities?
16 A.  Yes.
17 Q.  Does it include depressive disorders?
18 A.  Yes.
19 Q.  Does it include personality disorders?
20 A.  Yes.
21 Q.  Did you attend medical school?
22 A.  No.
23 Q.  And you are not a medical doctor?
24 A.  No.
25 Q.  Are you licensed to prescribe medication?

Page 17

1  A.  No.
2  Q.  Are you familiar with Major Depressive Disorder?
3  A.  Yes.
4  Q.  What do you understand it to be?
5  A.  Well, that's a good question.  It's a mood disorder.
6      It can be very debilitating.  It usually relates to
7      a person feeling that sense of hopelessness, a sense
8      of self -- poor self-esteem.  Often it's accompanied
9      by a variety of symptoms that have to do with
10     somatic symptoms, sleep problems, appetite problems,
11     fatigue, tiredness, sense of lack of purpose; a
12     variety of different criteria.
13 Q.  Have you diagnosed patients with Major Depressive
14     Disorder?
15 A.  Yes.
16 Q.  And have you treated patients with Major Depressive
17     Disorder?
18 A.  Yes.
19 Q.  Have you ever referred a patient to a psychiatrist
20     for further treatment?
21 A.  Yes.
22 Q.  Can you describe your employment history since the
23     end of your formal education.
24 A.  Okay.  My -- let's see.  My first job was, after
25     completing my Master's Degree in rehabilitation

5 (Pages 14 - 17)

Page 18

1    counseling, was at the Mental Health Clinic in
2    Albany, New York, where I was a therapist. I began
3    working with the Children's Team there and after
4    several years, took a position that was a shared
5    position with OMRDD and the county, working with
6    children.
7          I went from there to Wildwood School,
8    which is a school for primarily autistic children,
9    or it was at that time, which is local. And, again,
10   I was a family therapist and a therapist for
11   children. I took a break. I went back to school
12   for my Ph.D. and -- let's see.
13         I began working -- when I was in
14   school, I began working at Berkshire Farm Center and
15   Services For Youth, which is a very large agency,
16   but I worked at the Residential Center For
17   Adolescent Boys, and I worked as a clinician
18   initially and then I was a Program Director and a
19   clinician and I did some training and I did
20   administrative work, and I left there in 2006. That
21   was full-time. I left there in 2006, and during the
22   course of working there, I had had a small private
23   practice, and I left and began to develop a
24   full-time private practice. And in that context, I
25   began working regularly for various agencies doing

Page 19

1    assessments, fitness for duty, preemployment
2    assessments, individual therapy, some training, and
3    I'm still doing that.
4    Q.  You mentioned Mental Health Clinic in Albany. Did
5    Dr. Wapner work there as well?
6    A.  He did work there.
7    Q.  Were you married at the time?
8    A.  No.
9    Q.  Did you meet there?
10   A.  We did meet there.
11   Q.  So since 2006, you have been in full-time private
12   practice; is that right?
13   A.  Well, now I am. It took a while to get there, but
14   not initially.
15   Q.  Have you ever been a full-time employee of the
16   state?
17   A.  No.
18   Q.  You are a consulting psychologist for the state?
19   A.  Yes.
20   Q.  Do you have a contract with the state?
21   A.  Not right now. I -- it just ended March 31st.
22   Q.  And when you did have a contract, what did that
23   contract provide?
24         MS. HURLEY: You want to be a little
25   bit more specific?

Page 20

1          MR. ROCHELSON: Sure.
2    BY MR. ROCHELSON:
3    Q.  Did the contract provide for a rate of compensation?
4    A.  Yes.
5    Q.  What was the rate?
6    A.  It depends. If I was working in Cohoes, which is
7    nearer to this place, it was $150 for an hour-long
8    assessment and report. And if it was in New York
9    City -- it's changed a little bit. It's currently,
10   if it's in New York City, it's $260 an hour, which
11   includes transportation and if we -- if I stay
12   overnight, you know, a hotel.
13   Q.  And is there a limit on the number of hours you can
14   examine someone?
15         MS. HURLEY: Form.
16         You can go ahead and answer.
17   A.  No, it's not a limit.
18   Q.  In your private practice as a consulting
19   psychologist, what government entities do you work
20   for?
21   A.  New York State, the Albany Police Department, the
22   Albany Fire Department, very occasionally Columbia
23   County Sheriffs, and for a number of years, I worked
24   for Columbia County Department of Social Services.
25   I just ended my contract with them.

Page 21

1    Q.  And so, to the extent you work with juveniles, that
2    would be through the DSS contract?
3    A.  That was primarily custody and mental health
4    assessments for parents whose children had been
5    removed from their care, or were about to be removed
6    from their care, potentially.
7    Q.  Assessing them for fitness as custodial parents?
8    A.  Correct.
9    Q.  Have you also done work for the Catholic Church?
10   A.  Oh, yes. I forgot about that. That is part of my
11   private practice.
12   Q.  And what does that work entail?
13   A.  The Roman Catholic Diocese has a clinic, the
14   consultation center, which is in Albany, and I work
15   there one day a week, basically doing therapy with
16   adults and occasional adolescent, some testing. I
17   just did some testing --
18         MS. HURLEY: Doctor, wait for a
19   question.
20         THE WITNESS: Okay.
21   BY MR. ROCHELSON:
22   Q.  Is it general purpose therapy and testing or does it
23   have a particular purpose?
24   A.  General purpose.
25   Q.  Is part of your practice evaluating employees for

6 (Pages 18 - 21)

Page 22

1    fitness for the workplace?
2  A.  Yes.
3  Q.  If you can, can you identify a rough percentage of
4    your work that is that kind of work?
5        MS. HURLEY:  Presently?
6        MR. ROCHELSON:  Presently.
7  A.  Well, presently, I'm not working for New York State.
8  Q.  Why don't we say in the 2015/2016 timeframe, around
9    when you evaluated Mr. Quadir?
10  A.  Two days a month; two of 20.
11  Q.  And would that all be for government employees?
12  A.  Well, that would have included DSS as well.
13        MS. HURLEY:  You said "State," and now
14    you're saying "Government."
15        MR. ROCHELSON:  Fair enough.  I'll
16    clarify.
17  BY MR. ROCHELSON:
18  Q.  So would your DSS work include employee fitness
19    evaluations or only parental fitness evaluations?
20  A.  No.  I'm sorry.  No, it would not include employee
21    fitness.
22  Q.  So confined to employee fitness evaluations for any
23    government entity, whether that's state, city or
24    local, that would be two days a month?
25  A.  Yes.

Page 23

1  Q.  And does that work include evaluation of Department
2    of Labor employees?
3  A.  Yes.
4  Q.  Can you put a percentage on that?
5  A.  No.
6  Q.  Would the Labor Department be just one of various
7    state agencies whose employees you see?
8  A.  Yes.
9  Q.  Would you be able to say how many Labor Department
10    employees you see in a year?
11  A.  No.
12  Q.  Are you aware that Mr. Quadir held a position called
13    Labor Services Representative?
14  A.  Yes.
15  Q.  Are you familiar with that position?
16        MS. HURLEY:  Form.
17  BY MR. ROCHELSON:
18  Q.  Are you familiar with the position of Labor Services
19    Representative?
20  A.  Yes.
21  Q.  What do you understand it to be?
22  A.  I understand it to be what I read in the job
23    description when I have a referral in front of me.
24    So off the top of my head, I can't tell you a lot.
25  Q.  Sure.  So could you explain that a little bit?  And

Page 24

1    specifically I mean, when you are asked to conduct
2    an evaluation of an employee's fitness, are you
3    provided with the job description for that employee?
4  A.  Yes.
5  Q.  And do you review that description?
6  A.  Yes.
7  Q.  I might abbreviate Labor Services Representative as
8    LSR.  Is that all right?
9  A.  Sure.
10  Q.  Have you evaluated any LSR, other than Mr. Quadir?
11  A.  Yes.
12  Q.  About how many?
13  A.  In the last year, at least two.
14  Q.  Would that be typical of the past ten years?
15  A.  I don't know.
16  Q.  But you know that you've done two in the past year?
17  A.  Yes.  At least.
18  Q.  Do you recall what assignments they had within the
19    Labor Department?
20  A.  The other people?
21  Q.  Yes.
22  A.  One assignment they both had was running groups for
23    clients who came to the Department of Labor who were
24    looking for work.  One gentleman was in charge of a
25    resource room where apparently people could come and

Page 25

1    get materials.  They were -- They had contact with
2    clients of, you know, people who were actually
3    coming for assistance and finding jobs of various
4    kinds -- various kinds of assistance.
5  Q.  You mentioned that when you conduct an evaluation of
6    an employee for fitness, you ask for certain
7    referral materials?
8        MS. HURLEY:  Objection to form.  I
9    think she said she received material.  I don't
10    think she asked for them.
11        MR. ROCHELSON:  I appreciate that.
12    I'll rephrase.
13  BY MR. ROCHELSON:
14  Q.  Is it true that when you conduct an evaluation of an
15    employee for fitness, you receive certain referral
16    materials?
17  A.  Yes.
18  Q.  And what do those materials contain?
19  A.  They usually contain a face sheet with identifying
20    information about where the person works, what the
21    person's home address is, and the reason for
22    referral, which can be one of several.  A letter or
23    summary from the employer stating the reason -- more
24    in a narrative form, the reason for the referral.
25    Supporting documents, if there is that included in

7 (Pages 22 - 25)

Page 26

1    the reason for the referral.  The job description.
2    Sometimes evaluations, which may or may not be
3    reported in the referral, but they are pertinent
4    potentially.
5  Q.  When you say, "evaluations," do you mean job
6    evaluations?
7  A.  An annual evaluation on an employee.
8  Q.  A performance review?
9  A.  Yes.
10  Q.  Not a psychological?
11  A.  Correct.  I'm sorry.
12  Q.  Just to clarify.
13         If the referring materials you
14    received did not include performance reviews, would
15    you ask to see them?
16  A.  Sometimes.
17  Q.  Under what circumstances?
18  A.  If a person is reported in the referral materials to
19    be a problematic employee, to have difficulty with
20    attendance or to have poor performance, and I have
21    not received a performance evaluation and the
22    employee -- in that case, I typically would request
23    more documentation to support that.  If the employee
24    vehemently disagrees with the referral, I also ask
25    for verifying information.

Page 27

1  Q.  Do the referring materials include a subject's
2    medical records?
3  A.  Only in the case of if a person has a doctor's note
4    saying that this person is fit to return to work at
5    this point, that would be included, because I would
6    be asked to corroborate that.  Medical records in
7    terms of other medical issues, typically, no.
8  Q.  If there's a return to work letter, would you also
9    want to see underlying doctors' notes?
10  A.  Not necessarily.
11  Q.  Under what circumstances would you want to see them?
12  A.  I think if there was a conflict in the information,
13    I might typically call the doctor.
14  Q.  What do you mean by, "Conflict"?  You said if
15    there's a conflict in the information.  What do you
16    mean by that?
17  A.  Well, if the referral says one thing and the note is
18    vague or doesn't say that in some way, I might look
19    for more corroboration.
20  Q.  Has anyone ever challenged one of your evaluations?
21  A.  Yes.
22  Q.  About how many times?
23  A.  Since 2006, I would say, maybe eight or ten times.
24  Q.  About once a year, maybe?
25  A.  That would be a lot, but I would say on the outside.

Page 28

1  Q.  And do you have an approximation of how many
2    evaluations you've conducted in that time?
3        MS. HURLEY:  Since 2006 or the last
4    eight or ten years, because those are two
5    different periods.
6  BY MR. ROCHELSON:
7  Q.  Since 2006.
8  A.  No, I don't.
9  Q.  You mentioned there was one instance where you
10    testified at a hearing.  Was that a result of a
11    challenge like that?
12  A.  An appeal, yes.
13  Q.  It was an appeal of your opinion?
14  A.  Yes.
15  Q.  Do you recall what your opinion was?
16  A.  There were several of those.
17  Q.  To take them one at a time, if you recall -- Well,
18    let me ask generally.  Did they each involve a
19    finding that an employee was unfit for the
20    workplace?
21  A.  Yes.
22  Q.  And in each instance, the employee challenged that
23    finding?
24  A.  Yes.
25  Q.  Do you recall the outcome of the hearing?

Page 29

1  A.  I don't usually know the outcome of the hearing.
2  Q.  So they might have overturned your opinion or they
3    might not have.  You don't know.
4  A.  Right.
5        MS. HURLEY:  Could we take just a
6    minute?
7        MR. ROCHELSON:  Sure.
8        (Whereupon, a recess is taken.)
9  BY MR. ROCHELSON:
10  Q.  Dr. Bobseine, do you understand that you're still
11    under oath?
12  A.  Yes.
13  Q.  Have you ever had an instance where you reached a
14    different conclusion than a subject's personal
15    physicians?
16        MS. HURLEY:  Form.
17        You can answer.
18  A.  Yes.
19  Q.  Do you recall any particular instance?
20  A.  This case is an instance in that.
21  Q.  And in what sense?
22  A.  Mr. Quadir's doctor said that he felt he was fit to
23    return to work, and I disagreed.
24  Q.  Do you recall which of Mr. Quadir's physicians you
25    are referring to?

8 (Pages 26 - 29)

Page 30

1  A.  It was a psychiatrist.
2  Q.  Is that Dr. Iqbal?
3  A.  I don't know.
4  Q.  Do you recall if you spoke to his psychiatrist?
5  A.  No, I didn't.
6  Q.  Did you exchange any correspondence with him?
7  A.  I don't believe so.
8  Q.  Did you see the basis for this psychiatrist's
9      opinion that Mr. Quadir was fit to return to work?
10  A.  I saw a short letter.
11  Q.  And that was the extent of the basis that you saw?
12  A.  Yes.
13  Q.  Did you seek any additional notes or information or
14      backup for that opinion from his personal physician?
15          MS. HURLEY:  Form.
16  A.  No.
17  Q.  Why not?
18  A.  I thought I had enough data to say that he was not
19      fit for his job duties.
20  Q.  How long did you spend with Mr. Quadir?
21  A.  Totally, about three hours.
22  Q.  Is that cumulatively over the February and March
23      visits?
24  A.  Yes.
25  Q.  Do you have a sense of how long Mr. Quadir's

Page 31

1      personal physician has been his personal physician?
2  A.  No.
3  Q.  When there is a conflict between your opinion and
4      the subject's personal physician's opinion, how does
5      EHS weigh those opinions against each other?
6          MS. HURLEY:  Form.
7  A.  I don't understand.  I'm not EHS.
8          MS. HURLEY:  So you don't know?
9          THE WITNESS:  I don't know.
10          BY MR. ROCHELSON:
11  Q.  Fair enough.  When you conduct an evaluation of an
12      employee for fitness, how do you decide which tests
13      to run?
14  A.  Depends on the referral question.  It depends on the
15      reason that they -- There's two types of fitness.
16  Q.  What are the two types?
17  A.  Is a person fit to remain on the job and is a person
18      fit to return to work.
19  Q.  How do the evaluations differ?
20  A.  I can't say exactly.  Depends on the referral
21      material.
22  Q.  Do you always conduct multiple tests as part of an
23      evaluation?
24  A.  Not always.
25  Q.  Sometimes a single test is enough?

Page 32

1  A.  Sometimes an interview is enough.
2  Q.  To determine if an employee is fit or unfit?
3  A.  No.  I'm getting my evaluations -- Fitness for duty,
4      no.
5  Q.  Do you belong to any professional associations?
6  A.  Yes.
7  Q.  Which ones?
8  A.  American Psychological Association.
9  Q.  And what is your role within that organization?
10  A.  I am a dues-paying member.
11  Q.  Have you ever spoken at a conference or panel
12      discussion of the APA?
13  A.  No.
14  Q.  Have you published on the subject of workplace
15      psychology?
16  A.  No.
17  Q.  Have you ever been named as a defendant in a
18      lawsuit?
19  A.  No.
20  Q.  Have you ever been a plaintiff?
21  A.  No.
22  Q.  Let's talk about your report.
23          MR. ROCHELSON:  Off the record.
24          (Whereupon, a discussion was held off
25      the record.)

Page 33

1          (Plaintiff Exhibit 7 is marked for
2      identification.)
3          BY MR. ROCHELSON:
4  Q.  Dr. Bobseine, I've handed you a document marked
5      Exhibit 7, which I understand to be the file that
6      EHS produced to DOL in this matter in response to a
7      document request from Mr. Quadir for all documents
8      relating to your evaluation of him.  I understand
9      that you filed a report based on your February 2016
10      examination of him and your March 2016 examination
11      of him, and that this only contains the latter and
12      may otherwise be incomplete or have other certain
13      issues that we are going to resolve offline.  But in
14      the meantime, I would like to ask you questions
15      about this document, to the extent you are familiar
16      with it and are able to, if that is all right with
17      you and your counsel?
18          MS. HURLEY:  We will take it one
19      question at a time.
20          MR. ROCHELSON:  Fair enough.
21          BY MR. ROCHELSON:
22  Q.  So have you seen the first page of this document
23      before?
24  A.  Literally, this one?
25          MS. HURLEY:  That first page?

9 (Pages 30 - 33)

1   BY MR. ROCHELSON:
2   Q.  The very first page.
3   A.  No, I don't believe I've ever seen it.
4   Q.  So it appears to be a fax cover sheet from
5       Sharon Lacy to Employee Health Services dated
6       June 1, 2017.  Do you know who Sharon Lacy is?
7           MS. HURLEY:  Just so the record is
8       clear, they are actually two dates on this.
9           MR. ROCHELSON:  There are two dates,
10          that's right.
11  BY MR. ROCHELSON:
12  Q.  It says "date" in typewritten, "May 30, 2017," and
13      then there's a handwritten slash and in handwriting,
14      it says "June 1, 2017."  So it appears to be from
15      late May or early June of 2017.  Do you know who
16      Sharon Lacy is.
17  A.  No.
18  Q.  This refers to a medical examination of Mr. Quadir,
19      March 8, 2016, conducted by Dr. Cynthia Bobseine.
20      Is that you?
21  A.  Yes.
22  Q.  It also refers to a Section 73 Termination Hearing
23      scheduled for June 13, 2017.  Do you see that it
24      says that?
25  A.  Yes.

1   Q.  Do you have any understanding of what a Section 73
2       Termination Hearing is?
3   A.  Yes.
4   Q.  What do you understand it to be?
5   A.  As I understand it, it's a hearing to terminate the
6       employment of a New York State employee who has been
7       out of work for over a year.
8   Q.  Did you examine Mr. Quadir on March 8, 2016?
9   A.  Yes.
10  Q.  Did you understand that to be pursuant to Section 73
11      of the Civil Service Law?
12          MS. HURLEY:  Form.
13          MR. BERG:  Objection to form.
14          MS. HURLEY:  Did you know that,
15      Doctor?
16          THE WITNESS:  No, I didn't know.
17  BY MR. ROCHELSON:
18  Q.  Okay.  Did there come a time when you were asked to
19      examine Mr. Quadir?
20  A.  Yes.
21  Q.  Do you recall when that happened?
22  A.  I received the request the day he was scheduled -- I
23      mean, a few days before he was scheduled.
24  Q.  Do you recall who sent it to you?
25  A.  Someone at EHS puts together the packet.

1   Q.  Do you know under what circumstances DOL orders the
2       mental health evaluations of employees?
3           MS. HURLEY:  Form.
4   A.  No.  No.
5   Q.  Do you know how EHS chose you to evaluate
6       Mr. Quadir?
7   A.  How EHS chose me?
8   Q.  Yes.
9   A.  No.
10  Q.  If you could turn to the page with the Bates number
11      ending in 5241.  You should see a little number at
12      the bottom starting with DEFS.  That is called a
13      Bates number.
14          MS. HURLEY:  It looks like this.
15      Right, that's it.
16          THE WITNESS:  Okay.
17  BY MR. ROCHELSON:
18  Q.  Have you seen this letter before?
19  A.  Yes.
20  Q.  What do you recognize it to be?
21  A.  This is a referral letter.
22  Q.  And for the record, this is the letter dated
23      September 22, 2016, from MaryAnn Wilson to
24      Dr. Richard Ciulla; is that right?
25  A.  Yes.

1   Q.  And who is Dr. Ciulla?
2   A.  He is the Medical Director of EHS.
3   Q.  Yeah.  It might actually be a typo on this letter.
4       We think that this letter was probably actually sent
5       in 2015.
6           MS. HURLEY:  Well, for the record,
7       Dr. Bobseine's name doesn't appear anywhere on
8       this page.
9           MR. ROCHELSON:  That is right.  You're
10      right.  You could see it's cut off at the very
11      top, but it looks like the fax was sent on
12      January 22nd of 2016.
13          MS. HURLEY:  You know, we can't know
14      that.  You're going to have to get another copy
15      of this letter that shows that full fax number.
16  BY MR. ROCHELSON:
17  Q.  Was it Dr. Ciulla that contacted you about
18      conducting the evaluation?
19          MS. HURLEY:  Object to the form.
20  A.  No.
21  Q.  Do you recall who it was who contacted you?
22  A.  I picked up referral packets.
23          MS. HURLEY:  Doctor, just --
24  A.  No.  I don't.
25  Q.  Did you have any communications with anyone at DOL

Page 38

1    before your examination of Mr. Quadir?
2    A.  No.
3    Q.  Did you have any communications with anyone at EHS
4    before your examination of Mr. Quadir?
5    A.  No.
6    Q.  What about after your examination?
7            MS. HURLEY:  Would you ask the
8        complete question, please.
9            MR. ROCHELSON:  Sure.
10   BY MR. ROCHELSON:
11   Q.  Did you have any communications with anyone at DOL
12       after your examination of Mr. Quadir?
13   A.  The March 8th evaluation?
14   Q.  Yes.
15   A.  I don't recall.
16   Q.  Did you have any communications with anyone at EHS
17       after your examination of Mr. Quadir in March 2016?
18   A.  Other than sending in a report, no.
19   Q.  Did you understand that Dr. Wapner had evaluated
20       Mr. Quadir in September 2015?
21           MR. BERG:  Objection to form.
22           MS. HURLEY:  Form.
23   A.  Yes.
24   Q.  What did you understand about that evaluation?
25           MS. HURLEY:  Can we have a timeframe?

Page 39

1            MR. BERG:  Objection to form.
2            MR. ROCHELSON:  I'll withdraw the
3        question.
4    BY MR. ROCHELSON:
5    Q.  At the time that EHS contacted you about evaluating
6        Mr. Quadir, what did you understand about
7        Dr. Wapner's evaluation in September of 2015?
8    A.  On the initial referral, nothing.  I had no
9        information.
10   Q.  Did you request Dr. Wapner's report?
11   A.  After I saw Mr. Quadir the first time.
12   Q.  After you saw him in February 2016, you requested
13       the report from Dr. Wapner from September 2015; is
14       that right?
15           MS. HURLEY:  Form.  Form.
16       Go ahead.
17   A.  I requested Dr. Wapner's report from 2015 from EHS.
18   Q.  Had you met Mr. Quadir before you evaluated him?
19   A.  In February?
20   Q.  In February, for the first time --
21   A.  No.
22   Q.  In February 2016, yes.
23   A.  No.
24   Q.  Were you paid for your evaluation of Mr. Quadir?
25   A.  Yes.

Page 40

1    Q.  What was your rate of compensation?
2    A.  Oh, I don't recall at that point.
3    Q.  Would it have been at the 260-per-hour rate for New
4        York City residents?
5            MR. BERG:  Objection to form.
6    A.  I don't know.
7    Q.  Was your compensation contingent upon the outcome of
8        your evaluation?
9    A.  No.
10   Q.  Was it contingent on anything else?
11   A.  Amount of time spent in contact.
12   Q.  It's contingent on the amount of time spent in
13       contact because it's an hourly rate?
14   A.  Yes.
15   Q.  Who determines your rate of compensation?
16   A.  I don't know.
17   Q.  Is your rate of compensation set by contract?
18   A.  Yes.
19   Q.  Did you negotiate that contract?
20   A.  I am not sure I understand the question.  Did I
21       negotiate?
22   Q.  Did Employee Health Services offer you a rate of
23       compensation and you accepted it?
24   A.  Yes.
25   Q.  Did anyone at EHS tell you the outcome they intended

Page 41

1        for the evaluation of Mr. Quadir?
2    A.  No.
3    Q.  Did anyone at DOL tell you the outcome they intended
4        for your evaluation of Mr. Quadir?
5            MS. HURLEY:  Form.
6    A.  No.
7    Q.  Is the state covering your expenses today?
8    A.  No.
9    Q.  After you saw Mr. Quadir in February of 2016 and
10       requested Dr. Wapner's report from September 2015,
11       did Mr. Quadir consent to your reviewing the prior
12       report?
13   A.  Could you ask that question again?
14   Q.  In February 2016, when you asked to see the report
15       from Dr. Wapner's evaluation in September 2015, did
16       Mr. Quadir authorize your review of his prior
17       evaluation?
18           MS. HURLEY:  Object to the form.
19   A.  I don't know.
20   Q.  So can we take a look at page 5237 of Exhibit 7.
21       Have you seen this before?
22   A.  Yes.
23   Q.  What is it?
24   A.  This is my report from my evaluation on March 8th of
25       2016.

11 (Pages 38 - 41)

Page 42

1  Q.  Let's actually look at the previous page ending in
2     5236.  Can you tell me if you've seen that before?
3  A.  Yes.
4  Q.  And what is it?
5  A.  It's the letter that was sent to the Department of
6     Labor, giving my conclusion from March 8th.
7  Q.  So, for the record, it's a letter dated March 18,
8     2016 from Dr. Ciulla to Ms. MaryAnn Wilson.  You're
9     not a recipient of this letter; is that right?
10 A.  No.
11 Q.  But your name does appear in the first line; is that
12    right?
13 A.  Yes.
14 Q.  So the first line says, "At your request,
15    Mohammed Quadir was evaluated by
16    Dr. Cynthia Bobseine, psychologist, on March 8,
17    2016, pursuant to Section 72 of the Civil Service
18    Law."  Do you see that?
19 A.  Yes.
20 Q.  Did you understand that you were evaluating
21    Mr. Quadir pursuant to Section 72?
22         MS. HURLEY:  Form.  At what point?  At
23    the point on the date of this letter?
24 BY MR. ROCHELSON:
25 Q.  On the date of your evaluation of Mr. Quadir on

Page 43

1     March 8, 2016, did you understand that you were
2     evaluating him pursuant to Section 72 of the Civil
3     Service Law?
4  A.  Yes.
5  Q.  At that same point in time, did you understand you
6     were evaluating him pursuant to Section 73 of the
7     Civil Service Law?
8  A.  No.
9  Q.  If you were evaluating him pursuant to Section 73 on
10    March 8, 2016, would your evaluation have differed?
11         MR. BERG:  Objection to form.
12         MS. HURLEY:  Same.  Could you just
13    read that back, please.
14         (Whereupon, the requested question is
15    read back by the Court Reporter.)
16         MS. HURLEY:  You mean the exercise or
17    do you mean the report?
18         MR. ROCHELSON:  We can take it piece
19    by piece.
20         MS. HURLEY:  Well, they are two
21    different questions, that's why.
22         MR. ROCHELSON:  Sure.  I'll withdraw
23    the question.
24 BY MR. ROCHELSON:
25 Q.  On March 8, 2016, when you conducted certain

Page 44

1     psychological tests for Mr. Quadir, would you have
2     conducted different tests if you were evaluating him
3     pursuant to Section 72, as opposed to Section 73?
4  A.  No.
5  Q.  On March 8, 2016, when you were writing up your
6     conclusions about Mr. Quadir, would you have reached
7     different conclusions if you were evaluating him
8     based on Section 72, as opposed to Section 73?
9  A.  No.
10 Q.  So now I am on the page ending in 5237, which is
11    your actual report, right?
12 A.  Okay.
13 Q.  At the top, where it says, "Agency employed
14    Department of Labor; years employed at NYS, five
15    years."  Do you see that?
16 A.  Yeah.
17 Q.  Does that refer to the duration of Mr. Quadir's
18    employment?
19 A.  Yes.
20 Q.  And the date is -- Where it says, "date of
21    evaluation March 8, 2016," do you see that?
22 A.  Yeah.
23 Q.  Did you write your report on the same day?
24 A.  Oh, I don't recall.
25 Q.  In the section here that is titled, "Summary," it

Page 45

1     refers to your February 2016 meeting.  Do you see
2     that?
3  A.  Yes.
4  Q.  Do you recall how long you met with him in that
5     February meeting?
6  A.  About an hour.
7  Q.  Did you have to cut the examination short?
8  A.  I chose to.
9  Q.  And why is that?
10 A.  Mr. Quadir had a headache.  I felt that it was not
11    fair to do testing with him.  He seemed distracted
12    and uncomfortable, so I decided to reschedule him.
13 Q.  And you rescheduled for March 8, 2016?
14 A.  Yes.
15 Q.  And how long did you meet with him on that occasion?
16 A.  I believe, about two hours.
17 Q.  Does the rest of this report only reflect the tests
18    you ran and interview from the March meeting?
19         MR. BERG:  Objection to form.
20 A.  Could you ask that question again?
21 Q.  I'll rephrase it.  The beginning of this report
22    refers to the February 2016 meeting, and then it
23    proceeds to summarize certain tests that you ran and
24    conclusions that you drew; is that right?
25 A.  That's correct.

12 (Pages 42 - 45)

Page 46

1 Q. And are those tests that you ran only in the March
2    2016 meeting?
3 A. Yes.
4 Q. And do your conclusions reflect only the March 2016
5    meeting?
6        MS. HURLEY: You mean, other than the
7    mention of the February?
8        MR. ROCHELSON: Yes.
9 A. This conclusion is based on the data from March 8th
10    meeting, yes.
11 Q. The first line here says, "You evaluated Mr. Quadir
12    after he submitted medical documentation, clearing
13    him to return to work from involuntary leave." Do
14    you see that?
15 A. Yes.
16 Q. And if you could flip to the page ending in 5242.
17 A. Okay.
18 Q. Have you seen this document before?
19 A. Yes.
20 Q. And what is this?
21 A. This is a medical note from his psychiatrist.
22 Q. I will just read it into the record quickly. It's
23    dated January 1, 2016. It says, "To whom it may
24    concern: Mohammed Quadir has been under my care
25    since August 16, 2011. Mr. Quadir is fully

Page 47

1    compliant with all plans of treatment and follow-up
2    appointments. I am supportive of this patient
3    returning to work and despite his diagnosis of Major
4    Depressive Disorder, I believe he is capable of
5    successfully performing his work duties.
6    Respectfully submitted, Naveed Iqbal, M.D." Did I
7    read that correctly?
8 A. Yes.
9 Q. So did you review this letter in the course of your
10    examination?
11 A. Yes.
12 Q. How did it affect your conclusions?
13        MS. HURLEY: Form.
14        MR. BERG: Objection to form.
15 BY MR. ROCHELSON:
16 Q. How did it affect your conclusions?
17 A. It was a piece of data that I weighed against other
18    information that I had.
19 Q. I believe you testified earlier that you and
20    Dr. Iqbal reached different conclusions; is that
21    right?
22 A. Yes.
23 Q. Because Dr. Iqbal found that Mr. Quadir was fit to
24    return to work, and you found that he was not fit to
25    return to work; is that right?

Page 48

1 A. Yes.
2 Q. Is the fact that Dr. Iqbal, according to this
3    letter, has had Mr. Quadir under his care since
4    August of 2011, make his opinion compelling?
5        MS. HURLEY: Form.
6        MR. BERG: Objection to form.
7 BY MR. ROCHELSON:
8 Q. If you can answer.
9 A. It's an opinion that I certainly would weigh,
10    absolutely.
11 Q. How would you weigh the opinion of a practitioner
12    who has cared for a patient for four and a half
13    years against a practitioner who saw a patient for
14    three hours?
15        MS. HURLEY: Form.
16        MR. BERG: Objection to form.
17 A. I believe I know more about the job that Mr. Quadir
18    has and some of the characteristics that are
19    necessary to complete it, which this doctor may or
20    may not have.
21 Q. But his knowledge of Mr. Quadir is superior?
22        MS. HURLEY: Form.
23        MR. BERG: Objection to form.
24 A. Not necessarily.
25 Q. Back on the first page of your report, this refers

Page 49

1    to an evaluation completed by John Wapner on
2    September 21, 2015. Do you see that?
3        MS. HURLEY: What page?
4        MR. ROCHELSON: Sorry. We are back on
5    the first page of the report, which is 5237.
6 A. Yes.
7 Q. And Dr. Wapner is your husband, right?
8 A. Yes.
9 Q. Is there any disclosure here that he is your
10    husband?
11 A. In this report?
12 Q. Yes.
13 A. No.
14 Q. Did you consider disclosing it?
15 A. No.
16 Q. Why not?
17 A. I don't believe it's pertinent.
18 Q. At the bottom of 5237, there is a section called
19    Mental Status.
20 A. Yes.
21 Q. Are those your observations of Mr. Quadir's mental
22    status?
23        MS. HURLEY: Form.
24        MR. BERG: Objection to form.
25 A. These are my observations of Mr. Quadir's mental

13 (Pages 46 - 49)

1    status, yes.
2 Q.  I'd just like to walk through them briefly.
3      Starting at the top of the next page, you wrote,
4      "His attitude was polite and appropriate
5      throughout."  Do you see that?
6 A.  Yes.
7 Q.  Is that a factor that weighs in favor of a finding
8      that Mr. Quadir was fit to return to work?
9 A.  Not necessarily.
10 Q.  Why not?
11 A.  It's a factor that weighs relative to how
12      cooperative he was and, therefore, how the data that
13      I obtained was probably accurate.
14 Q.  But it doesn't bear on his fitness for the
15      workplace?
16 A.  No.
17 Q.  A couple of lines further down you write, "His
18      perceptions were grossly intact, with no evidence
19      for hallucinations."  Do you see that?
20 A.  Yes.
21 Q.  What does it mean that "His perceptions were grossly
22      intact"?
23 A.  He knew where he was, he knew who he was, he knew
24      who I was or what I was there for.  He had a good
25      sense of reality, he was not psychotic.

1 Q.  Is that a finding that weighs in favor of a
2      conclusion that Mr. Quadir was fit for the
3      workplace?
4          MR. BERG:  Not being psychotic?
5          Objection to form.
6          MS. HURLEY:  Same.
7 BY MR. ROCHELSON:
8 Q.  If you can answer.
9 A.  I'm sorry.  Could you ask the question again?
10         MR. ROCHELSON:  Can you read it back?
11         (Whereupon, the requested question is
12     read back by the Court Reporter.)
13 A.  It's kind of a basic fitness.
14 Q.  A few lines down, you say, "His thought processes
15      were organized, and thought content was grossly
16      intact, marked by preoccupation about his
17      problematic relationship with his agency and the
18      stress in his life."  Do you see that?
19 A.  Yes.
20 Q.  Is that a finding that weighs in favor of a
21      conclusion that Mr. Quadir was fit to work as an
22      LSR?
23 A.  Again, it's a basic condition of performing work
24      duties.
25 Q.  But it weighs in favor?

1          MR. BERG:  Objection to form.
2          Compound.
3      BY MR. ROCHELSON:
4 Q.  Sorry.  What was your answer?
5 A.  Yes.
6 Q.  And where it says, "His thought content was grossly
7      intact," does that also weigh in favor of a finding
8      that he was fit for the workplace?
9 A.  Yes.
10 Q.  You write that, "His concentration and attention
11      seemed somewhat better than on the first contact in
12      February, but test results today show that he is
13      currently relatively impaired in some cognitive
14      domains, including memory functioning."  Do you see
15      that?
16 A.  Yes.
17 Q.  Does the finding about his concentration and
18      attention weigh in favor of a conclusion that he was
19      fit for the workplace?
20 A.  The first part of this sentence that it says,
21      "Seemed somewhat better," is a behavioral
22      impression.  That's different than test data.
23 Q.  At the end of this paragraph, you say, "His impulse
24      control was adequate.  He presented with at least
25      average intelligence, fair insight and adequate

1      judgment."  Do you see that?
2 A.  Yes.
3 Q.  Do those findings weigh in favor of a conclusion
4      that Mr. Quadir was fit for the workplace?
5 A.  Yes.
6 Q.  At the bottom of the next page, there's a section
7      called "Conclusion," and I just want to read the
8      last sentence.  You say, "At this time, it is the
9      opinion of the undersigned that he is not
10      functioning well enough to be able to perform his
11      job duties in a consistent manner."  Is that your
12      signature below that statement?
13 A.  Yes.
14 Q.  And was that your ultimate conclusion?
15 A.  Yes.
16 Q.  Okay.  We'll come back to that.
17          Can you look at Exhibit 2, please.
18 A.  Is that something I have?
19 Q.  Oh, I have it.  I'm sorry.  This is an exhibit that
20      was entered previously in Dr. Wapner's deposition.
21      I am going to ask if you could turn to the page with
22      the Bates number ending in 5194.
23 A.  Okay.
24 Q.  Have you seen this document before?
25 A.  Yes.

14 (Pages 50 - 53)

1 Q.  And what is it?
2 A.  That is the job description for Labor Services
3      Representative.
4 Q.  If you turn to the page with the Bates number ending
5      in 5196, do you have an understanding of what
6      appears on this page?
7 A.  Yes.
8 Q.  And what is it?
9 A.  It's more specific duties that are related to that
10     job description.
11 Q.  Were these job duties provided to you as part of
12     your evaluation of Mr. Quadir?
13 A.  I believe so. I can't say, really.
14 Q.  Do you see that there are a series of headings
15     followed by bulleted lists?
16 A.  Yes.
17 Q.  The first heading refers to "LSRs assigned to
18     Employment Services." Do you see that?
19 A.  Up here?
20 Q.  Take your time to read it, if you need to.
21 A.  Yes, okay.
22 Q.  And then at the end of that bulleted list, there's
23     another quick heading that says, "When providing
24     services to employers," and there's a bulleted list
25     that follows?

1 A.  Yes.
2 Q.  Yes, you see that?
3 A.  Yes, I do.
4 Q.  And then at the end of that bulleted list, there's a
5      heading that says, "When assigned to Unemployment
6      Insurance," and there's a bulleted list?
7 A.  Yes.
8 Q.  And on the next page, there's a heading that says,
9      "When assigned to the Unemployment Insurance Appeal
10     Board," and there's a bulleted list. Do you see
11     that?
12 A.  Yes.
13 Q.  Which of these four assignments did Mr. Quadir have
14     as a Labor Services Representative?
15 A.  I don't recall.
16 Q.  I'll represent to you, and you and Counsel are
17     welcome to dispute my representation, but I will
18     represent to you that Mr. Quadir was assigned only
19     to Employment Services, which is the first list of
20     job duties on page 5196. Are you familiar with
21     these job duties?
22 A.  Yes.
23 Q.  Which of these job duties did you find that
24     Mr. Quadir was unfit to perform?
25        MR. BERG:  Objection to form.

1        MS. HURLEY:  Same.
2 A.  I'm going to read these.
3 Q.  Please.
4 A.  I believe he would have had trouble with several of
5      these things, depending on how he was functioning on
6      any given day.
7 Q.  Can you identify in particular which job duties he
8      was unfit to perform?
9 A.  Well, in the first one, "Interviewing," I think the
10     concentration necessary to do a good interview might
11     have been lacking. The third one down, "Maintaining
12     a sense of what resources were available from DOL
13     and having those readily accessible in discussions
14     with people seeking employment," might have been
15     lacking. I think, in general, "Being at work and
16     completing whatever assignment he had" might have
17     been difficult.
18 Q.  Does that mean your opinion extends to all job
19     duties?
20 A.  I can't say.
21 Q.  Is your opinion that Mr. Quadir was unfit to work as
22     an LSR in particular or to work in any workplace?
23 A.  As an LSR in particular.
24 Q.  And is it your opinion that he was not fit to
25     perform any of these job duties?

1 A.  I wouldn't say that.
2 Q.  Are there certain of the job duties listed here that
3      he was fit to perform?
4        MS. HURLEY:  Don't forget to take a
5      look at your report, Doctor.
6        THE WITNESS:  If I do go back to my
7      report --
8        MS. HURLEY:  Don't think out loud,
9      Doctor. Look at your report.
10       THE WITNESS:  This is not my report.
11       MR. ROCHELSON:  We're shading a little
12     bit into impermissible coaching of the witness.
13       MS. HURLEY:  That's been marked, isn't
14     it, that report?
15       MR. ROCHELSON:  The report is
16     Exhibit 7, I believe.
17 A.  I think the symptoms of depression that Mr. Quadir
18     both described and that were apparent from the
19     psychological testing that I did were such that it
20     would have been very difficult for him to work and
21     to do his job duties on a full-time basis
22     consistently.
23 Q.  Is that opinion regardless of what those job duties
24     are?
25       MR. BERG:  Objection to form.

15 (Pages 54 - 57)

Page 58

1 A.  Going from the job description.
2 Q.  Your opinion is that he was unfit to perform the
3      particular job duties listed in this job
4      description?
5 A.  Correct.
6 Q.  And your opinion extends to all of those job duties;
7      is that correct?
8 A.  I can't say that.
9 Q.  Can you point me to somewhere in your report that
10     specifically identifies job duties that Mr. Quadir
11     was capable of performing?
12 A.  That wasn't the question.
13 Q.  That wasn't what question?
14 A.  The referral question.
15 Q.  What was the referral question?
16 A.  "Is he fit to perform his assigned job duties?"
17 Q.  Because of the way the referral question was
18     phrased, you did not think it was necessary to
19     identify particular job duties that Mr. Quadir could
20     not perform?
21         MS. HURLEY:  Object to the form of
22     that question.  I am going to ask you to
23     rephrase.
24         MR. BERG:  Objection.
25         MR. ROCHELSON:  Okay.  I could

Page 59

1      rephrase.
2      BY MR. ROCHELSON:
3 Q.  Why did you not identify particular job duties that
4      you thought Mr. Quadir was not fit to perform?
5 A.  I think there was a double negative in there.  I'm
6      sorry.  Could you rephrase that?
7         MR. ROCHELSON:  Sure.  I will withdraw
8      the question.
9 Q.  In your report, you do not identify particular job
10     duties that Mr. Quadir was not fit to perform,
11     correct?
12 A.  Correct.
13 Q.  Why?
14 A.  I didn't feel it was necessary.
15 Q.  Why didn't you feel it was necessary?
16 A.  The referral question was, "Was he fit to return to
17     work and perform his job duties," implying all of
18     his job duties.  So it was a global judgment.
19 Q.  Did you consider the possibility that he might have
20     been fit to return to work and perform some of his
21     job duties?
22 A.  No.
23 Q.  Okay.  Let's look back at your report again, the
24     page ending in 5238.
25         MR. ROCHELSON:  And please let me know

Page 60

1      if now is a good time to take a break.
2         MS. HURLEY:  You know, I could use a
3      little break here.
4         MR. ROCHELSON:  Sure.
5         (Whereupon, a brief recess is taken.)
6      BY MR. ROCHELSON:
7 Q.  Dr. Bobscine, you recognize that you're still under
8      oath?
9 A.  Yes.
10 Q.  During the break, did you meet with your Counsel?
11         MS. HURLEY:  We talked in the ladies'
12     room, is that what you mean by "meet"?
13      BY MR. ROCHELSON:
14 Q.  Did you discuss the content of the deposition?
15         MS. HURLEY:  I don't think you could
16     ask that.  That's confidential.
17         MR. ROCHELSON:  Okay.
18      BY MR. ROCHELSON:
19 Q.  Where were we?  Okay.  So on the document, the page
20     ending in Bates number 5238, this is your report,
21     the second page, there's a paragraph that's called
22     "Psychological Testing."  Do you see that?
23 A.  Yes.
24 Q.  Does this list the tests you conducted for
25     Mr. Quadir?

Page 61

1 A.  Yes.
2 Q.  And one test you list is the Brief Cognitive Status
3      Exam.  Do you see that?
4 A.  Yes.
5 Q.  What is that test?
6 A.  That is a screening test for various types of
7      cognitive functioning.
8 Q.  Could you provide some examples?
9 A.  Yes.  The first question is a question about
10     orientation, what's today's date, what day of the
11     week, who's president of the United States?  There's
12     some mental control things, where you ask a person
13     to count backwards from 20 to 1, say the months of
14     the years in backwards order, which requires
15     long-term memory and ability to order things in an
16     unusual way.  Part of it is asking a person to name
17     as many colors they could think of within a
18     timeframe, draw a picture of a clock, put in a
19     requested time.  There's a -- There's one where a
20     person has to rename familiar shapes, which requires
21     shifting a cognitive set to do something unfamiliar.
22     If it's a series of triangles and rectangles and
23     triangles and rectangles, and they have to go
24     through it naming them correctly and then go through
25     it naming them the opposite shape, which takes

16 (Pages 58 - 61)

1    concentration.
2  Q.  How was this test relevant to Mr. Quadir's job
3       duties as an LSR?
4  A.  I use it to get a sense about where a person might
5       have some deficits in cognitive functioning and to
6       guide additional testing.
7  Q.  What do you mean by, "Guide additional testing"?
8  A.  Well, I could see that he had trouble with memory
9       from doing this test, both recent memory and some
10      past memory, he had trouble organizing information,
11      so that told me what else I wanted to look at more
12      thoroughly.
13 Q.  Just so I understand, you ran this test and then
14      used that to determine what other tests to run; is
15      that right?
16 A.  Confirming, yes.
17 Q.  Are you aware of any criticism of the validity of
18      this test?
19 A.  No.  It's used frequently, as well.  Standardized.
20 Q.  You found that he scored in the very low range for
21      this test; is that right?
22 A.  Yes.
23 Q.  Did that contribute to your finding that Mr. Quadir
24      was unfit to work as an LSR?
25 A.  Yes.

1  Q.  In what range would Mr. Quadir have had to score to
2       support a finding that he was fit to work as an LSR?
3            MR. BERG:  Objection to form.
4            MS. HURLEY:  Same.  Go ahead, you can
5       answer, if you can.
6  A.  Average.  Average.
7  Q.  A maximum score on this test is 58; is that right?
8  A.  Yep.
9  Q.  And you found that Mr. Quadir scored a 33?
10 A.  I would have to check.
11 Q.  I think, if you look at the page ending in 5246.
12 A.  Yes.
13 Q.  Are these your notes from that test?
14 A.  Yes.
15 Q.  And on the page ending in 5247, in the bottom right
16      corner, does that indicate a score of 33?
17 A.  Yes.
18 Q.  And on the next page of 5248, are these the
19      different score ranges based on different ages?
20 A.  Yes.  And years of education.
21 Q.  I see.  And years of education.  And so for someone
22      from age 30 to 44 with more than 16 years of
23      education, a score lower than 45 or below is in the
24      very low range; is that right?
25 A.  Yes.

1  Q.  And an average score is 55 to 58; is that right?
2  A.  Yes.
3  Q.  Would Mr. Quadir have had to score in the 55 to 58
4       range to work as an LSR?
5            MR. BERG:  Objection to form.
6            MS. HURLEY:  Same.  You can answer.
7  A.  Well, it's one of the pieces of data.  If that was
8       the only thing I was looking at, probably low
9       average to average, but that wouldn't be
10      appropriate.
11 Q.  On this scale, it looks to me like average is the
12      highest score.
13 A.  That's correct.
14 Q.  So Mr. Quadir would have had to score an average or
15      low average, which are the top two ranges, in order
16      to work as an LSR; is that right?
17           MR. BERG:  Objection to form.
18           MS. HURLEY:  Same.
19 A.  As one piece of data.
20 Q.  Going back a couple of pages to 5244, there's
21      something called the Mental Status Examination.  Do
22      you see that?
23 A.  Yes.
24 Q.  What is this?
25 A.  This is something I use to make notes of behavioral

1       observations when I meet with someone.
2  Q.  Is this your handwriting?
3  A.  Yes, it is.
4  Q.  Are these your notes from your conducting the Mental
5       Status Examination of Mr. Quadir?
6  A.  Yes.
7  Q.  When you conducted this test for Mr. Quadir, what
8       were you looking for?
9  A.  Exactly what's on here.
10 Q.  Can you summarize it?
11 A.  Okay.  His grooming.  His appropriateness of dress
12      relative to weather.  Generally, how cooperative he
13      was.  How engaged he was.  Whether his speech was of
14      normal rhythm, tone, loudness.  Whether he seemed
15      agitated or calm.  What his mood was like during the
16      testing.  What his affect was like.  Perceptual
17      problems or not.  Whether his thinking was logical
18      and organized.  Whether his thought content was
19      relevant to what we were talking about or, as in
20      this case, was somewhat preoccupied with problems at
21      work.  Whether he knew where he was, who he was, who
22      I was.  Whether he was alert.  Just an impression of
23      his concentration, his attention, his memory, and
24      also based on testing those particular things, and
25      whether he expressed any intent to harm himself or

17 (Pages 62 - 65)

1    anyone else.  Whether his impulse control seemed to
2    be adequate.  How bright he seemed.  Whether he had
3    a sense of what his circumstance was and why he was
4    functioning, how he was functioning.
5  Q.  How bright did he seem?
6  A.  I said at least average.
7  Q.  Is this a screening test?
8  A.  No.  It's just a behavioral observation checklist.
9    It's not -- it's totally based on my interactions
10    with him, my impression.
11  Q.  Got it.  Can you flip back to the page ending in
12    5239, which is the third page of your report?
13  A.  Okay.
14  Q.  Looking at the top of the page, is another test you
15    conducted the Working Memory Index?
16  A.  Yes.
17  Q.  What is that test?
18  A.  That is a series of subtests.  It's part of an
19    intelligence test.  That's what that is.
20  Q.  When you conducted this test for Mr. Quadir, what
21    were you looking for?
22  A.  I was looking for short-term memory, concentration,
23    attention, ability to listen to information and
24    process it and manipulate it, as in doing math in
25    his head was one of the big issues.

1  Q.  Is there an LSR job duty that requires doing math in
2    your head?
3  A.  I don't know about that, but there are many LSR
4    duties that require concentration, attention,
5    ability to listen to a person and remember what they
6    say.  So it has to do with auditory memory,
7    short-term memory and being able to focus.
8  Q.  Why does an LSR need memory?
9  A.  Why does an LSR need memory?  Well, the job duties
10    require that he know the materials he has available
11    to people who come to the Department of Labor, that
12    he remembers how to use them, that he knows what to
13    give them, that he might remember a person coming
14    back for a second time.  There's a variety of things
15    that would require memory.
16  Q.  Did you ask Mr. Quadir if he remembered the
17    resources available at the DOL?
18  A.  I don't recall.
19  Q.  Did you ask Mr. Quadir if he could remember the face
20    of someone that he had seen previously?
21  A.  I don't recall.
22  Q.  Referring back to the Working Memory Index, are you
23    aware of any criticism of the validity of this test?
24  A.  No.  This is a very well standardized intelligence
25    test that's used in a variety of settings.

1  Q.  So you're not aware of any criticism of it?
2  A.  No.
3  Q.  It appears that it contains a number of subtests; is
4    that right?
5  A.  Yes.
6  Q.  Is one of them the Digit Span Subtest?
7  A.  Yes.
8  Q.  What is that?
9  A.  That is -- That actually has three segments to it.
10    It has to do with short-term memory and sequencing
11    of information.
12  Q.  You found that Mr. Quadir scored in the borderline
13    range in that test; is that right?  I'm looking on
14    page 5239, about four lines down.
15  A.  On the Digit Span, yes.
16  Q.  Did that contribute to your findings that Mr. Quadir
17    was unfit to work as an LSR?
18  A.  Yes, it did.
19  Q.  Why is that?
20  A.  Because his attention and concentration were
21    impaired and his short-term memory was impaired.
22  Q.  In what range would Mr. Quadir have had to score to
23    support a finding that he was fit to work as an LSR?
24        MR. BERG:  Objection.
25        MS. HURLEY:  Same.

1        Go ahead and answer, Doctor.
2  A.  I wouldn't make a determination based on that one
3    test.
4  Q.  Were there some factors that weighed in favor of a
5    finding that Mr. Quadir was fit to work as an LSR?
6  A.  His doctor's letter.
7  Q.  Were any of the tests you conducted, factors that
8    weighed in favor of a finding that Mr. Quadir was
9    fit to work as an LSR?
10  A.  Taken as a whole, no.
11  Q.  My question is not taken as a whole, but each piece
12    by itself.  Did any of those tests weigh in favor of
13    a finding that Mr. Quadir was fit to work as an LSR?
14        MR. BERG:  Objection to form.
15  A.  Well, he scored near average on auditory memory.
16    All of his other scores, I believe, are borderline
17    to low average, which is considerably lower than
18    average.  So there was very little test data
19    indicating that he was fit to perform his job
20    duties.
21  Q.  And is someone of below average memory ability unfit
22    to work as an LSR?
23  A.  That issue alone, no.
24  Q.  Let's just go through them one by one quickly.  On
25    the Letter/Number Sequencing Subtest, you found that

18 (Pages 66 - 69)

## Page 70

1  he scored in the low average range.
2  A.  Let me just find this.
3  Q.  Yeah.  It's on the fourth line, right after the
4      Digit Span Subtest, after the semicolon.
5  A.  Okay.  Yes.
6  Q.  Did that contribute to your finding that Mr. Quadir
7      was unfit to work as an LSR?
8  A.  It contributed.
9  Q.  In what range would Mr. Quadir have had to score to
10     support a finding that he was fit to work as an LSR?
11 A.  Average, ideally.
12 Q.  Next, as to the Arithmetic Subtest, you found that
13     he scored in the average range.  Do you see that?
14 A.  Yes.
15 Q.  Did that contribute to your finding that Mr. Quadir
16     was unfit to work as an LSR?
17 A.  No.
18 Q.  Is that because his score was sufficient on that
19     subtest?
20 A.  Yes.
21 Q.  Did that weigh in favor of a finding that Mr. Quadir
22     was fit to work as an LSR?
23 A.  Yes.
24 Q.  And then you have the next sentence, you sum up,
25     "Depending on which two subtests are summed for a

## Page 71

1  score on the composite WMI, his score ranges from
2  borderline to low average."  Do you see that?
3  A.  Yes.
4  Q.  What does that mean, "Depending on which two tests
5      are summed"?
6  A.  The way the WMI, or the Working Memory Index, works
7      is, it's not based on one of the subtests; it's
8      based on two of the subtests.  And typically the two
9      subtests that are given would be Arithmetic and
10     Digit Span.  But because of the way his Brief
11     Cognitive Status Exam came out showing a lot of
12     deficits, I wanted to get data on different kinds of
13     short-term memory.
14 Q.  Just so I understand, you ran three of these tests,
15     right?
16 A.  Correct.
17 Q.  And the three score ranges were borderline, low
18     average and average; is that right?
19 A.  Correct.
20 Q.  And so, if you average the top two, low average and
21     average, does that average out to low average?
22 A.  It must have.
23 Q.  Is that because there's underlying numbers that you
24     were averaging, not the range?
25 A.  Yes.

## Page 72

1  Q.  I understand.  Okay.
2  A.  Yes.
3  Q.  On the composite, in what range would Mr. Quadir
4      have had to score to support a finding that he was
5      fit to work as an LSR?
6  A.  Average.
7  Q.  So another test you conducted was the Wechsler
8      Memory Scale, 4th Edition, Flexible Approach, or
9      LMVR; is that right?
10 A.  Yes.
11 Q.  Would you call that LMVR for short or WMS?
12 A.  LMVR.
13 Q.  LMVR, okay.  And what does that test measure?
14 A.  That test measures different kinds of memory.  It
15     measures immediate and delayed memory for both
16     verbally presented narrative material and visually
17     presented designs.  So you end up with four scores,
18     immediate memory, delayed memory, verbal memory and
19     auditory memory.
20 Q.  Weren't the other tests also memory tests?
21 A.  The WMI is, yes.  And to a certain extent, the Brief
22     Cognitive is.
23 Q.  Why aren't these tests redundant?
24 A.  They measure different things, different tasks.
25 Q.  Are you aware of any criticism of the validity of

## Page 73

1  this test?
2  A.  No.
3  Q.  As to immediate memory, you found he scored in the
4      borderline to low average range.  Do you see that?
5  A.  Yes.
6  Q.  Did that contribute to your finding that Mr. Quadir
7      was unfit to work as an LSR?
8  A.  Yes.
9  Q.  In what range would Mr. Quadir have had to score to
10     support a finding that he was fit to work as an LSR?
11 A.  Average.
12 Q.  As to delayed memory, you also found he scored in
13     the borderline to low average range.  Do you see
14     that?
15 A.  I'm sorry?
16 Q.  Sorry.  So, actually, the sentence says, "Borderline
17     to low average for both immediate and delayed."
18 A.  Yes.
19 Q.  Did that contribute to your finding that Mr. Quadir
20     was unfit to work as an LSR?
21 A.  Yes.
22 Q.  In what range would Mr. Quadir have had to score to
23     support a finding that he was fit to work as an LSR?
24 A.  Average.
25 Q.  As to auditory memory, you found that he scored in

19 (Pages 70 - 73)

1    the low average to average range.  Do you see that?
2  A.   Yes.
3  Q.   Did that contribute to your finding that Mr. Quadir
4       was unfit to work as an LSR?
5  A.   Yes.
6  Q.   In what range would Mr. Quadir have had to score to
7       support a finding that he was fit to work as an LSR?
8  A.   Average.
9  Q.   As to visual memory, you found that he scored in the
10      borderline to low average range.  Do you see that?
11  A.   Yes.
12  Q.   Did that contribute to your finding that Mr. Quadir
13      was unfit to work as an LSR?
14  A.   Yes.
15  Q.   In what range would Mr. Quadir have had to score to
16      support a finding that he was fit to work as an LSR?
17  A.   Average.
18  Q.   Why does his job require visual memory?
19  A.   He has to read directions, he has to look at
20      materials, he has to remember things that he's seen;
21      a variety of different materials for his job.
22  Q.   Does visual memory mean reading?
23  A.   No.  It's recall of what you have seen.  It can mean
24      reading.
25  Q.   Is it recall of images?

1  A.   This is, yes.
2  Q.   Is there recall of images required in the job of an
3       LSR?
4  A.   I don't know.
5  Q.   If you could flip to 5254.
6  A.   54?
7  Q.   Yeah, 5254.  There's a page that says, "WMS-IV
8       Response Booklet, Brief Cognitive Status Exam,
9       Visual Reproduction I and II."
10  A.   Yes.
11  Q.   What is this?
12  A.   This is the -- What is this booklet?
13  Q.   Yeah.
14  A.   This booklet is what was given to Mr. Quadir to
15      complete some of the memory work on the WMS LMVR.
16      So these are his responses that are --
17  Q.   I see.  So I am just confused because it refers to
18      WMS and to Brief Cognitive Status Exam.  Do you know
19      which one it's from?
20  A.   Oh.  Well, this segment with the clock is part of
21      the Brief Cognitive Status Exam.  So that if you do
22      testing other than the Brief Cognitive,
23      they -- people are asked to draw the clock in this
24      booklet.
25  Q.   I see.  Okay.  How does the drawing of the clock

1       relate to Mr. Quadir's job duties as an LSR?
2           MR. BERG:  Objection to form.
3  A.   Well, the drawing of the clock is an indication of a
4       person's ability to remember what a clock looks
5       like, to represent a requested time, to do some
6       planning, in terms of fitting all the numbers in and
7       making sure the hands go where they go.  It's a
8       measure of neurological functioning.
9  Q.   Does it relate directly to any job duties as an LSR?
10  A.   Drawing a clock does not.
11  Q.   Is it a proxy for some other job duties?
12  A.   Planning, organization, ability to represent
13      familiar objects.
14  Q.   All right.  Let's go back to 5239.  Did you also
15      conduct the Beck Depression Inventory?
16  A.   Yes.
17  Q.   And what is that test?
18  A.   That is a series of -- there's 21 items that a
19      person rates himself on, relative to severity of
20      that symptom at the present when he's filling it
21      out.
22  Q.   And when you conducted this test for Mr. Quadir,
23      what were you looking for?
24  A.   I was looking for how serious he rated his symptoms
25      of depression.

1  Q.   Did you already have reports from his personal
2       physician that Mr. Quadir suffered from depression?
3  A.   Yes.
4  Q.   Why did you think it was necessary to evaluate that
5       yourself?
6  A.   Well, this evaluation has to do with on the day of
7       the evaluation, what was going on with Mr. Quadir.
8       So his doctor's letter was from another day.
9  Q.   Are you aware of any criticism of the validity of
10      this test?
11  A.   It's a self-report.
12  Q.   Does that undermine its validity?
13  A.   Not necessarily.
14  Q.   Are you aware of a more accurate test of an
15      individual's depression?
16  A.   No.
17  Q.   Would a psychiatrist who sees a patient regularly
18      have a better sense of a patient's depression?
19          MR. BERG:  Objection to form.
20          MS. HURLEY:  Same.
21  A.   Possible.
22  Q.   You said you have treated patients with Major
23      Depressive Disorder, right?
24  A.   Yes.
25  Q.   Do you run the BDI for them?

Page 78

1 A.  Sometimes.
2 Q.  Do you also sometimes evaluate them through
3     counseling sessions?
4 A.  Yes.
5 Q.  Do you have an opinion, based on your personal
6     experience, whether you are able to more accurately
7     diagnose depression based on counseling sessions
8     versus the BDI?
9 A.  It varies.  It's not across-the-board.
10 Q.  You found that Mr. Quadir suffers from a moderate
11     level of clinical depression; is that right?
12 A.  Yes.
13 Q.  Did that contribute to your finding that Mr. Quadir
14     was unfit to work as an LSR?
15 A.  Yes.
16 Q.  Why?
17 A.  Because if you look at the things that he reported,
18     many of those symptoms would interfere with him
19     doing his job.
20 Q.  How did they interfere?
21 A.  His mood, his pessimism about the future, generally
22     his low mood, his self-critical feelings, but more
23     importantly I think his restlessness, his reported
24     problems with concentration, with making decisions,
25     low energy, sleep problems, all suggest that he

Page 79

1     would not be functioning well on a daily basis.
2 Q.  Can someone with depression be an LSR?
3 A.  Someone with that diagnosis?  Yes.
4 Q.  But not Mr. Quadir?
5         MR. BERG:  Objection to form.
6 A.  A person with depression can be treated and can feel
7     better and have many fewer symptoms of depression
8     based on how they respond to treatment and so, yes.
9 Q.  Did you make a determination about whether
10     Mr. Quadir would respond to treatment and his
11     condition might improve?
12 A.  No.
13 Q.  Do you recall that you reviewed Dr. Wapner's report
14     from his September 2015 evaluation of Mr. Quadir?
15 A.  Yes.
16 Q.  Do you recall that Dr. Wapner found that Mr. Quadir
17     was lacking in coping skills?
18 A.  Not particularly, no.
19 Q.  Did you reach any conclusion about Mr. Quadir's
20     coping skills?
21 A.  Not that I wrote in the report.
22 Q.  Okay.  I'd like to ask you some questions about the
23     factors you considered in the course of your
24     evaluation of Mr. Quadir.  Did you review any of
25     Mr. Quadir's performance evaluations from work?

Page 80

1 A.  I don't recall.
2 Q.  If it were true that Mr. Quadir's supervisor had
3     given him positive performance reviews in the months
4     and years before your February and March 2016
5     evaluations of him, would that change your opinion
6     of his fitness to work as an LSR?
7         MR. BERG:  Objection.
8         MS. HURLEY:  Objection.
9 A.  Not at the time that I did the evaluation.
10 Q.  Why not?
11 A.  Because my data says that he would have trouble
12     doing his job.
13 Q.  Are an employee's performance evaluations relevant
14     to your determination of their fitness for the
15     workplace?
16 A.  Sometimes.
17 Q.  Under what circumstances?
18 A.  If they're current, if they're in timing with what
19     I'm seeing, when I'm seeing the person.
20 Q.  How recent is current?
21 A.  Concurrent.  At time of referral.
22 Q.  The same day, the same week, the same month?
23 A.  I would give more weight to something that came with
24     the referral.  Let me say --
25         MS. HURLEY:  You answered the

Page 81

1     question, Doctor.
2     BY MR. ROCHELSON:
3 Q.  You mentioned that you received the return to work
4     letter from Dr. Iqbal.  Do you recall that?
5 A.  Yes.
6 Q.  When you prepared your report, did you ask to see
7     any other reports or notes from Dr. Iqbal?
8 A.  No.
9 Q.  Why not?
10 A.  I felt I had a lot of data to the contrary and it
11     wouldn't have made a difference.
12 Q.  So if you had a different opinion from Dr. Iqbal,
13     wouldn't you want to see the data that supported his
14     opinion?
15         MS. HURLEY:  Form.
16 A.  I felt I had sufficient data to make a decision.
17 Q.  Under what circumstances do you ask to see a
18     patient's prior medical records?
19 A.  If the person is not giving me clear information
20     about what's going on in treatment, I often will
21     contact the treating professional.
22 Q.  Did you find that was true for Mr. Quadir?
23 A.  No.
24 Q.  He was giving you adequate information to make your
25     evaluation?

21 (Pages 78 - 81)

Page 82

1 A.  I thought so.
2 Q.  Are you aware that Dr. Iqbal identified certain job
3     duties that Mr. Quadir was unable to perform?
4 A.  No.
5 Q.  Could we go back to Exhibit 5, please?
6 A.  Do you want me to read this?
7 Q.  Have you seen this document before?
8 A.  No, I haven't.
9 Q.  So this is Exhibit 5, previously entered as an
10     exhibit to Dr. Wapner's deposition, and I believe
11     there were certain objections made to its
12     authenticity, but I'll ask you to just review it
13     briefly.  And on their face, subject to those
14     objections, they appear to be medical notes from
15     visits of Mr. Quadir to a Dr. Sandeep Gulati, who is
16     a Doctor of Neurology?
17 A.  Yes.
18 Q.  And I'll draw your attention in particular to a few
19     areas of the document.  Feel free to take the time
20     to read them completely, if you'd like.
21 A.  Okay.  Just this one or --
22 Q.  No.  So there are three pages of notes here from
23     visits on March 2, 2015, June 1, 2015, and May 2,
24     2016.
25 A.  Okay.

Page 83

1 Q.  So two of those visits precede your meetings with
2     Mr. Quadir in February/March, 2016, and one of them
3     postdates your visit of March 2016.
4 A.  Okay.
5 Q.  So as to the two visits that predate your February,
6     2016 examination of Mr. Quadir, did you review those
7     notes in the preparation of your evaluation and
8     report?
9         MR. BERG: Objection to form.
10         MS. HURLEY:  You mean, did she review
11     these notes in this exhibit before she prepared
12     the report?
13         MR. ROCHELSON: Yes.
14 A.  I have not seen these before today.
15 Q.  For the March 2, 2015 notes, on the second page,
16     about a third of the way down, there's a section
17     called Mental Status.  Let me know if you see that.
18 A.  Yes.
19 Q.  Dr. Gulati found that Mr. Quadir -- had: "Mood is
20     appropriate, immediate recall is intact, short-term
21     memory is intact, long-term memory is intact."  Do
22     you see that?
23 A.  Yes.
24 Q.  Did that conflict with the opinions of your
25     examination from approximately one year later?

Page 84

1 A.  Yes.  Some of it does.
2 Q.  Which parts?
3 A.  His mood was different when I saw him.  He had
4     trouble with immediate recall.  He had trouble with
5     short-term memory.  He had trouble with delayed
6     memory, which is different than long-term memory.
7     Those things.
8 Q.  How is delayed memory different from long-term
9     memory?
10 A.  Delayed memory is something that's measured by the
11     LMBR, which is that a person has to recall something
12     after 20 minutes with no reminders.  Long-term
13     memory is more like:  When you were growing up and
14     you were 10, did you play baseball?  Tell me about
15     your family.  That kind of memory.
16 Q.  Which of those two types of memory is more pertinent
17     to the job duties of an LSR?
18         MR. BERG:  Objection to form.
19 A.  I can't say.
20 Q.  Are they both?
21 A.  I would think so, yes.
22 Q.  Looking at the next page of this exhibit, these are
23     notes from a June 1, 2015 visit.
24 A.  Okay.
25 Q.  And this time, it's on the first page, about

Page 85

1     two-thirds of the way down, it says, "Neurological
2     exam.  Mental status: Mood is appropriate.
3     Immediate recall is intact.  Short-term memory is
4     intact.  Long-term memory is intact."  Do you see
5     that?
6 A.  Yes.
7 Q.  And did that conflict with your conclusions from
8     your March 8, 2015 examination?
9         MR. BERG:  Objection.
10 A.  This is different, yes.  This conflicts with my
11     examination.
12 Q.  Turning the page, these are notes from a May 2, 2016
13     visit.  And on the second page, about a third of the
14     way down, there's a section, "Neurological exam.
15     Mental status."  It says, "Mood is appropriate.
16     Immediate recall is intact.  Short-term memory is
17     intact.  Long-term memory is intact."  Do you see
18     that?
19         MR. BERG:  I am going to object, not
20     to the form of the question exactly, but to
21     Counsel's characterization of Exhibit 5.  With
22     that, you can go ahead.
23         MS. HURLEY:  Yeah, I am going to join
24     in that as well.  I mean, you can tell by the
25     verbiage that this guy is just hitting the

22 (Pages 82 - 85)

Page 86

1    auto-fill key, but if you want to treat them
2    like different assessments, with that
3    understanding, go ahead, Doctor, you can
4    answer.
5         MR. ROCHELSON:  I'll move to strike
6    Counsel's testimony from the record, but we can
7    keep going.
8    BY MR. ROCHELSON:
9  Q.  This visit of May 2, 2016 is approximately two
10   months after your examination of Mr. Quadir; is that
11   right?
12        MR. BERG:  Object to the form.
13 A.  Yes.
14 Q.  And Dr. Gulati's conclusions about Mr. Quadir's
15   mental status differed from yours; is that right?
16        MR. BERG:  Objection.  There's no
17   evidence that this witness knows who Dr. Gulati
18   is or that he ever undertook any examination of
19   Mr. Quadir.
20        MR. ROCHELSON:  Objection's noted.
21 A.  These findings are different than mine.
22 Q.  Do you recall we discussed that Mr. Quadir also
23   noticed the deposition of John Wapner?
24 A.  I'm sorry.  Say that again.
25 Q.  Do you recall we discussed that Mr. Quadir also

Page 87

1    subpoenaed John Wapner for deposition?
2  A.  Yes.  Yes.
3  Q.  And do you know that Dr. Wapner testified in this
4    matter in deposition this morning?
5  A.  Yes.
6  Q.  And you're married to Dr. Wapner; is that right?
7  A.  That's correct.
8  Q.  How long have you been married?
9  A.  Over 40 years.
10 Q.  Do you reside together?
11 A.  Yes.
12 Q.  Do you understand that prior to your evaluation of
13   Mr. Quadir in February of 2016, Dr. Wapner evaluated
14   him in September 2015?
15 A.  Yes.
16 Q.  Did you discuss Dr. Wapner's evaluation of
17   Mr. Quadir following the September 2015 evaluation?
18 A.  I doubt it.  I don't think so.
19 Q.  Did you discuss Dr. Wapner's September 2015
20   evaluation of Mr. Quadir prior to your February 2016
21   evaluation of Mr. Quadir?
22 A.  No.
23 Q.  Did you discuss with Dr. Wapner his September 2016
24   evaluation of Mr. Quadir prior to your March 8, 2016
25   evaluation of Mr. Quadir?

Page 88

1  A.  I don't recall.
2  Q.  Did you discuss Dr. Wapner's evaluation in September
3    of 2015 of Mr. Quadir after your March 8, 2016
4    evaluation of Mr. Quadir?
5  A.  I don't recall.
6  Q.  You said that you reviewed Dr. Wapner's evaluation
7    in the course of preparing your own; is that right?
8  A.  Yes.
9  Q.  Did you talk with Dr. Wapner about his evaluation?
10 A.  I don't know.
11 Q.  Did you talk with Dr. Wapner about your evaluation
12   in February 2016?
13 A.  I don't know.
14 Q.  Did you talk with Dr. Wapner about your evaluation
15   in March 2016?
16 A.  I don't recall.
17 Q.  Have you talked with Dr. Wapner about your
18   evaluations of Mr. Quadir since your evaluation in
19   March 2016?
20 A.  No.
21 Q.  Had there been prior occasions where you and
22   Dr. Bobseine both conducted evaluations of the same
23   employee?
24        MS. HURLEY:  This is Dr. Bobseine.
25        MR. ROCHELSON:  I got a cut and paste

Page 89

1    problem.
2    BY MR. ROCHELSON:
3  Q.  Have there been prior occasions where you and
4    Dr. Wapner both conducted evaluations of the same
5    employee?
6  A.  Yes.
7  Q.  About how many times?
8  A.  I can't say.
9  Q.  More than once a year?
10 A.  I really can't say.
11 Q.  Is it closer to zero or closer to 100?
12 A.  About closer to zero.
13 Q.  Is it closer to ten or closer to 50?
14 A.  I don't know.
15 Q.  Do you recall if, on those occasions, you and
16   Dr. Wapner reached the same conclusions?
17 A.  I don't know.
18 Q.  Did you always reach the same conclusions?
19 A.  I don't know.
20 Q.  Have you and Dr. Wapner conducted evaluations of the
21   same employee in the past year?
22 A.  Not that I recall.
23        MR. ROCHELSON:  One quick exhibit.
24        (Plaintiff Exhibit 8 is marked for
25   Identification.)

23 (Pages 86 - 89)

Page 90

1 Q. Let me know when you've had a chance to take a look
2    at that.
3 A. Pretty good letter.
4 Q. Have you seen this document before?
5 A. Yes, I have.
6 Q. What is it?
7 A. It's a letter to the editor.
8 Q. The editor of what?
9 A. I believe the Columbia paper.  Well, let's see.
10    Hudson Valley 360.  That would be the Register Star
11    in Hudson.  It's a local paper.
12 Q. Is HudsonValley360.com a local newspaper near where
13    you live?
14 A. Yes.
15 Q. And is this a letter you wrote to the editor of that
16    paper dated October 17, 2017?
17 A. Yes.
18 Q. At the bottom of the first page, you write, "I am
19    writing to support John Wapner and Kevin Weldon to
20    continue this work for our town.  Both are endorsed
21    by the Chatham Democrats and the Chatham Citizens
22    Party and both bring a work ethic that will ensure
23    continued efforts to address the needs of citizens
24    of Chatham.  John Wapner has served two years, is a
25    strong independent board member, he works well with

Page 91

1    others, has good ideas and stands up for his point
2    of view.  Among his many efforts on the board,
3    John's worked to organize the new Recreation
4    Commission and improve recreation in the town has
5    been outstanding."  Did I read that correctly?
6 A. Yes.
7 Q. Did you disclose in this letter that John Wapner is
8    your husband?
9 A. No.
10 Q. Why not?
11 A. I was writing as a member of the Chatham Democratic
12    Committee.
13       MR. ROCHELSON:  Could we take a break
14    for a minute.
15       MS. HURLEY:  Sure.
16       (Whereupon, a brief recess was taken.)
17       MR. ROCHELSON:  No further questions.
18       MR. BERG:  I think I just have a
19    couple of questions.
20 EXAMINATION BY
21 MR. BERG:
22 Q. Dr. Bobseine, did you ever communicate with anyone
23    at the Department of Labor about your evaluation of
24    Mr. Quadir?
25 A. No.

Page 92

1 Q. Has anybody from the Department of Labor ever
2    communicated to you what your evaluation should
3    conclude?
4 A. No.
5       MR. BERG:  That's all I have.
6       (Transcript requests are as follows.)
7       MS. HURLEY:  I don't need a
8    transcript.
9       MR. BERG:  I'll take a hard copy and
10    PDF.
11       MR. ROCHELSON:  Regular delivery.
12    E-mail me and I will confirm my specific order.
13       (Whereupon the above-titled matter was
14    concluded at 5:05 p.m.)

Page 93

1       INDEX PAGE
2
3 WITNESS:
4    CYNTHIA BOBSEINE, Ph.D.
5 EXAMINATION BY MR. ROCHELSON          4
6 EXAMINATION BY MR. BERG               91
7
8
9       EXHIBITS
10 (Exhibits retained by counsel.)
11 PLAINTIFF    DESCRIPTION          PAGE
12 EXHIBIT 6    Subpoena of Dr. Bobseine    9
13 EXHIBIT 7    DEFS005235 - 5278          33
14 EXHIBIT 8    HudsonValley360.com article  89
         dated 10/17/17

24 (Pages 90 - 93)

Page 94

C E R T I F I C A T I O N

1
2  STATE OF NEW YORK:
   COUNTY OF WARREN:
3
4      I, Deborah M. McByrne, do hereby certify
   that the foregoing testimony was duly sworn to;
5  that I reported in machine shorthand the
   foregoing pages of the above-styled cause, and
6  that they were prepared by computer-assisted
   transcription under my personal supervision and
7  constitute a true and accurate record of the
   proceedings;
8
9
10     I further certify that I am not an attorney
   or counsel of any parties, nor a relative or
11  employee of any attorney or counsel connected
   with the action, nor financially interested in
12  the action.
13
       WITNESS my hand in the City of Queensbury,
14  County of Warren, State of New York
15
16
17
18
19
20  DEBORAH M. McBYRNE
21  Court Reporter
22
23
24
25

Page 95

ACKNOWLEDGMENT OF DEPONENT

1
2
3      I have read the foregoing transcript of
4  my deposition and except for any corrections or
5  changes noted on the errata sheet, I hereby
6  subscribe to the transcript as an accurate record
7  of the statements made by me.
8
9
10     CYNTHIA BOBSEINE, Ph.D.
11
12     SUBSCRIBED AND SWORN before and to me
13  this ____ day of _____, 20___.
14
15
16     _____
17               NOTARY PUBLIC
18
19
20  My Commission expires:
21
22
23
24
25

Page 96

1      E R R A T A   S H E E T
2  IN RE:  QUADIR vs. NYS LABOR DEPARTMENT
3  DATE:  4/16/2019
4  PAGE   LINE   CORRECTION AND REASON
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  (DATE)       CYNTHIA BOBSEINE, Ph.D.

Page 97

1      E R R A T A   S H E E T   C O N T I N U E D
2  IN RE:  QUADIR vs. NYS LABOR DEPARTMENT
3  DATE:  4/16/2019
4  PAGE   LINE   CORRECTION AND REASON
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  (DATE)       CYNTHIA BOBSEINE, Ph.D.

25 (Pages 94 - 97)

# In The Matter Of:

*Mohammed Quadir v.*
*NYS Labor Dept*

---

*Lisa Burrell*
*June 7, 2019*

---

*mgr reporting, Inc.*

Mohammed Quadir v.
NYS Labor Dept

Lisa Burrell
June 7, 2019

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
MOHAMMED QUADIR,

                              Plaintiff,

          -against-        Case Nos.:
                           16-CV-7476
                           17-CV-5177


DEPARTMENT OF LABOR,

                              Defendant.
-------------------------------------------X
1                        500 Pearl Street
                         New York, New York
2                        June 7, 2019
                         11:03 a.m.
3

4

5        DEPOSITION of a Non-Party Witness,

6   LISA BURRELL, taken by the respective parties,

7   pursuant to a Subpoena and to the Federal Rules of

8   Civil Procedure, held at the above time and place,

9   before Nicole Ellis, a Notary Public of the State

    of New York.

Page 2

A P P E A R A N C E S :


MOHAMMED QUADIR, Pro Se
      120 Alcott Place, Apartment 2A
      Bronx, New York 10475


MICHAL A. BERG, ESQ.
ASSISTANT ATTORNEY GENERAL
STATE OF NEW YORK
      28 Liberty Street
      New York, New York 10005
      michael.berg@ag.ny.gov

1
2   ALSO PRESENT:
3        ROBERT F. AXISA, Litigation Director
         NYS Department of Labor
4

5

6

7

8

9

Page 3

          F E D E R A L   S T I P U L A T I O N S

Page 3

         IT IS HEREBY STIPULATED AND AGREED, by and

    between the attorneys for the respective parties

    herein that the sealing, filing and certification

    of the within deposition be waived;

         That such deposition may be signed and sworn

    to before any officer authorized to administer an

    oath with the same force and effect as if signed

1   and sworn to before the officer before whom said

2   deposition was taken;

3        IT IS FURTHER STIPULATED AND AGREED that all

4   objections except as to form, are reserved to the

5   time of trial.

6

7

8

9


                    *    *    *    *

Mohammed Quadir v.
NYS Labor Dept

Lisa Burrell
June 7, 2019

Page 4

L. Burrell
1        L. Burrell
2  L I S A   B U R R E L L, called as a witness,
3  having been first duly sworn by a Notary Public of
4  the State of New York, was examined and testified
5  as follows:
6  EXAMINATION BY
7  MR. QUADIR:
8    Q.    Please state your name for the record.
9    A.    Lisa Burrell.
10   Q.    What is your address?

Page 5

L. Burrell
1        L. Burrell
2  Room 561, Albany, New York.
3    Q.    That's where you live, Albany, New
4  York?
5           MR. BERG: Objection to form.
6    A.    That's where I work.
7    Q.    How did you get to the courthouse
8  today?
9    A.    Train.
10   Q.    You took the train in?
11   A.    Yes.
12   Q.    Is there anything that's preventing
13  you from giving accurate or truthful answers today?
14   A.    No.
15   Q.    Are you on any prescription drugs?
16   A.    No.
17   Q.    Has anybody threatened you against
18  testifying today in any way?
19   A.    No.
20   Q.    How did you prepare for today's
21  deposition?
22   A.    I prepared by receiving the notice
23  that I had to report here today.  I discussed with
24  Robert Axisa where to go, what time, what train we
25  were taking down.

Page 6

L. Burrell
1        L. Burrell
2    Q.    Besides the discussion with the
3  attorney, did you discuss this case and today's
4  deposition with anybody else?
5    A.    No.
6    Q.    Did you do any preparation for today's
7  deposition?
8    A.    No.
9    Q.    Not at all?  Nothing?
10   A.    No.
11   Q.    Okay.  Do you know who I am?
12   A.    No.
13   Q.    Do you know my name?
14   A.    Yes.
15   Q.    Just for curiosity, what's my name?
16   A.    Quadir.
17   Q.    What's my first name?
18   A.    Quadir.
19   Q.    No.  I'll state for the record,
20  Mohammed is my first name.
21          Prior to today, have you ever met me,
22  obviously --
23   A.    No.
24   Q.    No, right?
25          Do you know why you're here today?

Page 7

L. Burrell
1        L. Burrell
2  Why I requested your presence today?
3           MR. BERG: Objection to form.
4    A.    No.
5    Q.    You don't?
6    A.    No.
7    Q.    What is your general educational and
8  employment history after high school?
9    A.    I worked for New York State for
10  27 years.  Graduated from high school, went to a
11  trade school for data entry.
12   Q.    Do you have an associate's degree?
13  Bachelor's degree?
14   A.    No.
15   Q.    When you say you worked for the State
16  of New York for 27 years, were all of them with the
17  Department of Labor?
18   A.    No.
19   Q.    They were not.
20          What were the other agencies with the
21  State of New York that you worked for 27 years?
22   A.    I started with the Division of
23  Criminal Justice Services.
24   Q.    What was your job title there?
25   A.    Data entry operator.

Mohammed Quadir v.
NYS Labor Dept

Lisa Burrell
June 7, 2019

Page 8

L. Burrell
1
2   Q.   And after that?
3   A.   After that, I worked for New York
4   State Division of Parole.
5   Q.   How many years was that for?
6   A.   Which one?
7   Q.   The first one.
8   A.   One year.
9   Q.   Subsequently Parole?
10  A.   Yes.
11  Q.   Subsequently one year for Parole?
12  A.   For Parole, I worked maybe four.
13  Q.   And after that, what other State
14  agency did you go to?
15  A.   Department of Crime Victim Services,
16  Office of the State Comptroller, and then
17  Department of Labor.
18  Q.   How long have you been working for the
19  New York State Department of Labor?
20  A.   Three years, going on four.
21  Q.   Four years.
22  A.   Three years, going on four.
23       MR. BERG: Objection to form.
24  Q.   Three years.
25       So this is 2019, you've been working

Page 9

L. Burrell
1
2   there since 2015, that would be accurate to say?
3        MR. BERG: Objection to form.
4   A.   I'm sorry, August of 2016. I think it
5   was '16, I'm not sure.
6   Q.   So you think you started with DOL
7   August of 2016, okay.
8        What is your present official job
9   title?
10  A.   Associate Director of Human
11  Resources I.
12  Q.   And this would be with the DOL agency,
13  right?
14  A.   Correct.
15  Q.   Since you've been working for DOL, you
16  advised since August of 2016, have you been -- have
17  you held that position since August of 2016?
18  A.   Yes.
19  Q.   You have.
20       Is that a management confidential
21  position?
22  A.   Yes, it is.
23  Q.   Since you're an associate director of
24  HR, I assume you supervise employees?
25       MR. BERG: Objection to form.

Page 10

L. Burrell
1
2   A.   Yes.
3   Q.   How many employees do you supervise?
4   A.   Seven.
5   Q.   And you don't have to give me their
6   names, what -- in general, what are their job
7   titles and how many employees in those job titles
8   out of those seven?
9   A.   Human Resources Specialist II, there's
10  two of them. Human Resources Specialist trainees.
11  Q.   How many of the trainees?
12  A.   Three.
13       Office Assistant I, three.
14  Secretary II, one.
15  Q.   It seems like it's just slightly above
16  seven, am I correct, if you do the mathematics?
17  A.   Human Resources Specialist II --
18  Q.   Would you speak up a little bit louder
19  so she can hear you.
20  A.   I have two Human Resources
21  Specialist II. I have three Human Resources
22  Specialist trainees. Office Assistant III, HR, and
23  a Secretary II.
24  Q.   They also work in Albany, New York?
25  A.   Yes.

Page 11

L. Burrell
1
2   Q.   Were you ever a supervisor to a DOL
3   personnel department employee named Kathleen Case?
4   A.   No.
5   Q.   Do you know who Kathleen Case is?
6   A.   No.
7   Q.   I'm going to give you some -- I'm
8   going to say some names to you, about four of them.
9   Please inform me as to what your relationship with
10  these following individuals are and how well you
11  know them.
12       MR. BERG: Objection to form.
13  Q.   So the question I'm asking you is:
14  What's your relationship to these four individuals
15  that I'm going to name for you one by one and how
16  well do you know them?
17       MR. BERG: Objection to form.
18  Q.   What's your relationship to Mr. Atul
19  Sheffey? Do you know who he is and how well do you
20  know him?
21       MR. BERG: Objection to form.
22  A.   No, I don't know.
23  Q.   You don't know him at all?
24  A.   No.
25  Q.   And since you don't know him at all,

Page 12

L. Burrell

1   L. Burrell
2   obviously, it would be an accurate statement to say
3   you don't communicate with him?  You can't
4   communicate with somebody you don't know?
5          MR. BERG: Objection to form.
6   A.    Correct.
7   Q.    What is your relationship to Ms. Noemi
8   Ramos?
9   A.    There's no relationship.
10  Q.    So communication also?
11         MR. BERG: Objection to form.
12  Q.    That would be a "no"?
13  A.    That's a no.
14  Q.    What is your relationship to Edna
15  Fernandez?  Do you know who she is?
16         MR. BERG: Objection to form.
17  A.    No, I do not.
18  Q.    And what is your relationship to Earl
19  Dawkins?  How well do you know him?
20         MR. BERG: Objection to form.
21  A.    I do not know him.
22  Q.    Okay.  Just like with these four
23  individuals, I'm going to ask you the question --
24  well, I think you already said it, you have no
25  relationship with me.  You even -- you didn't even

Page 13

L. Burrell

1   L. Burrell
2   know what my first name was prior to today, right?
3   A.    Correct.
4   Q.    Okay.  Do you remember that you -- and
5   I'm asking you to refresh your memory, so, you
6   know, you can say "yes" or "no," either you
7   remember it or you don't.
8          Do you remember that you sent me a
9   letter on December 19th, 2016, in which you advised
10  me that DOL was terminating my employment as a
11  labor services representative effective
12  December 15th, 2016?  Do you remember sending me a
13  letter like that?
14         MR. BERG: Objection to the form
15  of the question.
16         You're asking for her memory?
17         MR. QUADIR: I'm asking her does
18  she recall very specifically that she wrote a
19  letter on behalf of the Department of Labor,
20  that letter was dated December 19th, 2016.
21  I'll show the letter in a second, I want to
22  get her memory.
23         MR. BERG: I object to the form.
24         You can answer.
25  A.    I don't recall the exact date of the

Page 14

L. Burrell

1   L. Burrell
2   letter.  I do recall signing a letter of that
3   intent, yes.
4   Q.    Right.
5          And around December 2016?
6          MR. BERG: Objection to form.
7   A.    I don't remember the date.
8   Q.    Prior to sending me that letter
9   officially terminating me from the Labor Department
10  in December of 2016, did you ever interview or
11  question any of my LSR co-workers at the Bronx
12  office in terms of what they thought of my ability
13  to work?
14  A.    No.
15  Q.    Did you ever personally observe me as
16  a worker at the Bronx office doing my job?
17  A.    No.
18  Q.    So would it be fair to say you do not
19  have otherwise firsthand knowledge of what I was
20  doing at the job and how well or how poorly I was
21  doing?  Would that be correct to say as well?
22         MR. BERG: Objection to form.
23  A.    Yes, that would be correct.
24  Q.    Okay.  I'm going to show you some
25  documents.

Page 15

L. Burrell

1   L. Burrell
2          MR. QUADIR: Could you mark this
3   Plaintiff's 14?
4          (Whereupon, document was marked as
5   Plaintiff's Exhibit 14 for identification.)
6   BY MR. QUADIR:
7   Q.    The first page you're looking at, it's
8   a letter, right, from the Department of Civil
9   Service to me, Mohammed Quadir, dated October 5th,
10  2016?
11         MR. BERG: Objection to the form
12  of the question.  There's no foundation that
13  she knows what this is.
14         MR. QUADIR: No, I'm saying, does
15  she read that?  Can she read that's what it
16  says?
17         MR. BERG: Objection to form of
18  the question.
19  A.    Yes.
20  Q.    So the letter is from the New York
21  State Department of Civil Service addressed to
22  Mohammed Quadir, me, who's the person who is
23  questioning you today.  It's dated October 5th,
24  2016; am I correct so far?
25         MR. BERG: Object to the form of

Page 16

L. Burrell

1  L. Burrell
2  the question.  You haven't established that
3  this is a letter from anybody to anybody.  You
4  could have written this last night.
5          MR. QUADIR:  Right.  I did not and
6  it was filed in the case, and you were given
7  this document and it's part of the court case
8  already filed on July 7th, 2017, page 15 of
9  32, Document No. 2.
10         MR. BERG:  True, you couldn't have
11  written it last night.  But this witness --
12  you haven't established that this witness has
13  any knowledge that this is a letter from
14  anybody to anybody.
15         MR. QUADIR:  No, no, I'm not
16  saying she wrote the letter or anything like
17  that.  I'm just saying, is that what the
18  letter states?  That's what I'm asking you.
19  BY MR. QUADIR:
20  Q.   Having received October 5th, 2016, is the
21  letter dated from the Department of Civil Service
22  to Mohammed Quadir?
23         MR. BERG:  Object to the form of
24  the question.
25  A.   Yes.

Page 17

L. Burrell

1  L. Burrell
2  Q.   You see where it says, "Dear, Mohammed
3  Quadir"?  Do you see that?
4  A.   Yes.
5  Q.   Do you see where it says -- could you
6  just read the first paragraph after "Dear, Mohammed
7  Quadir."
8          MR. BERG:  Objection to having
9  this witness read a letter that you haven't
10  established that she had anything to do with.
11         MR. QUADIR:  No, I acknowledge --
12         MR. BERG:  I'm not telling her not
13  to answer, she can read it.
14         MR. QUADIR:  It doesn't have her
15  name on it, I know.  I'm fully aware of that.
16  BY MR. QUADIR:
17  Q.   The header is Department of Civil
18  Services.  It wasn't even officially sent to me by
19  DOL, but the Department of Civil Services is a
20  sister agency of the Department of Labor.
21         So "Dear, Mohammed Quadir," could you
22  read the first paragraph just for the record.
23         MR. BERG:  Objection.
24         You can read it.
25  A.   "Effective 7/28/2016, your New York

Page 18

L. Burrell

1  L. Burrell
2  State Health Insurance Program, NYSHIP, coverage
3  was canceled due to failure to remit payment in
4  full by the due date inclusive of the grace period.
5          "Any claims for services incurred
6  after your cancellation date will not be covered by
7  NYSHIP.  Please be advised that deliberate use of
8  benefits after termination constitutes fraud."
9  Q.   Okay.  Thank you.
10         Could you turn the page over?
11         Again, I fully concede this letter was
12  not signed by you, it wasn't -- your signature is
13  not on there, and this letter, similar to the
14  previous one, it was sent on the header of
15  Department of Civil Service.
16         Do you see where it says the letter
17  is -- it's indicating on the letter it's dated
18  October 18th, 2016?
19         MR. BERG:  Object to the form.
20  A.   Yes.
21  Q.   Do you see where it says my name,
22  Mohammed Quadir, and my address in the Bronx?
23  A.   Yes.
24  Q.   Could you read the first paragraph of
25  the letter for me, just the first one.

Page 19

L. Burrell

1  L. Burrell
2  A.   "This is to notify you that the
3  application for waiver of premium for health
4  insurance under the New York State Health Insurance
5  Program, NYSHIP, has been denied."
6  Q.   Okay.  Thank you.
7          MR. QUADIR:  Could you mark this
8  Plaintiff's Exhibit 15.
9          (Whereupon, document was marked as
10  Plaintiff's Exhibit 15 for identification.)
11  BY MR. QUADIR:
12  Q.   Ms. Burrell, do you see the document
13  right in front of you which is dated -- it's a
14  letter dated October 19th, 2016?  Do you see your
15  name on the top left-hand corner of the letter
16  where it says, "Lisa Burrell, Associate Director of
17  Personnel"?
18  A.   Yes.
19  Q.   Do you see where it says, "Dear,
20  Mr. Quadir"?
21  A.   Yes.
22         MR. BERG:  I'm going to note --
23  object to this document as what appears to be
24  a compilation of several documents, but...
25         MR. QUADIR:  Absolutely, it is.

Page 20

L. Burrell

1      It's not -- it is several, several documents
2   but dealing with the same subject matter.  So
3   that's the reason for it.
4          But I agree, there's different
5   documents, of course.  There's no -- they are
6   the same exact subject matter essentially.
7   BY MR. QUADIR:
8      Q.   Do you see where it says, "Dear,
9   Mr. Quadir"?
10     A.   Yes.
11     Q.   And below that, do you see where it
12  says numbers one and two?
13     A.   Yes.
14     Q.   And below that, you see where it says,
15  "Your request for a meeting"?
16     A.   Yes.
17     Q.   Could you read out to the point -- you
18  see where it says, "Lisa Burrell, Associate
19  Director of Personnel," you see that in the middle?
20     A.   Yes.
21     Q.   After "Dear, Mr. Quadir" to -- prior
22  to your name, could you read that out loud.
23         MR. BERG: Objection.  Why?
24         MR. QUADIR: If she doesn't want

Page 21

L. Burrell

1   to read it out loud, she can tell me -- she
2   can look at the document and she can tell me
3   what the document says.  It's up to you.
4          MR. BERG: You can read it.
5      A.   "Our records indicate that you have
6   been continuously absent from your Labor Services
7   Representative I position since October 8th, 2015.
8   After being placed on involuntary leave of absence
9   pursuant to Section 72 of the Civil Service Law due
10  to a non-work-related illness or injury.
11         "Therefore, pursuant to Section 73 of
12  the Civil Service Law, we propose to terminate your
13  employment on November 7th, 2016, close of business
14  if you're not able to return to work and perform
15  the full duties of your position.
16         "You have a right to request a meeting
17  to discuss the proposed termination.  This meeting
18  will be limited in scope to the following areas:
19  One, has there been a continuous year of absence
20  due to a non-occupational disability?  Two, are you
21  medically unable to return to work and perform the
22  full duties of your position?
23         "Your request for a meeting must be in
24  writing and should specify the reason for your

Page 22

L. Burrell

1   dispute.  Your written request must be sent by
2   certified or registered mail within ten working
3   days of receipt of this letter too."
4      Q.   So the letter is dated October 18th,
5   2016, it's under your name, Lisa Burrell, the
6   associate director of personnel.
7          In this letter, you're advising me
8   that you're proposing to terminate me effective
9   November 7th, 2016; am I correct?
10         MR. BERG: Objection to form.
11         You can answer.
12     A.   Yes.
13     Q.   And if I object to the termination, my
14  recourse was to send a certified mail within ten
15  working days of the receipt of this letter.  Would
16  that be correct as well?
17     A.   Yes.
18     Q.   Okay.  Thank you.
19         Could you turn the document over to a
20  document that says "PDF16."
21         MR. BERG: This is the third page
22  of the exhibit, right?
23         MR. QUADIR: Yeah, the exhibit
24  deals with the same subject matter.

Page 23

L. Burrell

1          MR. BERG: I'm just saying this is
2   one, two, three.
3          THE WITNESS: My copy doesn't say
4   PD-anything.
5          MR. QUADIR: No, it definitely
6   doesn't because you don't need to know the
7   numbers.  He needs to know the PDF numbers.
8   I'm doing that because of him, you're not
9   defending or prosecuting the case.
10         You need to just look at the
11  document, you don't need to know what PDF
12  number.
13         THE WITNESS: Well, you referred
14  to it, so that's why I was looking for it.
15         MR. QUADIR: Sorry, I apologize.
16  BY MR. QUADIR:
17     Q.   So do you see what it says here?  What
18  does it look like to you?
19     A.   It's a receipt for certified mail.
20         MR. BERG: I'm sorry.  Are there
21  any other differences between what you're
22  giving the witness and what you're giving me
23  other than --
24         MR. QUADIR: That is it, PDF16,

Mohammed Quadir v.
NYS Labor Dept

Lisa Burrell
June 7, 2019

Page 24

L. Burrell
1
2 that is it.  No other differences whatsoever.
3      This is for you to take home, you
4 check the records, you'll see, I gave you a
5 PDF16.  I e-mailed them to you and also gave
6 it to you on the CD as well.
7 BY MR. QUADIR:
8      Q.    What was your answer regarding these
9 two different documents?  Not only this, also the
10 next page.  If you turn to the next page.
11      A.    Which one do you want me to refer to
12 first?
13      Q.    Refer to the one -- the page that
14 you're on right now.
15      A.    There are receipts for certified mail
16 sent.
17      Q.    And who were the certified letters
18 mailed to -- sent to?
19      A.    It was sent to you.  It was sent to
20 you, the mail.
21      Q.    Is this the page you're looking at?
22      A.    I'm sorry, who was it sent to?  It was
23 sent to me, Lisa Burrell, I apologize.
24      Q.    And that is your work address, State
25 Campus Building 12, Room 561?

Page 25

L. Burrell
1
2      A.    Yes.
3      Q.    Okay.  Thank you.
4      The next page.  What do those two
5 documents look like to you?
6      MR. BERG: Object to the form of
7 the question.
8      A.    They look like receipts of some sort.
9      Q.    Right.
10      MR. QUADIR: I am asserting, I'm
11 vouching that those are the receipts -- that's
12 how much it cost me to send her the certified
13 mail through return receipt requested.  And
14 that's the return receipt that I got in the
15 mail.  That's what I'm vouching, that's what
16 I'm saying.  I don't know if you want to take
17 it up with the judge, if you think my
18 assessment is wrong, you are free to do so
19 later, but that's what my position is.
20      The reason sometimes I will do
21 that is because I don't have the benefit of
22 having a lawyer.  If I had a lawyer, the
23 lawyer would say because Mr. Quadir's
24 position, this is a document he received as a
25 receipt from the U.S. Post Office.

Page 26

L. Burrell
1
2      Since I don't have a lawyer, I
3 have to make this assertion on my own behalf.
4 BY MR. QUADIR:
5      Q.    And the next document, please.  I'll
6 give you the option, you can read the entire
7 document or you can just read it out loud or you
8 can read it to yourself, and tell me what the
9 document says, it's up to you.
10      A.    Which do you want me to do?
11      MR. BERG: Why don't you read it
12 out loud into the record because that way you
13 will state in the record most accurately what
14 the document states.
15      A.    "Ms. Burrell, I'm in receipt of the
16 October 19, '16 termination notice sent to me by
17 the New York State Labor Department pertaining to
18 my continued employment with it as a labor services
19 representative, LSR.
20      "The notice informs if I wish to
21 contest the proposed termination pursuant to
22 Section 73 of the Civil Service Law, I need to
23 request a meeting.  Such a request could only be
24 effectuated by me sending a letter by way of
25 certified mail, return receipt requested, addressed

Page 27

L. Burrell
1
2 to you at the DOL address listed above just below
3 your name, hence my reason for sending you this
4 letter.
5      "I am indeed requesting a meeting to
6 discuss the termination; however, please be advised
7 it is highly unlikely that I will be able to
8 provide you, i.e. DOL, with a medical note by
9 November 7th, '16, which is the proposed effective
10 date of my termination indicating that I'm able to
11 perform the essential duties of a labor services
12 representative position.  This is primarily due to
13 my lack of medical insurance coverage at the
14 moment.
15      "As you are aware, due to the Labor
16 Department putting me on forced involuntary medical
17 suspension without pay since October 7th, '15, over
18 one year ago, and now serving me with a second
19 termination notice, I no longer have health
20 insurance, and without insurance, it is very
21 expensive to see physicians.
22      "As such, I'm requesting that DOL
23 allow me until Friday, January 6th, 2017, to
24 provide it with a medical note indicating that I'm
25 ready, willing, and able to work, and have always