UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MOHAMMED QUADIR,

                Plaintiff,

      -v-

NEW YORK STATE DEPARTMENT
OF LABOR,

                Defendant.

16-CV-7476 (JPO)

---

MOHAMMED QUADIR,

                Plaintiff,

      -v-

NEW YORK STATE DEPARTMENT
OF LABOR,

                Defendant.

17-CV-5177 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

      Plaintiff Mohammed Quadir brings these related actions against his former employer, the New York State Department of Labor ("DOL"), alleging disability discrimination, failure to accommodate, and retaliation under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* DOL moves for summary judgment on all claims in both actions. For the reasons that follow, DOL's motions for summary judgment are granted.

**I.    Background**

      Quadir has filed three related actions in this Court against the DOL, which the Court refers to as *Quadir I* (13 Civ. 3327), *Quadir II* (16 Civ. 7476), and *Quadir III* (17 Civ. 5177). The Court assumes familiarity with the background of this case as set forth in its prior opinions.

1

*See Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528 (S.D.N.Y. 2014); *Quadir v. N.Y. State Dep't of Labor*, No. 13 Civ. 3327, 2016 WL 3633406 (S.D.N.Y. June 29, 2016), *aff'd*, 691 F. App'x 674 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 658 (2018); *Quadir v. N.Y. State Dep't of Labor*, No. 16 Civ. 7476, 2017 WL 4217137 (S.D.N.Y. Sept. 19, 2017).  This opinion addresses the pending motions in *Quadir II* and *Quadir III*.

The following facts are undisputed except where otherwise noted.

Beginning in 2010, Quadir was employed by DOL in its Bronx Career Center as a Labor Services Representative ("LSR").  (Dkt. No. 68[1] ("SOF") ¶ 1.)  LSRs provide services to job seekers during regular business hours.  (SOF ¶ 5.)  Quadir's responsibilities as an LSR "included meeting individually with job seekers, assessing their skills, assisting in preparing their resumes, and matching them with available job postings."  (SOF ¶ 4.)

From April 15, 2013, to April 11, 2014, Quadir was absent from work on 92 days and arrived to work late 145 times.  (SOF ¶ 8.)  And from April 15, 2014, to April 15, 2015, Quadir was absent from work 97 days and arrived to work late 146 times.  (SOF ¶ 9.)  DOL asserts that it took several measures to address Quadir's absences and late arrivals.  In 2014 and 2015, Quadir was counseled several times regarding his absenteeism, tardiness, and failure to follow the proper procedure for reporting unscheduled absences and late arrivals.  (SOF ¶ 15.)  In April 2015, Quadir received a performance rating of "unsatisfactory" during his annual evaluation.  (SOF ¶ 22.)  He was rated unsatisfactory in several respects, and the evaluation noted that his "extensive absenteeism and tardiness disrupted the operations of the Bronx Career Center."  (SOF ¶¶ 23–24.)  Further, Quadir was served with two disciplinary notices, one in June 2015 and one in May 2016, due to his poor attendance record.  (SOF ¶¶ 17–18.)

---

[1] All docket citations herein refer to *Quadir II*, No. 16 Civ. 7476.

On November 12, 2014, Employment Services Manager Atul Sheffey met with Quadir and discussed several topics including his late arrivals to work. (SOF ¶¶ 3, 25.) Quadir notes that while he did not "very specifically and very directly" ask for an accommodation, he informed Sheffey that he was chronically late due to his disability. (Dkt. No. 92 ("CSOF") ¶ 26.) Quadir asserts that he was "in effect" requesting an accommodation to come in later in the mornings, an accommodation that Sheffey denied. (*Id.*) Sheffey maintains that Quadir did not ask him "to arrive late to work as an accommodation for an asserted disability." (SOF ¶ 26.)

In August 2015, DOL asked the Employee Health Service ("EHS") to undertake a medical examination of Quadir and determine whether he was fit to remain an LSR "in response to concerns about [his] high rate of tardiness and absenteeism and his behavior when he [was] in the office." (SOF ¶¶ 31–32.) The EHS-appointed psychologist found that Quadir was not fit to perform his job duties. (SOF ¶¶ 33–34.) Based on this report, EHS's Medical Director, Dr. Richard Ciulla, advised DOL that Quadir was unfit to perform the duties of an LSR. (SOF ¶ 35.) DOL subsequently placed Quadir on involuntary medical leave, effective October 8, 2015. (SOF ¶ 36.) In January 2016, Quadir requested reinstatement. (SOF ¶ 37.) In response, DOL requested that EHS arrange a second medical evaluation for Quadir. (SOF ¶ 38.) A new EHS-appointed psychologist also found that Quadir was unfit to perform his job duties. (SOF ¶¶ 38–39.) Dr. Ciulla reviewed this new report and again advised DOL that Quadir could not perform the duties of an LSR. (SOF ¶ 40.) As a result, DOL denied Quadir's reinstatement request on March 28, 2016. (SOF ¶ 41.) Quadir administratively appealed his suspension, but it was upheld by a Neutral Hearing Officer on April 11, 2016. (SOF ¶¶ 42–43.) That determination was adopted by DOL a week later. (SOF ¶ 46.) Quadir appealed DOL's

determination to the New York Civil Service Commission, which affirmed DOL's decision on February 28, 2017.  (SOF ¶ 47.)

While Quadir was on involuntary medical leave, New York State discontinued its contributions toward his health insurance premiums.  (SOF ¶ 49.)  When the state ends its contributions, employees' policies are cancelled if they do not pay the full premium.  (*Id.*)  Quadir notes that he requested a waiver-of-premium form from DOL, and his application was ultimately denied.  (CSOF ¶ 50.)  Sometime after the denial of the waiver, Quadir's health insurance was cancelled due to non-payment.  (*See* SOF ¶ 50.)

Quadir remained on involuntary medical leave from October 8, 2015, until he was terminated effective December 15, 2016.  (SOF ¶ 51.)  On October 19, 2016, after Quadir had been on involuntary medical leave for over a year, the point at which DOL typically terminates such employees, DOL notified Quadir of its intent to terminate him.  (SOF ¶¶ 52–53.)  Quadir was advised that he could apply for restoration to duty prior to the date of his termination if he submitted medical documentation affirming that he could return to work without restrictions. (SOF ¶ 54.)  Quadir notes that he requested an extension until January 6, 2017, to submit his request, which was denied.  (CSOF ¶ 54.)  In any event, Quadir was advised that he was terminated effective December 15, 2016, due to the length of his involuntary medical leave and because he had not provided documentation demonstrating that he could return to work.  (SOF ¶ 56.)  Quadir administratively appealed his termination, which was affirmed by a Neutral Hearing Officer on August 5, 2017.  (SOF ¶¶ 57–58.)

## II.     Legal Standard

Summary judgment under Rule 56 is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."

4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense."  *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).  "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence."  *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014).  The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted) (second quoting *Lunds, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

**III.    Discussion**

    **A.    Disability Discrimination Claims**

To establish a *prima facie* Rehabilitation Act discrimination claim, a plaintiff must show: "(1) plaintiff's employer is subject to the Rehabilitation Act; (2) plaintiff was disabled within the meaning of the Rehabilitation Act; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of her disability."  *Quadir I*, 2016 WL 3633406, at *5 (quoting *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004) (alterations omitted)).

DOL argues that Quadir was not otherwise qualified to perform the essential functions of his job due to his chronic absences and lateness.  "[R]egularly attending work is an essential

5

function of virtually every job." *Vandenbroek v. PSEG Power CT LLC*, 356 F. App'x 457 (2d Cir. 2009) (summary order) (citation omitted).  Quadir's rate of absences and late arrivals is staggering — it is undisputed that from April 15, 2013, to April 11, 2014, Quadir was absent 92 days and was late 145 times (SOF ¶ 8), and that from April 14, 2014, to April 14, 2015, Quadir was absent 97 days and was late 146 times (SOF ¶ 9).

In further support, DOL has offered evidence that punctuality and attendance were especially essential to the LSR role.  The Bronx Career Center is one of the busiest DOL facilities in New York State, serving an average of 500 to 600 people a week.  (SOF ¶ 6.)  That work must be performed during regular business hours, when job seekers are allowed to visit the facility.  (SOF ¶ 5.)  Additionally, when Quadir appealed his involuntary medical leave to the agency, Neutral Hearing Officer Campagna held that "it is clear . . . that regular attendance is an essential job function" because the role requires "face-to-face interaction with customers and employers and teamwork."  (Dkt. No. 74-8 at 14.)  Campagna's findings were fully adopted by the DOL and affirmed by the Civil Service Commission.  (*See* Dkt. Nos. 74-9, 74-10.)  Moreover, the disruption that Quadir's absence caused was not theoretical.  Quadir's supervisors noted that his "excessive absences and late arrivals to work frequently disrupted the efficient operations of the Bronx Career Center, inconvenienced job seekers whose appointments had to be delayed or rescheduled, and imposed burdens on other LSRs who were tasked with additional work in [Quadir's] absence."  (Dkt. No. 69 ¶ 12; *see* Dkt. No. 70 ¶¶ 20–21.)

Quadir advances no evidence that punctuality and attendance were not essential functions of the job, nor does he offer any evidence that DOL's records of his absences were somehow erroneous.  Instead, he first seeks to explain his absences, arguing that up to 40% of those absences were due to "supervisory harassment."  (*See* Dkt. No. 88 at 4 (noting that he "had been

6

disciplined and written up so many times and . . . found the environment so stressful that [he] often found it difficult to come to work.").) It is unclear whether Quadir's increased distress over his work environment was, at least in part, due to his disability. However, employers are not required "to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability." *Lewis v. N.Y.C. Police Dep't*, 908 F. Supp. 2d 313, 337 (E.D.N.Y. 2012), *aff'd*, 537 F. App'x 11 (2d Cir. 2013) (summary order) (quoting *Mescall v. Marra*, 49 F. Supp. 2d 365, 374 n.18 (S.D.N.Y. 1999)). Therefore, the reasons why Quadir found himself unable to attend work are irrelevant. Because he indisputably was unable to show up to work regularly, he was not otherwise qualified to perform the essential functions of his job as a matter of law.

For similar reasons, Quadir's argument that he was qualified for his position aside from his absences is unavailing. (*See, e.g.*, Dkt. No. 88 at 9 (noting that he "was not only meeting, but exceeding DOL's numerical performance metrics.").) However, "[t]o be a qualified individual, 'in addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate those skills by coming to work on a regular basis.'" *Ramirez v. N.Y.C. Bd. of Educ.*, 481 F. Supp. 2d 209, 221 (E.D.N.Y. 2007) (quoting *Mescall*, 49 F. Supp. 2d at 374) (second alteration omitted). Therefore, it is irrelevant whether Quadir was performing on other metrics, because it is undisputed that he failed to come to work regularly — an essential function of his job. Accordingly, Quadir's disability discrimination claims must be dismissed.

### B.  Reasonable Accommodation Claims

To establish a claim for failure to make reasonable accommodations under the Rehabilitation Act, a plaintiff must show that "(1) the plaintiff is a person with a disability under the meaning of the Act; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, the plaintiff could perform the essential functions of the job at

issue; and (4) the employer has refused to make such accommodations." *Quadir I*, 2016 WL 3633406, at *2 (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)) (alterations omitted). "After this *prima facie* case is established, an employer can defeat such a claim if it shows '(1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue.'" *Id.* (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)). "Although a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) (citation omitted).

Quadir argues that DOL "repeatedly denied [his] reasonable accommodation requests to come to work a little later in the morning at reduced pay." (CSOF ¶¶ 8–9; *see also* Dkt. No. 2-1 at 19 (alleging that DOL denied his request for "an alternative work schedule or grace period, which would have allowed him to report to work [at about] 9:30 or 9:45 [a.m.].").) DOL counters that Quadir never made any such accommodation request. Quadir concedes that while he did not "very specifically and very directly" request an accommodation, he apprised Sheffey of the fact that he was continually late due to his disability and Sheffey failed to accommodate him with an alternative work schedule. (CSOF ¶ 26; SOF ¶ 26.) As evidence of this denial, he offers an email sent by Sheffey in which Sheffey acknowledged that Quadir "said he was late because of [his] illness," but stated that he still needed to be on time for work. (Dkt. No. 70-2.) It is true that "generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) (citation omitted). However, even if no request is made, "an employer has a duty to reasonably accommodate an employee's disability . . . if the employer knew or reasonably

8

should have known that the employee was disabled." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (noting that the ADA and Rehabilitation Act are typically considered to impose identical requirements).  DOL was aware that Quadir's chronic lateness was due to his disability (*see* Dkt. No. 70-2), and therefore a lack of notice does not bar Quadir's claim.

However, the requested accommodation was not reasonable as a matter of law.  "[A] reasonable accommodation can never involve the elimination of an essential function of the job." *Maysonet v. Valley Nat'l Bank*, No. 17 Civ. 3939, 2019 WL 1368327, at *5 (S.D.N.Y. Mar. 25, 2019) (quoting *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003)).  As discussed *supra* Section III.A, punctuality and attendance were essential job functions.  And allowing Quadir to come in thirty to forty-five minutes late each day would definitionally mean that he would not be at work during full business hours — the hours at which job seekers utilized DOL's services.  (*See* Dkt. No. 69 ¶ 11.)

Even if the requested accommodation did not eliminate an essential function, courts may "grant summary judgment[] for defendants in cases in which the plaintiff's proposal is . . . clearly ineffective." *Borkowski*, 63 F.3d at 139.  Setting aside his tardiness, Quadir missed over ninety days of work a year from April 2013 to April 2015.  (SOF ¶¶ 8–9.)  There is no indication that allowing Quadir to work on a later schedule would have alleviated his chronic absenteeism and allowed him to show up for work regularly.

Because Quadir's proposal would eliminate an essential function of the role and the proposal is clearly ineffective, Quadir's reasonable accommodation claims must be dismissed.

### C. Retaliation Claims

To establish a claim for retaliation under the Rehabilitation Act, a plaintiff must show that "'(1) she engaged in an activity protected by the Rehabilitation Act; (2) the employer was

9

aware of this activity; (3) the employer took an adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity,' that is, the employer acted with a retaliatory motive." *Quadir I*, 2016 WL 3633406, at *6 (quoting *Caskey v. Cty. of Ontario*, 560 F. App'x 57, 58 (2d Cir. 2014)) (alterations omitted). "In the retaliation context, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

"Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) (internal quotation marks and citation omitted).

Quadir claims that he was subjected to a litany of adverse employment actions in retaliation for his litigation of *Quadir I*. As an initial matter, Quadir asserts that the "disciplinary write-ups, emails and counseling sessions" that he had been subject to were retaliatory. (*See* Dkt. No. 88 at 2.) However, any counseling memos, and by extension the counseling sessions that produced them, do not qualify as adverse employment actions. As this Court previously held in *Quadir I*, "counseling memos . . . which note Quadir's absenteeism and tardiness issues, are concededly not disciplinary in nature and would not have deterred a reasonable employee from engaging in protected activity." 2016 WL 3633406, at *7 (citing *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011)). Further, while the two disciplinary

10

notices issued to Quadir threatened suspension and termination (*see* Dkt. Nos. 74-3, 74-4), "the threat of disciplinary action, without more, does not constitute an adverse employment action." *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 407 (S.D.N.Y. 2014).  Additionally, Quadir himself has acknowledged that no consequences flowed from either of these notices. (*See* Dkt. No. 73-1 at 52:4–16.)  Accordingly, the disciplinary notices cannot form the basis of a retaliation claim.  Similarly, any emails likewise do not qualify as adverse employment actions in the absence of any material consequences that resulted.  *See Tepperwien*, 663 F.3d at 571 (noting that "trivial harms" such as "petty slights or minor annoyances . . . are not materially adverse" (citation omitted)).

Quadir further complains that he was subject to "full restrictions" in retaliation for *Quadir I*.  (*See* Dkt. No. 88 at 2.)  "[F]ull restrictions refers to the process of strictly monitoring an employee's time and attendance, and requiring the employee to provide medical documentation for every unscheduled partial or full-day absence . . . . If the employee does not provide medical documentation," the employee will not be compensated for the absence.  (Dkt. No. 70 ¶ 29 (emphasis omitted).)  As an initial matter, his complaint on this score is time-barred. *Quadir II* only covers acts that "took place between June 8, 2014, and November 6, 2015." *Quadir II*, 2017 WL 4217137, at *2.  However, Quadir was placed on full restrictions in April 2014.  *Quadir I*, 2016 WL 3633406, at *6.

And this question was fully litigated in the previous lawsuit.  In *Quadir I*, this Court noted that "[p]lacement on full restrictions may have inconvenienced Quadir, but inconvenience and scrutiny from management are not, alone, sufficient to constitute an adverse employment action."  2016 WL 3633406, at *6.  Quadir now argues that placement on full restrictions prevented him from accruing leave — essentially costing him "tens of thousands of dollars."

11

(Dkt. No. 88 at 12.)  Whether or not that is accurate, this Court previously noted that Quadir's placement on full restrictions "furthered a legitimate goal, especially given his attendance record." *Quadir I*, 2016 WL 3633406, at *7.  Quadir did not then, nor does he now, offer any evidence that DOL's explanation of his continued placement on full restrictions was somehow pretextual, given that his attendance did not improve.  (*See* Dkt. No. 69 ¶ 61.)  Accordingly, Quadir's placement on full restrictions was not retaliatory as a matter of law.

Next, Quadir complains of the unsatisfactory evaluation that he received in April 2015.  He asserts that as a result of that negative evaluation, he was denied a pay raise.  (Dkt. No. 88 at 8.)  However, DOL advances a legitimate reason for the unsatisfactory evaluation — Quadir's excessive absenteeism and its impact on Bronx Career Center operations.  (*See* Dkt. No. 69 at Dkt. No. 69-10 at 8.)  The only evidence that Quadir offers as pretext is the notion that he was satisfactory in other areas of his job.  (*See* CSOF ¶¶ 22–23.)  However, DOL offers evidence that Quadir's "deplorable attendance record would have resulted in an overall performance rating of unsatisfactory even if his work had been satisfactory in all other respects, which . . . it was not." (Dkt. No. 69 ¶ 62.)  Quadir does not dispute his chronic absences, nor does he offer any evidence that an unsatisfactory performance rating based even entirely on those absences was atypical or pretextual.  As this Court has already noted, attendance at work is an essential job function.  As such, no rational factfinder could find, without more, that merely being satisfactory in other areas is sufficient evidence of pretext under the circumstances.  Accordingly, all retaliation claims based on the April 2015 unsatisfactory evaluation are dismissed.

Quadir further argues that his involuntary medical suspension, as well as the denial of his request for reinstatement, was retaliatory.  However, both his involuntary medical suspension and the denial of his request for reinstatement were based on independent evaluations.  New

York Civil Service Law § 72(1) allows an agency to place an employee on leave if a "medical officer [selected by EHS] . . . certif[ies] that such employee is not physically or mentally fit to perform the duties of his or her position."  In August 2015, due to Quadir's frequent absenteeism and lateness, DOL requested such an examination.  (*See* Dkt. No. 71-1.)  After evaluating Quadir, an independent psychologist found that he was unfit to perform the duties of an LSR.  (Dkt. No. 71 ¶¶ 32–33.)  DOL asserts that Quadir was suspended solely as a result of that evaluation.  (Dkt. No. 74 ¶ 33.)  Quadir administratively appealed his suspension, but the suspension was upheld by the hearing officer.  (*See* Dkt. No. 74-8.)  The hearing officer's determination was adopted by the DOL and affirmed by the Civil Service Commission.  (*See* Dkt. Nos. 74-9, 74-10.)  When Quadir sought to be reinstated in January 2016, DOL requested another full medical evaluation.  (Dkt. No. 74 ¶¶ 34–35.)  He was again found unfit by another independent psychologist, and his request for reinstatement was denied.  (Dkt. No. 74 ¶¶ 36–38.)

      Quadir spends the bulk of his opposition pointing to perceived flaws in the reports of the psychologists who evaluated him and offers the fact that his EHS-appointed psychologists are married to each other as evidence of bias.  (*See* Dkt. No. 88.)  However, even if Quadir is correct, these facts do not constitute evidence that DOL's reliance on those reports when it decided to suspend Quadir was pretextual.  Further, because Quadir's suspension was upheld by an "independent, neutral, and unbiased adjudicator," the decision is "highly probative of the absence of discriminatory intent."  *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002).  Because Quadir does not offer any evidence that either DOL's proffered reasons for requesting the medical evaluations or its reliance on those evaluations were pretextual, his retaliation claims based on his involuntary medical suspension must be dismissed.

Quadir also argues that the termination of his medical insurance and the denial of his request to not pay the full premium were retaliatory.  However, this is simply a consequence of his involuntary medical suspension.  As a matter of course, New York State does not "contribute toward health insurance premiums for employees on unpaid leave."  (Dkt. No. 74 ¶ 40.)  To remain enrolled in his health insurance, Quadir was required to pay the entire premium.  (*Id.*)  Ultimately, his insurance was cancelled for failure to pay the premium.  (Dkt. No. 74 ¶ 41.)  DOL asserts that it "did not initiate the cancellation, and did not have any authority to continue [Quadir's] coverage."  (*Id.*)  Quadir only asserts in defense that he received the waiver form from DOL, and that a DOL employee provided him with an incorrect figure regarding the cost of his premium.  (CSOF ¶¶ 49–50.)  However, even if true, this evidence does not show that DOL had any control over whether Quadir kept his insurance.  Because Quadir cannot show that DOL "took [this] adverse employment action against [him]," *Quadir I*, 2016 WL 3633406, at *6 (quoting *Caskey*, 560 F. App'x at 58), any retaliation claims based on his loss of medical insurance must be dismissed.

Finally, Quadir argues that DOL's retaliation against him for the litigation of *Quadir I* culminated in his termination.  However, New York law provides that if an employee placed on involuntary medical leave under New York Civil Service Law § 72 "is not reinstated within one year after the date of commencement of such leave, his or her employment status may be terminated."  N.Y. Civ. Serv. Law § 72(4).  DOL asserts that it typically terminates any employee who is on involuntary medical leave for more than a year.  (Dkt. No. 72 ¶ 9.)  DOL maintains that the only reasons that Quadir was terminated were the length of time he had been on involuntary medical leave and the fact that he had failed to submit any medical evidence showing that he was fit to return to work.  (Dkt. No. 72 ¶ 27.)  Quadir administratively appealed

14

his termination, which was upheld by a neutral hearing officer.  (*See* Dkt. No. 74-15.)  Quadir contests none of these facts, arguing only that he was denied an extension to submit evidence that he was able to return to work.  (*See* CSOF ¶¶ 56–57.)   However, this is not evidence that DOL's reason for terminating him was pretextual.  In the absence of any evidence of pretext, any retaliation claims based on his termination must be dismissed.

In sum, because Quadir does not advance evidence that any adverse actions taken against him by DOL were in retaliation for his litigation of *Quadir I*, no reasonable jury could find in his favor on his retaliation claims.  Accordingly, those claims must be dismissed.

## IV.    Conclusion

For the foregoing reasons, Defendant's motions for summary judgment are GRANTED.

The Clerk of Court is directed to close the motions at Docket Number 66 in No. 16 Civ. 7476, and Docket Number 39 in No. 17 Civ. 5177, enter judgment on behalf of Defendant, and close both of these cases.

SO ORDERED.

Dated: June 1, 2020
         New York, New York

_____
                         J. PAUL OETKEN
                         United States District Judge

15